## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - -  x
                         :

In re:                       :    Chapter 11
                         :

DELTA PETROLEUM, et al.,    :    Case No. 11-14006 (KJC)
                         :

       Debtors.        :    Jointly Administered
                         :

- - - - - - - - - - - - - - - - - - - -  x
DELTA PETROLEUM GENERAL    :
RECOVERY TRUST, and PAR     :
PETROLEUM CORPORATION,    :
                         :
                         :    Adv. Pro No. 12-50898 (KJC)
       Plaintiffs,     :
v.                      :
                         :

BWAB LIMITED LIABILITY COMPANY, :
                         :
  Defendant, Counterclaimant.  x

## BWAB'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56 AND FED. R. BANKR. P. 7056 (Adv. D.I. 34)

BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP

Raymond H. Lemisch (No. 4204)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
(302) 442-7010

JONES & KELLER, P.C.

Barry L. Wilkie (Colo. Bar No. 10751)
Stuart N. Bennett (Colo. Bar No. 5682)
1999 Broadway, Suite 3150
Denver, CO 80202
(303) 573-1600

*Counsel to BWAB Limited Liability Company*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT .......................................................................... 1

NATURE AND STAGE OF PROCEEDINGS ................................................... 3

SUMMARY OF ARGUMENT ............................................................................ 4

STATEMENT OF FACTS ................................................................................... 6

ARGUMENT ...................................................................................................... 15

    I.    The 1994 BWAB ORRI was a conveyance from Whiting to BWAB, is not and never was property of Delta's bankruptcy estate, and cannot have been and was not extinguished by Delta under its Plan. ............................................. 15

    II.   The 1999 BWAB ORRI is a real property interest and is not avoidable. .............. 18

        A.  The 1999 BWAB ORRI is a real property interest. ........................................ 18

        B.  Plaintiffs are judicially estopped from claiming the 1999 BWAB ORRI is anything but a real property interest. .............................................. 21

        C.  The 1999 BWAB ORRI is not avoidable because the transfer was not a transfer that could have been perfected against a bona fide purchaser under applicable law. .................................................................................. 23

    III.  Even if the Court determines the ORRIs are personal property interests, the confirmation of the Plan did not strip BWAB of its interests because BWAB had no claim at the time of confirmation. ................................................ 25

        A.  Movants cite inapplicable caselaw in arguing that BWAB had a "claim" which was "extinguished." ............................................................ 29

    IV.  The Motion should be denied as to the alleged "excess" payments. ..................... 31

        A.  Summary judgment as to the allegedly "excess" payments is not appropriate at this time as demonstrated by BWAB's 56(d) Motion ........... 32

        B.  The alleged "excess" payments neither constitute unjust enrichment, nor do they constitute fraudulent transfers, nor are they avoidable under the Bankruptcy Code ......................................................................... 34

        C.  The existence of disputed issues of material fact concerning BWAB's affirmative defenses compels the denial of the Motion as to the alleged miscalculation of the 1994 ORRI. ................................................. 36

    V.   The Motion should be denied because the Bullock Declaration upon which it relies lacks foundation. ................................................................................... 38

CONCLUSION ................................................................................................... 40

# TABLE OF AUTHORITIES

## CASES

*Akmakjian v. Haider*, 2008 WL 484335 (Cal. App. 4th Feb. 25, 2008) ........................ 19

*Austin v. Hallmark Oil Co.*, 134 P2d 777 (Cal. 1943) ................................................... 18

*Bothin v. The California Title Ins. Co.*, 96 P. 500 (Cal. 1908) ...................................... 25

*Butner v. United States*, 440 U.S. 48 (1979) ................................................................. 18

*Far W. Sav. & Loan Assn. v. McLaughlin*, 246 Cal. Rptr. 872 (Cal. App. 1988) .......... 25

*Gillan v. Stansbury*, 217 P2d 1016 (Cal. App. 1950) .................................................... 18

*Grynberg v. Waltman*, 946 P.2d 473 (Colo. App. 1996) .......................................... 29, 30

*Harris v. 25 Hill Properties, Inc.*, 2007 WL 2774483 (Cal. Ct. App. Sep. 25,
    2007) ...................................................................................................................... 16, 18

*Honolulu Oil Corp. v. Kennedy*, 251 F.2d 424 (9th Cir. 1957) ............................... 16, 18

*In re Am. Home Mortg. Holding*, 458 B.R. 161 (Bankr. D. Del. 2011) ......................... 36

*In re Am. Remanufacturers, Inc.*, 2010 WL 1027803 (Bankr. D. Del. Mar. 19,
    2010) ............................................................................................................................ 39

*In re Bake-Line Group, LLC*, 359 B.R. 556 (Bankr. D. Del. 2007) .............................. 17

*In re Bridge*, 18 F.3d 195 (3d Cir. 1994) ...................................................................... 24

*In re Colonial Ctr., Inc.*, 156 B.R. 452 (Bankr. E.D. Pa. 1993) ................................... 18

*In re Day*, 443 B.R. 338 (Bankr. D.N.J. 2011) ............................................................. 24

*In re Dean*, 317 B.R. 482 (Bankr. W.D. Pa. 2004) ....................................................... 29

*In re Dyckman*, 2012 WL 1302613 (Bankr. M.D. Pa. Apr. 16, 2012) .......................... 18

*In re Exide Technologies*, 2013 WL 85193 (Bankr. D. Del. Jan. 8, 2013) .......... 22, 26, 27, 30

*In re Foothills Texas, Inc.*, 476 B.R. 143 (Bankr. D. Del. 2012) .................................. 16

*In re Granati,* 307 B.R. 827 (E.D.Va. 2002) ............................................................ 26, 29

*In re Hathaway Ranch P'ship*, 127 B.R. 859 (Bankr. C.D. Cal. 1990) ......................... 24

*In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461 (Bankr. D. Del. 2006) ......................... 35

*In re Hurst*, 27 B.R. 740 (Bankr. E.D. Tenn. 1983) .................................................... 24

*In re Investment Sales Diversified, Inc.,* 38 B.R. 446 (Bankr. D. Minn. 1984) ............................ 24

*In re Network Access Solutions, Corp.*, 330 B.R. 67 (Bankr. D. Del. 2005) ......................... 36, 38

*In re Nielsen*, 1998 WL 3379 (Bankr. D. Minn. Jan. 7, 1998) ...................................................... 17

*In re Reynolds*, 470 B.R. 138 (Bankr. D. Colo. 2012) ................................................................... 22

*In re Safety-Kleen Corp.*, 410 B.R. 164 (Bankr. D. Del. 2009) ..................................................... 20

*In re Texaco Inc.*, 254 B.R. 536  (Bankr. S.D.N.Y. 2000) ............................................................. 26

*In re Yepremian*, 116 F.3d 1295 (9th Cir. 1997) .......................................................................... 24

*Kabayan v. Yepremian*, 190 B.R. 389 (C.D. Cal. 1995) ............................................................... 24

*Kudokas v. Balkus*, 26 Cal. App. 3d 744 (Cal. Ct. App. 1972) ..................................................... 19

*La Laguna Ranch Co. v. Dodge*, 114 P.2d 351 (Cal. 1941) .......................................................... 18

*Leeds LP v. U.S.*, 2010 WL 3070349 (S.D. Cal., August 5, 2010) .......................................... 19, 20

*Martin v. Kehl*, 145 Cal. App. 3d 228 (Cal. App. 2nd 1983) ........................................................ 19

*Martinez v. Barrios*, 2009 WL 3402314 (Cal. App. 2nd Oct. 23, 2009) ....................................... 19

*Missouri Breaks, LLC v. Burns*, 791 N.W. 2d 33 (N.D. 2010) ............................................... 30, 31

*Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773
        (3rd Cir. 2001) .................................................................................................................... 22

*Moore v. Tristar Oil & Gas Corp.*, 528 F. Supp. 296 (S.D.N.Y. 1981) ................................... 16, 18

*Riley v. McDonald*, 2009 WL 1478918 (Cal. App. 6th May 26, 2009) ......................................... 19

## STATUTES

11 U.S.C. § 101 ............................................................................................................................... 26

11 U.S.C. § 363 ............................................................................................................................... 36

11 U.S.C. § 503 ............................................................................................................................... 35

11 U.S.C. § 507 ............................................................................................................................... 35

11 U.S.C. § 544 ......................................................................................................................... 23, 24

11 U.S.C. § 549 ............................................................................................................................... 35

11 U.S.C. § 726.................................................................................................... 35

43 U.S.C. § 1333.................................................................................................. 18

Cal. Civ. Code § 1532........................................................................................... 17

Cal. Civ. Code § 19............................................................................................... 24

## OTHER AUTHORITIES

56 A.L.R.4th 539 (Originally published in 1987)........................................................ 18

BWAB Limited Liability Company ("BWAB") by and through its attorneys, submit this Response in Opposition to Plaintiffs' Motion for Summary Judgment ("Motion") and Incorporated Memorandum of Law in Opposition Thereto.

## PRELIMINARY STATEMENT

In this case, the Plaintiffs seek to extinguish an overriding royalty that BWAB has owned since 1994 (the "1994 ORRI"). The overriding royalty was granted to BWAB by Whiting Petroleum Corporation ("Whiting")—not by either the Reorganized Debtors or the Debtor, Delta Petroleum Corporation ("Delta"). The 1994 ORRI covers various oil and gas properties off the coast of Santa Barbara, California, including certain oil and gas leases that later became known as the Point Arguello Unit.

BWAB's interest in the Point Arguello Unit actually predates even Whiting's interest. In 1994 BWAB's affiliate, BWAB Incorporated, acquired an option to purchase a large number of properties from Union Pacific Resources Corp., including the Point Arguello properties and adjacent Rocky Point properties. The option to purchase was later assigned to Whiting. The option assignment agreement required Whiting, as part of the consideration for the assignment, to grant the 1994 ORRI to BWAB. These transactions took place five years before Delta acquired any interest in the Point Arguello properties. The properties were unitized in 1996 pursuant to the October 1, 1996 Point Arguello Unit Agreement and the Point Arguello Operating Agreement. When Delta finally acquired its interest in the Point Arguello Unit in 1999, its interest was specifically subject to and reduced by the 1994 ORRI.

For the past 18 years the 1994 ORRI has been paid timely and without objection, first by Whiting and then by Delta.

Throughout its bankruptcy Delta referred to its interest in the Point Arguello Unit as a real property interest.  For the first time after the confirmation of Delta's bankruptcy plan ("Plan"), the Reorganized Debtor, not Delta, asserted in this lawsuit that the 1994 ORRI was not a real property interest but was instead only a prepetition contractual right to payment that was extinguished by the Plan.  BWAB had no notice of any kind during the bankruptcy that Delta disputed its entitlement to the 1994 ORRI or Delta's ongoing obligation to pay the 1994 ORRI from oil production revenues it received from Whiting as Whiting's nominee.

Under these circumstances, there is absolutely no basis in fact or law to extinguish the 1994 ORRI.  The Reorganized Debtors' attempt to do so is a frivolous, groundless and brazen attempt to convert BWAB's property into its own.

The Reorganized Debtors also seek to convert another overriding royalty owned by BWAB, this one conveyed by Delta to BWAB in December 1999 ("1999 ORRI").  BWAB earned the right to the assignment of the 1999 ORRI because it acted as the finder which enabled Delta to acquire Whiting's interest in the Point Arguello Unit, among other properties.  Delta acquired all of Whiting's beneficial interest in the Point Arguello Unit, but was unable to acquire bare legal title because other working interest owners objected.  After Whiting conveyed to Delta its beneficial interest (called a "Net Operating Interest" or "NOI"), Whiting received monthly revenues from production of the Point Arguello Unit and transmitted them to Delta.  From 1999 until September 2012, Delta timely distributed to BWAB the revenues owned by BWAB, per the 1994 and 1999 ORRIs, which Delta received on BWAB's behalf.  Even during Delta's bankruptcy, it continued to deliver BWAB's share of the revenues as they were received from Whiting

in the ordinary course of business.  At no time during its bankruptcy did Delta notify

BWAB that it disputed BWAB's ownership or entitlement to the 1999 ORRI or the share

of production attributable thereto.

Only after confirmation of the Plan, did the Reorganized Debtors, again not Delta,

claim for the first time in this law suit that the 1999 ORRI was either extinguished by the

Plan or that it could be avoided under the bankruptcy code.  There is, however, no legal

or factual basis for extinguishing or avoiding BWAB's ownership of the 1999 ORRI.

Finally, in an amended complaint, the Reorganized Debtors assert for the first

time that for some unspecified period over the course of many years, BWAB has been

overpaid with respect to the 1994 ORRI.  This claim asserts that Delta's subsequent grant

of the 1999 ORRI to BWAB reduces the amounts due on the 1994 ORRI that Whiting

had years before granted to BWAB.  This argument violates all common sense precepts

of real estate conveyancing law and is contrary to the express provisions of the 1994

ORRI and the subsequent NOI.

## NATURE AND STAGE OF PROCEEDINGS

BWAB largely agrees with Plaintiffs' description of the nature and stage of the

proceedings, and supplements that description by noting that in addition to this Response,

BWAB is contemporaneously filing a Motion to Permit Discovery Pursuant to Fed. R.

Bankr. P. 7056 and Fed. R. Civ. P. 56(d) Prior to Decision Regarding Plaintiffs' Motion

for Summary Judgment ("56(d) Motion").

BWAB does not, however, agree with Plaintiffs' declaration that "there are no

disputed material facts."  Motion at 3.  As set forth below, disputed material facts exist in

this case which prevent summary judgment in favor of Plaintiffs.

## SUMMARY OF ARGUMENT

1.     BWAB obtained the 1994 ORRI with respect to the Point Arguello Unit from Whiting in December, 1994.  The 1994 ORRI is a properly perfected real property interest, but whether real or personal, it is BWAB's own property and is not now and has never been the property of Delta.  Indeed, the interest of Delta and the Reorganized debtors in the Point Arguello Unit was expressly made junior to and subject to BWAB's interest when Delta acquired its property.  Nothing in Delta's chapter 11 case or the confirmation of the Plan can extinguish BWAB's separate property or covert its property into property of the Reorganized Debtors.

2.     The 1999 ORRI is a real property interest, as is Delta's NOI and Plaintiffs are estopped to deny otherwise.  Unlike the 1994 ORRI, however, it is not a perfected real property interest because it was not recorded.  There is, however, no basis to avoid the 1999 ORRI under Section 544(a)(3) of the Code.  Delta's NOI in the Point Arguello Unit was, itself, not perfected by recording, nor was its predecessor's interest, from whom Delta received its NOI, and any effort to record the 1999 ORRI would have merely been a wild deed, outside of the chain of title.  Recording the 1999 ORRI would therefore not have perfected it against a hypothetical *bona fide* purchaser which is a prerequisite to avoidance under Section 544(a)(3).

3.     The Plaintiffs argue that the 1994 ORRI and the 1999 ORRI were nothing more than contractual rights to payment and as such were prepetition unsecured claims that were extinguished upon confirmation of the Plan.  Even if construed as a personal property interests, the 1994 and 1999 ORRIs were still conveyances of property and are still BWAB's separate property.  Characterizing the interest as personal does not change

4

the property interest into a contractual interest to which Delta is a party. Neither interest was part of Delta's assets and could not have been extinguished by its Plan. Moreover, Delta paid BWAB timely all funds owned by BWAB, and therefore due to BWAB under the 1994 and 1999 ORRIs from the monies it received from Whiting until after confirmation of the Plan so at no time, either pre- or post-petition, did BWAB have a claim in the chapter 11 case.

4.    Plaintiffs also claim that BWAB was overpaid with respect to the 1994 ORRI. It is indisputable that BWAB and Whiting entered into a written agreement in 1997 setting forth the proper calculation of the 1994 ORRI. BWAB was paid consistently with the 1997 agreement with Whiting. While it is disputed whether Delta actually assumed the obligation to pay BWAB, it is undisputed that BWAB never released Whiting from the obligation to pay and never consented to any amendment of its rights under the 1994 ORRI and the 1997 Agreement with Whiting. BWAB has received exactly what it was entitled to and there is no overpayment.

5.    Finally, all sums Delta received from Whiting post-petition with respect to the 1994 ORRI were as trustee or nominee for payment of the funds to BWAB. Delta never had any interest itself in the funds and would breach the trust relationship and would convert property belonging to BWAB if the funds were now disgorged. With respect to the 1999 ORRI, Delta was obligated to pay the production revenues earned by the overriding royalty to BWAB, having previously conveyed such property to BWAB and Delta has no basis to avoid BWAB's interest or convert BWAB's funds to its own. Moreover, as to both ORRIs, the Debtor sought and obtained court approval to make such payments post-petition and such payments were made in the ordinary course of business.

## STATEMENT OF FACTS

1.      In 1994, BWAB's affiliate BWAB Incorporated acquired an option to purchase a large number of properties from Union Pacific Resources Corporation, including properties that are known as the Point Arguello Properties.  Declaration of Steven Roitman ("Roitman Dec."), attached as Exhibit A, at ¶ 7.

2.      The Point Arguello Properties are the oil and gas properties described in Exhibit 1 to the Roitman Dec.  *See* Roitman Dec. at ¶ 6

3.      Steven Roitman has been a managing member of BWAB since its inception in 1994.  Roitman Dec. at ¶ 1.  Steven Roitman has also been a 50% co-owner and the Secretary-Treasurer of BWAB Incorporated since September 15, 1992.

4.      BWAB Incorporated later assigned the option to purchase the Point Arguello Properties to Whiting pursuant to a letter agreement dated July 28, 1994, between Whiting and BWAB Incorporated ("Whiting Letter Agreement").  Roitman Dec. at ¶ 7; *id.* at Ex. 2.

5.      As part of the consideration for the assignment of the option to Whiting, BWAB Incorporated received the right to an assignment of "a proportionately reduced 3.5% overriding royalty interest out of the net revenue interest acquired by Whiting" after Whiting exercised such option.  Roitman Dec. at ¶ 8; *id.* at Ex. 2, ¶ 2.  BWAB Incorporated also had the right to elect to have its overriding royalty interest "conveyed to another of its affiliates."  *Id.; id.* at Ex. 6, ¶ 6.

6.      Whiting exercised the option and acquired the Point Arguello Properties on or about December 16, 1994, pursuant to the Whiting Letter Agreement.  Upon its acquisition of such properties, Whiting executed and delivered to BWAB, an affiliate of

6

BWAB Incorporated, an Assignment of Overriding Royalty dated December 16, 1994 in

the Point Arguello Properties ("1994 BWAB ORRI"). Roitman Dec. at ¶ 11. A copy of

the 1994 BWAB ORRI was recorded in the Official Records of the County of Santa

Barbara, California on January 25, 1995. *Id.* The 1994 BWAB ORRI was also filed with

the Minerals Management Service, Pacific OCS Region, on January 11, 1995. *Id.*

      7.      Whiting acquired its interest in the Point Arguello Properties as a direct

result of BWAB's efforts. Both Whiting's interest and BWAB's 1994 ORRI in the Point

Arguello Properties were earned or purchased five years before Delta ever had any kind

of ownership interest. *See* Roitman Dec. at ¶ 11; *id.* at Exs. 3-4.

      8.      As required by the Whiting Letter Agreement, the 1994 BWAB ORRI

contained the following language or provisions:

> a.     "Assignment of Interest: Whiting does hereby **grant, convey, assign, set over and deliver to BWAB an overriding royalty** consisting of an undivided Three and One-Half Percent (3.5%) interest in Whiting's [*i.e.* not Delta's] Net Revenue Interest from the Subject Properties, to be determined as set forth below. As used herein, the term 'Net Revenues' to the BWAB Interest shall mean the difference between (A) the gross revenues received by Whiting from the sale of its fractional or percentage share of Hydrocarbons from the Subject Properties, after the deduction of all lessors royalties, overriding royalties, and other burdens and payments out of the gross production **that burden Whiting's [*i.e.* not Delta's] fractional or percentage share**, and (B) the sum of Whiting's fractional or percentage share of third party (i) transportation expenses, (ii) treatment and processing expenses, (iii) compression expenses, and (iv) severance taxes, occupation taxes, and other like taxes based on the production of Hydrocarbons . . . ." (Roitman Dec., at Ex. 4 ¶ 1, emphasis and bracketed content added).

> b.     Although the conveyance contemplated that Whiting would initially receive BWAB's share of net revenues earned from production of oil and gas from the Point Arguello Properties, it specifically required: "On or before the 15th day of each calendar month commencing January 15, 1995, Whiting shall remit to BWAB, …BWAB's Interest attributable to the Subject Properties as to revenues received by Whiting." (Roitman Dec. at Ex. 4 ¶ 2.b.). If BWAB did not timely receive payment from Whiting of BWAB's share of revenues from production for three consecutive months then: "BWAB shall have the right to

require, where practicable, direct payments to BWAB by the operator(s) or purchasers(s) if . . . (ii) Whiting is late in making payments to BWAB . . . for three consecutive months." (Roitman Dec. at Ex. 4 ¶ 2.c.).

  c.  Whiting received a right of first refusal to purchase the property conveyed by the 1994 BWAB ORRI in the event BWAB elected to transfer or convey its interest to a non BWAB affiliate. (Roitman Dec. at Ex. 4 ¶ 4).

  d.  "Special Warranty of Title. Whiting warrants title to the BWAB Interest herein conveyed as against all persons claiming by, through or under Whiting, but not otherwise." (Roitman Dec. at Ex. 4 ¶ 6).

*See* Roitman Dec. at ¶12.

  9.  That Whiting and BWAB intended that Whiting would convey an overriding royalty interest to BWAB is clear from the express language used in the 1994 BWAB ORRI., *i.e.,* "Whiting does hereby grant, convey, assign, set over and deliver to BWAB an overriding royalty." This is language of conveyance, not merely of contract. Roitman Dec. at ¶ 13.

  10.  Contrary to Mr. Bullock's speculations in his declaration attached to the Motion, Whiting and BWAB did not intend that the 1994 BWAB ORRI would create only a contractual payment obligation to BWAB out of the net cash proceeds received by Whiting. Roitman Dec. at ¶ 13. The 1994 BWAB ORRI interest was payable out of gross revenue less existing landowner royalties, other lease burdens, certain expenses of production and transportation and taxes on production. *Id.* at ¶ 12. Moreover, BWAB was given the right to protect its interest by demanding its share of revenues directly from the operator if Whiting failed to pay BWAB's share timely. *Id.* at ¶ 13.

  11.  Whiting and BWAB did not intend, and the terms of the 1994 BWAB ORRI do not permit, BWAB's ORRI to be unilaterally reduced by Whiting or a subsequent transferee. *Id.* at ¶ 14.

12.     During the fall of 1996, some or all of the leases comprising the Point Arguello Property were unitized into the Point Arguello Unit, pursuant to a Unit Agreement dated effective October 1, 1996, between Whiting and a number of other working interest owners ("Unit Agreement").  A unit agreement is an agreement among the owners of several oil and gas leases to operate and produce those leases as one unit. Only owners of oil and gas leases are parties to such unit agreements.  Roitman Dec. at ¶ 15; *id.* at Ex. 1.  As a consequence of the unitization, BWAB and Whiting negotiated the effect of that unitization on the calculation of the amounts earned by BWAB from the 1994 BWAB ORRI.  Those negotiations resulted in an agreement dated June 25, 1997, which sets out in detail BWAB's percentage interest in the production proceeds generated by Whiting's working interest in the Point Arguello Unit, out of which the 1994 BWAB ORRI is carved ("BWAB/Whiting 1997 Agreement").  *Id.* at ¶ 15; *id.* at Ex. 5.

13.     Following Whiting's delivery of the 1994 BWAB ORRI conveyance to BWAB, Whiting received—for BWAB's benefit—BWAB's monthly share of proceeds from the sale of hydrocarbons (most, if not all, of which were oil) produced from the Point Arguello Properties, and delivered them directly to BWAB on a monthly basis until late in 1999 or early 2000.  Roitman Dec. at ¶ 16.  These sums included the royalties calculated pursuant to the BWAB/Whiting 1997 Agreement.  *Id.*  Thereafter, Whiting delivered such proceeds (as calculated pursuant to the BWAB/Whiting 1997 Agreement) to Delta Petroleum Corporation ("Delta") for delivery to BWAB.  *Id.*  The documentation provided to BWAB by Delta confirms that the 1994 BWAB ORRI has been paid in accordance with its terms and the 1997 BWAB/Whiting Agreement and has not at any time been overpaid.  *Id.*

14.    BWAB did not object to being paid the sums due from Whiting on the
1994 BWAB ORRI through Delta as long as BWAB timely received its production
proceeds.  Roitman Dec. at ¶ 17.  BWAB was not a party to the Purchase Agreement and
Amendment between Delta and Whiting.  *Id.*  BWAB never released Whiting or the
operator of the Point Arguello Properties from their  obligations under the 1994 BWAB
ORRI conveyance to pay to BWAB its share of production revenues earned pursuant to
the 1994 BWAB ORRI.  *Id.*

15.    During the latter half of 1999, pursuant to the Purchase Agreement and
Amendment, Delta attempted to acquire Whiting's ownership interest in the Point
Arguello Properties.  Roitman Dec. at ¶ 18; Declaration of Aleron H. Larson ("Larson
Dec.") attached as Exhibit B, at ¶ 8.  BWAB assisted Delta in those efforts pursuant to an
Agreement dated April 29, 1999, but made effective as of April 1, 1999 ("BWAB Fee
Agreement").  Roitman Dec. at ¶ 19; *id.* at Ex. 6.  According to the terms of the BWAB
Fee Agreement, if Delta acquired a net operating interest in the property described on
Exhibit A thereto, including the Point Arguello Unit, Delta would convey to BWAB an
overriding royalty interest in the Point Arguello Unit "calculated as 3% of the actual
gross revenue generated from and accrued to Delta's interest." *Id.* at Ex. 6, ¶ 3(2);
Larson Dec. at ¶ 9.

16.    Due in part to the efforts of BWAB, Delta was able to enter into the
Purchase Agreement and Amendment with Whiting.  If successfully closed, the
transaction as initially contemplated by Delta, Whiting and BWAB, would have resulted
in Delta's acquisition of all of Whiting's legal and beneficial interest in the Point
Arguello Properties.  *See* Roitman Dec. at ¶ 20; Larson Dec. at ¶ 10.

17.    Whiting was unable, however, to obtain the consents of the other working interest owners in the Point Arguello Properties to the transfer of all of Whiting's interest in the property because of concerns that Delta did not have the financial strength necessary to fulfill Whiting's working interest obligations, particularly those relating to plugging and abandonment of the offshore wells and platforms.  The other working interest owners had no objection, however, if Whiting conveyed to Delta all of its ownership in the Point Arguello Properties, except for legal title. *See* Roitman Dec. at ¶ 21; Larson Dec. at ¶ 11.

18.    As a result, Whiting and Delta's transaction eventually closed in December of 1999, when Whiting executed and delivered to Delta a Conveyance and Assignment dated December 1, 1999, pursuant to which Whiting conveyed what was labeled a Net Operating Interest in the Point Arguello Properties to Delta (the "1999 Delta NOI"), including Whiting's interest in the Unit Agreement dated effective October 1, 1996 ("Point Arguello Unit Agreement") and the Unit Operating Agreement dated October 1, 1996 ("Point Arguello Unit Operating Agreement"), as described therein. Roitman Dec. at ¶ 22; *id.* at Ex. 7; Larson Dec. at ¶ 12.  The 1999 Delta NOI states in part: "Whiting Petroleum Corporation … does hereby grant, convey, transfer and assign to Delta Petroleum Corporation… a net operating interest (as herein defined) in, to and under the following:…" *Id.* at Ex. 7, pp. 1-2.

19.    The term Net Operating Interest is defined in the 1999 Delta NOI as the following:

g.  …The net operating interest ("NOI") herein conveyed and assigned is defined as the monthly payable positive or negative cash flow resulting to the Interests from the following eight step calculation:

(i)    oil and gas sales revenue:

(ii)     **less** royalties and **overriding royalties**:

(iii)     Less Unit lease operating expenses;

(iv)     less severance, production or ad valorem taxes, if any;

(v)      less capital expenditures;

(vi)     less Unit fees to the Unit operator; and

(vii)     plus the positive or less the negative cash flow from the Partnerships.

(viii)     plus or minus any other miscellaneous costs or revenues that may be related to these interests or operations….

**In the event of positive cash flow, Assignor will pay the excess to Assignee; in the event of a negative cash flow, Assignee will pay the deficit to Assignor.**

Roitman Dec. at Ex. 7, pp. 2-3 (emphasis added).

20.     The parties' intended and the definition of Net Operating Interest makes clear that Whiting retained bare legal title to the Point Arguello Properties but conveyed all of its beneficial interest to Delta except for previously granted royalties and overriding royalties owed to third parties such as the 1994 BWAB ORRI. Roitman Dec. at ¶ 23; Larson Dec. at ¶ 13.

21.     On December 1, 1999, pursuant to the BWAB Fee Agreement and as part of the closing of its transaction with Whiting, Delta executed and delivered to BWAB an overriding royalty interest carved out of Delta's newly acquired beneficial ownership interest in the Point Arguello Properties ("1999 BWAB ORRI"). Roitman Dec. at ¶ 24; *id.* at Ex. 8; Larson Dec. at ¶ 16.

22.     When Delta acquired the 1999 Delta NOI, it agreed with Whiting that it would not record such document in any county recording office because of Whiting's concern that its other working interest owners would consider such action as a

conveyance of legal title in violation of its agreements with them.  Roitman Dec. at ¶ 25;

Larson Dec. at ¶ 18.  As of February 14, 2013, the 1999 Delta NOI had not been recorded

in the public records of the Santa Barbara County, California Recorder's Office.

Declaration of Fred Gayner Rappleye ("Rappleye Dec.") attached hereto as Exhibit C, at

¶ 3.  There is also no evidence that Whiting had recorded its ownership interest in the

Point Arguello Properties, either before or after, it conveyed the NOI to Delta.  *Id.*

23.     Similarly, BWAB did not record or file the 1999 BWAB ORRI for the

same reason that Delta did not record the 1999 Delta NOI in any county recording or

filing office.  Roitman Dec. at ¶ 26.  Whiting was notified and made aware of Delta's

delivery of the 1999 BWAB ORRI and conveyance of part of its newly acquired interest

in the Point Arguello Properties to BWAB.  *Id.*

24.     Subsequent to Whiting's conveyance of the 1999 Delta NOI to Delta,

Whiting acted on behalf of Delta as its nominee and agent as to operations under the

Point Arguello Unit Agreement and Point Arguello Operating Agreement for the Point

Arguello Properties, including whether to participate or not participate in the drilling of

wells in the Point Arguello Unit.  Delta would make the decisions, would instruct

Whiting to implement such decisions, and Whiting would do so.  Larson Dec. at ¶ 14; *id.*

at Ex. 2, p. 24, fourth paragraph.

25.     Following Delta's acquisition of its interest in the Point Arguello

Properties, Whiting distributed to Delta for distribution to BWAB monthly revenues

owned by BWAB pursuant to its 1994 BWAB ORRI and its 1999 BWAB ORRI in the

ordinary course of business.  Delta in turn timely distributed such revenues to BWAB

until September of 2012.  Roitman Dec. at ¶ 27.  Even after Delta filed bankruptcy on

December 16, 2011, Delta continued to deliver such revenues to BWAB in the ordinary course of business when they were received from Whiting. *Id.* at ¶ 28.

26.    Seth Bullock, whose Declaration Plaintiffs have offered in support of the Motion, began consulting with Delta in November 2011, but did not become an officer of Delta or PAR Petroleum Corporation ("PAR") until July 2012. *See* Declaration of Seth Bullock ("Bullock Dec.") at ¶ 1, attached to the Motion.

27.    During its bankruptcy proceedings, Delta repeatedly referred to its interests in the Point Arguello Properties as interests in real property on its Bankruptcy Schedule A. *See, e.g.*, D.I. 140 at 9; *id.* at 112; D.I. 402 at 106; D.I. 492 at 11.

28.    Delta did not at any time include its NOI among the executory contracts described in its Bankruptcy Schedule G, nor did it ever request court authorization to assume the NOI. *See* D.I. 140 at 279; D.I. 417 at 5; D.I. 492 at 214; D.I. 714; D.I. 891.

29.    However, Delta repeatedly and frequently referred to the Point Arguello Unit Agreement and Point Arguello Unit Operating Agreement as executory contracts to which it was a party on its Bankruptcy Schedule G, and in its motions to assume executory contracts. *See* D.I. 140 at 289-90, 308, 316-17, 330-31, and 338; D.I. 417 at 19, 38, 45-47, 60, 61, and 66; D.I. 492 at 225, 244, 251-53, 266-67, and 274; D.I. 714 at 7, 16, 21, 29-30, and 32; D.I. 891 at 33-34. At no time prior to the latter part of September of 2012 did Delta or Plaintiffs ever provide notice to BWAB that they disputed the 1999 BWAB ORRI, or any amounts earned or previously paid pursuant thereto. At no time prior to January 4, 2013, when Plaintiffs filed their amended complaint in this proceeding did Delta or Plaintiffs provide notice to BWAB that they disputed the 1994 BWAB ORRI, or any amounts earned or previously paid pursuant

thereto.  *See* Roitman Dec. at ¶ 34.

30.     BWAB did not have any claim whatsoever against Delta, pre-petition or post-petition, as of August 31, 2012.  The last payment of production revenues by Delta to BWAB was a check dated August 21, 2012 and received on August 27, 2012.  A true and correct copy of the check and the detail which accompanied the check are attached to the Roitman Declaration as Exhibit 9.  Notably, the check detail confirms BWAB as "owner".  Roitman Dec. at ¶ 31.

31.     At no time did BWAB participate in Delta's bankruptcy proceeding prior to being sued in this lawsuit.  Roitman Dec. at ¶ 38.

32.     On January 16, 2013, Plaintiffs served their initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1).

33.     To this point in this adversary proceeding, Plaintiffs have produced very limited documents showing how Whiting may have transmitted BWAB's earnings to Delta for distribution to BWAB despite request from BWAB.  *See* Declaration of Barry L. Wilkie ("Wilkie Dec."), attached to BWAB's 56(d) Motion as Exhibit A thereto, at ¶ 14.

34.     On March 11, 2013, BWAB propounded discovery requests to Plaintiffs.  Wilkie Dec. at ¶ 18.  Along with those discovery requests, BWAB indicated that it sought the depositions of Seth Bullock, Plaintiffs and Whiting following BWAB's receipt of responses to those requests.  Wilkie Dec. at ¶ 19.

## ARGUMENT

I.      **The 1994 BWAB ORRI was a conveyance from Whiting to BWAB, is not and never was property of Delta's bankruptcy estate, and cannot have been and was not extinguished by Delta under its Plan.**

15

The 1994 BWAB ORRI is a properly recorded real property interest. Roitman

Dec. at ¶ 11; *In re Foothills Texas, Inc.*, 476 B.R. 143, 149 (Bankr. D. Del. 2012)

(describing overriding royalty interests as "an interest in real property regarded as a

covenant running with the land between the assignor and the assignee, and is enforceable

by the assignor against the assignee") (internal quotation marks and citation omitted).[1] It

is of no consequence, however, if it is a real or personal property interest. Whiting—not

Delta—conveyed the 1994 BWAB ORRI to BWAB. The Point Arguello Property

conveyed to Delta by the 1999 NOI, whether considered real or personal property, was

expressly reduced by then-existing overrides. Roitman Dec. at ¶ 23; Larson Dec. at ¶ 13.

As the 1994 BWAB ORRI predates the 1999 NOI, the property represented by the 1994

BWAB ORRI was never conveyed from Whiting to Delta. As the 1994 BWAB ORRI is

not and never was property of the debtor, it cannot be avoided or extinguished.

Delta's Plan makes it clear that <u>only property of the Debtor</u> is re-vested in the

Reorganized Debtors free and clear of claims. The Plan states the following: "all

property <u>comprising the Estates</u> not otherwise vested in the Joint Venture Company or

the Recovery Trusts shall revest in the Estate of the applicable Reorganized Debtor, free

and clear of all Liens, Claims and Equity Interests[.]" *See* Motion at 13 n. 20 (*quoting*

D.I. 885 § 10.1). By its express terms, this provision neither purports to nor does it have

---

[1] *See also Harris v. 25 Hill Properties, Inc.*, 2007 WL 2774483 (Cal. Ct. App. Sep. 25, 2007) (unpublished) ("overriding royalty interests created by an operating lessee for the duration of a specific oil and gas lease are interests in real property"); *Moore v. Tristar Oil & Gas Corp.*, 528 F. Supp. 296, 309 (S.D.N.Y. 1981) ("under California law, both an overriding royalty and a working interest are interests in real property"); *Honolulu Oil Corp. v. Kennedy*, 251 F.2d 424, 429 (9th Cir. 1957) ("The decisions of California courts establish that a stipulation that there be an overriding royalty, consisting of a share of the produce in kind, does create an interest in real property.").

the effect of re-vesting in the Reorganized Debtors property that was never part of the assets of Delta.

That Delta received money from Whiting to transmit to BWAB on account of the 1994 BWAB ORRI is of no moment. Delta was a mere conduit of payment from Whiting to BWAB. Roitman Dec. at ¶ 16, ¶¶ 27-28; Larson Dec. at ¶ 20. Although BWAB did not object to getting paid through Delta, BWAB never released Whiting of any obligation to pay under the 1994 BWAB ORRI. BWAB's rights are rights as to Whiting, not Delta. Roitman Dec. at ¶ 17.

Put differently, there was no novation of Whiting's obligation. Novation must occur by contract. *See* Cal. Civ. Code § 1532 ("Novation is made by contract, and is subject to all the rules concerning contracts in general."). No such contract of novation occurred here. Roitman Dec. at ¶ 17.

Delta had neither an equitable nor a legal interest in the funds it received from Whiting for payment to BWAB on account of the 1994 BWAB ORRI. Any assets that Delta received from Whiting on account of the 1994 BWAB ORRI were merely held by Delta for the benefit of BWAB. Plaintiffs have provided no evidence to support a proposition that such funds belong to any of them. The bankruptcy process does not permit the bankruptcy estate to acquire property it never owned in the first place. *In re Bake-Line Group, LLC*, 359 B.R. 556, 570 (Bankr. D. Del. 2007) ("A debtor may not increase its rights to property through the filing of a bankruptcy petition."); *In re Nielsen*, 1998 WL 3379 at *3 (Bankr. D. Minn. Jan. 7, 1998) (deeming it "axiomatic" that, subject

to inapplicable exceptions, "only property that is owned by the debtor as of the commencement of the case may constitute property of the estate").[2]

## II.        The 1999 BWAB ORRI is a real property interest and is not avoidable.

Movants correctly assert that California law governs real property interests and the perfection of such interests in this case.  Motion at 15-17; *see also Butner v. United States*, 440 U.S. 48, 55 (1979); 43 U.S.C. § 1333(a)(2)(A). Application of California law and the doctrine of judicial estoppel lead to the conclusion that the 1999 ORRI is a real property interest that is not avoidable.

### A.        The 1999 BWAB ORRI is a real property interest.

The leading California case interpreting the nature of overriding royalty interests concluded that "the purpose and scope of all such royalty interests are so similar" to "the right to receive future rents from real property" that "overriding royalties [are], therefore, interests in real property." *La Laguna Ranch Co. v. Dodge*, 114 P.2d 351 (Cal. 1941).[3]

Movants acknowledge, as they must, that the 1994 BWAB ORRI, by its plain language, conveyed "an 'overriding royalty[.]'" Motion at 6.  Movants also concede that the plain language of the 1999 BWAB ORRI was an assignment of an "overriding royalty interest[,]" and that "on its face, appears to convey a true overriding royalty interest[.]"

---

[2] *See also In re Colonial Ctr., Inc.*, 156 B.R. 452, 463 (Bankr. E.D. Pa. 1993) ("the scope of a debtor's interest in property is defined by relevant nonbankruptcy law and not expanded by the bankruptcy filing"); *In re Dyckman*, 2012 WL 1302613 at *2 (Bankr. M.D. Pa. Apr. 16, 2012) ("the Bankruptcy Code itself does not create property interests").

[3] *See also Harris, supra* at n.1; *Moore, supra* at n. 1; *Honolulu Oil Corp., supra*, at n. 1 ("The decisions of California courts establish that a stipulation that there be an overriding royalty, consisting of a share of the produce in kind, does create an interest in real property."). This conclusion, at least as to future/unaccrued royalties, is supported by secondary sources as well. 56 A.L.R.4th 539 (Originally published in 1987) ("unaccrued royalties, pertaining to future production of minerals, are real property interests"; *citing*, at §26[a], *Austin v. Hallmark Oil Co.*, 134 P2d 777 (Cal. 1943); *Gillan v. Stansbury*, 217 P2d 1016 (Cal. App. 1950)). Situations relevant to this case where overriding royalty interests are held to be personal property interests appear limited, to claims to previously-accrued royalties. *See* 56 A.L.R.4th 539 at §§ 26[b]-27 and 28[b].

Motion at 8; *id.* at 12 (citation omitted).  Movants also correctly state that overriding royalty interests are "a real property interest[.]"  Motion at 11.

Now, however, Movants argue precisely the opposite: "Delta could not have conveyed a real property interest to BWAB[.]"  Motion at 12.  This argument makes a fundamental error at the outset—it is premised on the assertion that merely because Whiting may not have conveyed title to the Point Arguello leases, Delta did not have an ownership interest in real property.  There is certainly nothing to prevent two parties from simultaneously having interests in the same real property.[4]  For instance, as here, Whiting conveyed equitable ownership in the Point Arguello leases to Delta without conveying legal title.  *Leeds LP v. U.S.*, 2010 WL 3070349 at *4 (S.D. Cal., August 5, 2010) ("'A nominee is one who holds bare legal title to property for the benefit of another.'") (citations omitted); *Martin v. Kehl*, 145 Cal. App. 3d 228, 238 (Cal. App. 2nd 1983) ("a resulting trust arises . . . where the purchase price, or a part thereof, is paid by one person and the title is taken in the name of another") (citations omitted).  It is also clear from the language of the 1999 Delta NOI that Whiting conveyed all of its ownership interest in the Point Arguello Properties except title.  *See* Bullock Dec. at Exh. D.[5]  That Delta did not have record title did not prevent it from conveying an interest in such real property to BWAB.

---

[4] *See Martinez v. Barrios*, 2009 WL 3402314 at *7 (Cal. App. 2nd Oct. 23, 2009) (unpublished) (discussing a debtor's failure to disclose "the equitable ownership of [real] property"); *Akmakjian v. Haider*, 2008 WL 484335 at *4 (Cal. App. 4th Feb. 25, 2008) (unpublished) (noting that "equitable ownership of the property… may differ substantially from the title as reflected in the official records"); *Riley v. McDonald*, 2009 WL 1478918 at *15 (Cal. App. 6th May 26, 2009) (unpublished) (discussing a vendee's "'equitable ownership of the property,'" *quoting Kudokas v. Balkus*, 26 Cal. App. 3d 744, 757 (Cal. Ct. App. 1972)).

[5] Stating, *inter alia*, that "[Whiting]…hereby grant[s], convey[s], transfer[s] and assign[s] to [Delta]…a net operating interest…to and under the [Leases, interests in the Lands, the Wells, the Units]", and Equipment, licenses, permits, contracts, agreements, instruments, payments, and rights to receive payments incident to same.

19

Indeed, the plain language of the 1999 ORRI supports the conclusion that it is an interest in real property.  Roitman Dec. at Ex. 8 (conveyance of overriding royalty interest "in and to the oil and gas leases and lands…which shall burden all the oil, gas and other leased minerals produced, saved and sold from or allocated to the lands covered by said Leases").  The actions of the parties support the conclusion that the 1999 ORRI is an interest in real property.  Roitman Dec. at ¶ 28; Larson Dec. at ¶ 21.  Delta's assertion that Whiting held the Point Arguello Properties as Delta's "nominee" (*see*, *e.g.*, Larson Dec. at ¶ 14; *id.* at Ex. 2, p. 24) supports the conclusion that the 1999 ORRI is an interest in real property.  *Leeds LP*, 2010 WL 3070349 at *4.  The fact that Delta made all decisions as to the conduct of operations of the Point Arguello Properties demonstrates property ownership.  Larson Dec. at ¶ 14. Delta's inclusion of its interest in Point Arguello as an interest in real property in its Bankruptcy Schedules reflects that it was an interest in real property.

If not an interest in real property, Delta's 1999 NOI can be only one other thing: an executory contract.  An executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."  *In re Safety-Kleen Corp.*, 410 B.R. 164, 167 (Bankr. D. Del. 2009) (citation and quotation marks omitted).  If in fact the 1999 NOI is not an interest in real property as Plaintiffs claim, it appears to be an executory contract as it in fact required continuing performance—failure of which by either party would constitute material breach—by both Whiting and Delta.  *See* Roitman Dec. at Ex. 7, 2-3 ("In the

20

event of positive cash flow, Assignor will pay the excess to Assignee; in the event of a

negative cash flow, Assignee will pay the deficit to Assignor.").

If Plaintiffs now claim that the 1999 NOI was in fact not a real property interest,

but an executory contract, it has been rejected because Delta did not assume it in its

bankruptcy proceedings.  *See* D.I. 714 at 7, 16, 21, 29, 30, and 32 (Unit Agreements to be

assumed, but no assumption of the 1999 NOI); D.I. 891 (no assumption of 1999 NOI);

D.I. 896 (notice of rejection of any executory contracts not listed); D.I. 918 (order

authorizing assumption of executory contracts does not include 1999 NOI).  Plaintiffs do

not appear to be arguing that the 1999 NOI has been rejected as an executory contract

which was not assumed, as indeed such rejection would severely harm the bankruptcy

estate.

Rather than twist the plain language of the relevant real property conveyances

beyond recognition and reach the conclusion that the 1999 NOI was an executory

contract which has been rejected—which none of the parties are arguing—the Court

should reach the more reasonable conclusion that the 1999 NOI was in fact an interest in

real property.  Indeed, at no point in Delta's bankruptcy proceedings did it declare the

1999 NOI to be a contract, executory or otherwise.  *See* § II.B., *infra*; Roitman Dec. at

28.  In fact, Delta claimed quite the opposite, repeatedly stating the 1999 NOI was an

interest in real property.  Delta is bound by those statements.

**B.**     **Plaintiffs are judicially estopped from claiming the 1999 BWAB
ORRI is anything but a real property interest.**

Repeatedly and throughout Delta's bankruptcy, Delta referred to its interests in

the Point Arguello Leases as real property interests.  *See, e.g.*, D.I. 140 at 9 (Schedule

A—Real Property, listing Point Arguello Gross Working Interest of 6.07% of Net

21

Revenue Interest conveyed by 1999 NOI); D.I. 140 at 112 (Schedule A—Real Property,

listing Point Arguello prospect).  By contrast, Delta did <u>not</u> refer to its interests in the

Point Arguello Leases as personal property or executory contracts.  *See, e.g.*, D.I. 140 at

151-54 (Schedule B—Personal Property, making no mention of 1999 NOI); D.I. 140 at

279 (Schedule G—Executory Contracts and Unexpired Leases, making no mention of the

1999 NOI).  Movants are judicially estopped from claiming that Delta's interests in the

leases comprising the Point Arguello Unit—from which the 1999 BWAB ORRI was

carved—are anything except real property interests.

The Third Circuit Court of Appeals applies the doctrine of judicial estoppel in the

following circumstances:

> (1) the party estopped must have taken two positions that are
> irreconcilably inconsistent, (2) the party changed his or her position in
> bad faith, i.e., with intent to play fast and loose with the court, and (3)
> the judicial estoppel sanction is tailored to address the harm identified
> and no lesser sanction would adequately remedy the damage done by
> the litigant's misconduct.

*In re Exide Technologies*, 2013 WL 85193 (Bankr. D. Del. Jan. 8, 2013) (*citing Montrose*

*Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773, 779-80 (3rd Cir.

2001)); *see also* (*In re Reynolds*, 470 B.R. 138, 145 (Bankr. D. Colo. 2012)) (deeming

debtors bound by bankruptcy schedules and applying doctrine of judicial estoppel

because "Debtors are responsible for their own sworn statements").

The doctrine of judicial estoppel prevents Movants' assertion that the overriding

royalty interests are interests in personal property.  Movants' current position is

irreconcilably inconsistent with Delta's own repeated assertions before this court that its

ownership interest in the Point Arguello Properties was a real property interest (not to

mention contrary to the plain language of the overriding royalty interests and established

caselaw).  Notably, throughout its bankruptcy proceeding, Delta also represented that is

was a party to the Point Arguello Unit Agreement which is the agreement among the

owners of the leases in the unit to unitize their leases.  Roitman Dec. at ¶ 15.  That

Movants now argue to deprive BWAB of its interests after confirmation of its plan,

despite never previously disputing such property ownership for over a decade both before

and during its bankruptcy, is evidence of Movants' bad faith.  Application of the doctrine

of judicial estoppel in this instance is narrowly tailored: during its bankruptcy, by

claiming in no uncertain terms that its interests in Point Arguello were interests in real

property, Delta made its bed and now Movants must lie in it.

At the very least, a question of disputed material fact exists as to whether

BWAB's ORRIs are interests in real property.  *Compare* Motion at 12 (calling the ORRIs

"a personal property interest") *with* Roitman Dec. at ¶ 13 (stating that the parties intended

to undertake a conveyance of an overriding royalty interest in the 1994 ORRI) and ¶¶ 22-

23 (describing the NOI as a conveyance of all Whiting's ownership interest to Delta

except legal title).  As BWAB demonstrates below, the real property nature of the ORRIs

compels denial of the Motion.

      **C.**      **The 1999 BWAB ORRI is not avoidable because the transfer was not
a transfer that could have been perfected against a bona fide
purchaser under applicable law.**

Not only did Delta not record its 1999 NOI in the recording offices of Santa

Barbara County, California, but Whiting did not record its interest in the Point Arguello

Properties either.  Rappleye Dec. at ¶ 3. Avoidance under Bankruptcy Code Section

544(a)(3) is limited to a transfer of real property of the debtor that is voidable by a

hypothetical bona fide purchaser "against whom applicable law permits such transfer to

23

be perfected…"  If under applicable law, it is not possible for a transferee to perfect such

transfer, then such transfer is not avoidable under Section 544(a)(3) of the Bankruptcy

Code as of the petition date.  *In re Bridge*, 18 F.3d 195, 200 (3rd Cir. 1994) (quoting

legislative history stating that "the language 'against whom applicable law permits such

transfer to be perfected' was included in § 544(a)(3) 'so as not to require a creditor to

perform the impossible in order to perfect his interest.'"); *In re Day*, 443 B.R. 338, 343

(Bankr. D.N.J. 2011) (same, *citing In re Bridge*); *In re Hurst*, 27 B.R. 740, 743 (Bankr.

E.D. Tenn. 1983) (citing legislative history and stating that "the bona fide purchase test

of § 544(a)(3)" does not require perfection, "vis-a-vis the bankruptcy trustee, of a transfer

if the applicable law does not permit perfection.").

     When BWAB was conveyed the 1999 BWAB ORRI in 1999, it was impossible

under California law for BWAB to perfect its transfer against a future bona fide

purchaser for value.[6]  If BWAB had recorded the 1999 BWAB ORRI, it would have been

outside the chain of record title (a "wild" deed); record title would not have reflected any

conveyance from Whiting to Delta, and thus Delta's conveyance to BWAB would be

outside the chain of title.  California does not charge subsequent purchasers with notice

of wild deeds:

---

[6] Movants acknowledge, as they must, that this "hypothetical bona fide purchaser" would be "'deemed to have conducted a title search of [the] property[.]'"  Motion at 15 (first brackets in original).  Such a search would have revealed that neither Whiting, nor Delta, nor BWAB held record title to Point Arguello interests.  This ambiguity in the record title would have put any buyer on inquiry notice of record title issues per California law.  Cal. Civ. Code § 19 ("Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact.").  Neither Whiting, nor Delta, nor BWAB could have transferred their interests to a bona fide purchaser for value under the California recording statutes because they, themselves, lacked record title. *See Kabayan v. Yepremian*, 190 B.R. 389, 394 (C.D. Cal. 1995) *aff'd sub nom. In re Yepremian*, 116 F.3d 1295 (9th Cir. 1997). *See also* the analysis in *In re Hathaway Ranch P'ship*, 127 B.R. 859, 865 (Bankr. C.D. Cal. 1990) (examining *In re Investment Sales Diversified, Inc.,* 38 B.R. 446 (Bankr. D. Minn. 1984), where "avoidance under Section 544(a)(3) was disallowed was due to constructive notice" of record title issues).

> If an instrument cannot be located by searching the "grantor" and
> "grantee" indices of the public records, the instrument does not
> constitute constructive notice and later bona fide purchasers or
> encumbrances are not charged with knowledge of its existence....
>
> [A] "wild" document [is] one recorded outside the chain of title. As
> such, a search of the grantor/grantee indices could not have disclosed
> its existence. "One who is not connected by any conveyance whatever
> with the record title to a piece of property and makes a conveyance
> thereof, does not thereby create any defect in the record title of another
> when such title is deducible by intermediate effective conveyances
> from the original owners to that other.... Such a deed would not even
> be constructive notice."

*Far W. Sav. & Loan Assn. v. McLaughlin*, 246 Cal. Rptr. 872, 875 (Cal. App. 1988)

(quoting *Bothin v. The California Title Ins. Co.*, 96 P. 500 (Cal. 1908)).

Because Delta's 1999 NOI was not recorded, BWAB did not have a method to

perfect its interest in the 1999 BWAB ORRI via real property recording statutes.  Such

recording would have been ineffective to convey record notice to potential purchasers

because it would have constituted a wild deed.  Bankruptcy Code § 544(a)(3) does not

authorize avoidance of the 1999 BWAB ORRI under such circumstances, particularly—

as here—where such interest had never been in dispute.

**III.    Even if the Court determines the ORRIs are personal property interests,
the confirmation of the Plan did not strip BWAB of its interests because
BWAB had no claim at the time of confirmation.**

Movants argue that BWAB's interests in the 1994 BWAB ORRI and the 1999

BWAB ORRI constitute unsecured personal property claims which were released and

discharged under the Plan.  Motion at 11-14.  As discussed above, that analysis is

incorrect, as the ORRIs were real property interests.  Even assuming, *arguendo*, that the

ORRIs constituted personal property, Movants' argument fails.  When the Plan was

confirmed, BWAB had no claims, as the amounts owed under the ORRIs had been paid

25

according to the parties' then-understanding of those amounts.  Roitman Dec. at ¶¶ 28, 31.

The Plan vested <u>Delta's</u> property—<u>not BWAB's</u> property—in the reorganized entities.  Moreover, Delta's property re-vested free and clear of pre-confirmation liens and claims only.  BWAB, however, had no such claims as of the Plan's August 31, 2012 effective date.

The definition of claim in 11 U.S.C. § 101(5) does not include a future claim. Indeed, it is "not surprising that no court has ever held that future claims for possible future breaches of contract constitute 'claims' under Section 101(5) that must be filed pre-confirmation." *In re Texaco Inc.*, 254 B.R. 536, 559 (Bankr. S.D.N.Y. 2000) (claims arising after confirmation from a pre-petition contractual relationship are not barred by a confirmation order).  *See also In re Granati,* 307 B.R. 827 (E.D.Va. 2002), *aff'd* 63 F. App'x 741 (4th Cir. 2003) (right to future payments pursuant to an equitable assignment is not a claim; it is property right).  It is also axiomatic that the definition of claim does not encompass a party's claim or future claims against a third party such as Whiting. *In re Exide Technologies*, 2013 WL 85193 at *5 (Bankr. D. Del. Jan. 8, 2013) ("While the Bankruptcy Code's definition of claim is undeniably broad, it is not without limit. The definition of a 'claim' includes a 'right to payment' that may be contingent or unmatured, but it necessarily <u>requires a pre-confirmation event</u> that triggers a 'right to payment,' whether based upon a breach of contract, tortious conduct, or a prepetition contract that provides for a right to payment, even if that right to payment is contingent." Emphasis added.).

*In re Exide Technologies* is particularly informative to the issues in this case.

Exide sought to reject a trade mark licensing agreement with EnerSys.  This court initially permitted rejection of licensing agreement, but its order was reversed by the Third Circuit.  After remand, Exide brought an adversary proceeding seeking a declaration that a boilerplate provision of its Plan purported to divest Enersys of its interest by default. This court characterized Exide's assertion as "disingenuous" and held that the default rule of Code section 1141(c) should not override the specific information disclosed to the parties and the court regarding the manner in which Enersys' interests were being treated under the Plan. 2013 WL 85193 at *4.  Having chosen to deal with Enersys' rights by rejection the court did not allow Exide to subsequently deprive Enersys' rights by boilerplate language in the Plan.  *Id.*

Exide also argued, as do the Plaintiffs here, that Enersys' rights under the license agreement amounted to a "claim" under the Code that was discharged by the confirmed Plan.  This Court, held, however, that Exide did not allege any facts that would give rise to a "pre-confirmation 'right to payment.'"  As this Court observed, the complaint merely alleged that Enersys was a holder of an unsecured claim, but did not allege that Exide had breached its obligations relating to the use of the mark triggering a right to payment. 2013 WL 85193 at *6.  In conclusion, the Court held that "Exide's Complaint does not allege facts to support its position that a 'claim' exists under Bankruptcy Code § 101(5) (A) based upon a pre-confirmation breach of contract, tortious conduct, or contract provision triggering a pre-confirmation right to payment . . . ."  *Id.*  Plaintiffs in the present cases similarly have not alleged, and the undisputed facts show that there was no pre-confirmation breach by Delta that would have given BWAB a right to payment and therefore a "claim" that could be extinguished by the Plan.

Having received what it believed was owed via the stream of payments ending with the check dated August 21, 2012, BWAB had no claim at all against Delta/PAR when the Effective Date occurred ten days later.  If indeed BWAB has claims against PAR, they arose or were "triggered" after the Effective Date, only after minerals were produced and sold, and only after Whiting received production revenues from the sale of those minerals, and only after Whiting delivered to Delta the production proceeds attributable to BWAB ORRI property interests for distribution of the amounts owed to BWAB, and only if Movants ceased their thirteen-year practice of monthly distribution of such monies to BWAB.  Roitman Dec. at ¶ 29.  Each time PAR fails to pay the monies received from Whiting for distribution to BWAB, a new claim arises.  If Whiting does not transfer BWAB's funds to PAR for distribution, BWAB has no claim against PAR, but would have a claim against Whiting and/or the operator.  Plaintiffs confuse a pre-petition conveyance of property with a pre-petition contract.

Without any factual support, Movants argue that "Delta assumed" the obligations of the 1994 BWAB ORRI and the obligations arising thereunder during the purchase of the 1999 NOI.  Bullock Dec. at ¶ 14.  However, BWAB never released Whiting from its obligations to pay sums due under the 1994 BWAB ORRI, nor have Movants so alleged.  As BWAB never released Whiting from Whiting's obligations, Delta's wrongful conversion of BWAB's funds has unfortunately now put Whiting at risk.  Moreover, Whiting may have a claim against PAR for its failure to honor its agreement with Whiting to distribute funds to BWAB, but that is an issue between Whiting and PAR.  See Motion at Ex. B, ¶ 10.2 (providing for Delta's indemnification of Whiting for any failure to distribute unpaid funds owed by Whiting to third parties).

28

Furthermore, Movants' argument that the monies owed under the 1994 BWAB ORRI and 1999 BWAB ORRI are claims against the estate are simply incorrect as a matter of law.  Assignment of a property interest strips a debtor of its interest, and the assignee's claims which may arise in the future, post-petition, on account of that interest are not dischargeable claims.  *See In re Dean*, 317 B.R. 482, 487 (Bankr. W.D. Pa. 2004) (determining that debtor's pre-petition assignment of interest gave debtor "no right, legal or equitable" to that interest); *In re Granati*, 270 B.R. 575, 586-87 (Bankr. E.D. Va. 2001) *aff'd* 307 B.R. 827 (E.D. Va. 2002) *aff'd* 63 F. App'x 741 (4th Cir. 2003) (deeming assigned interest "not a claim" which "has not been discharged").

### A.    Movants cite inapplicable caselaw in arguing that BWAB had a "claim" which was "extinguished."

Even assuming, *arguendo*, that Movants' "claim" analysis controls the determination of the Motion—which it does not, as the correct analysis sounds in real property jurisprudence—Movants' argument fails because they cite several inapplicable cases to argue that BWAB has lost its opportunity to assert its alleged "claims".

For instance, under their heading claiming that BWAB's interests "have been extinguished," Movants cite *Grynberg v. Waltman*, 946 P.2d 473 (Colo. App. 1996). *See* Motion at § II, p. 11 n. 16.  *Grynberg* is inapplicable to this case.  There, the purported assignee of the overriding royalty interests had stopped receiving payments on those interests for several years before the assignor-debtor's bankruptcy filing.  946 P.2d at 475.  Indeed, the assignor affirmatively told the assignee, "in response to [assignee's] inquiries, [assignor] informed him that further royalties would not be paid." *Id.*  As such, "both parties were aware that the ownership of the overriding royalty interests was in dispute at the time of plaintiff's bankruptcy proceedings." *Id.* at 477.  This resulted in the

*Grynberg* court's following conclusion:

> Once the claim to royalty payments based on the overriding royalty
> interests was disputed, the ownership of that interest was called into
> question and was, therefore, before the bankruptcy court.  Defendant
> was required to take those steps necessary to preserve his claim.

*Id.*

Here, however, a quite opposite situation exists: Delta not only paid the sums due

up until its bankruptcy filing (Roitman Dec. at ¶¶ 27, 28), but took affirmative steps to

ensure that those payments continued through the bankruptcy case.  D.I. 9, 66, 296.  The

assignee of the overriding royalty interest in *Grynberg* only had "claims" and/or notice

that his "property interests may be challenged" in the first place because of the unpaid

accrued royalties (*see* 946 P. 2d at 477), a situation which did not exist here.  Rather than

put BWAB on notice of any dispute like the *Grynberg* assignor-debtor, Delta instead

lulled BWAB into thinking its interests were safe, while Movants laid in wait to ambush

BWAB after confirmation.  *Grynberg* is inapplicable.  *Cf. In re Exide Technologies,*

*supra.*

Also in support of their misguided argument that BWAB's "claims" have been

"extinguished," Movants cite *Missouri Breaks, LLC v. Burns*, 791 N.W. 2d 33 (N.D.

2010).  *See* Motion at 14 n. 22.  There, however, the debtor's reorganization plan featured

the following language:

> On the Effective Date, the <u>Property of the Estate</u> and any and all other
> assets of the Debtor <u>shall be transferred to [Missouri Breaks]</u> free and
> clear of any and all Claims, Liens, <u>charges, encumbrances and
> interests</u>, except as otherwise provided in the Plan…. <u>and [Missouri
> Breaks] shall be deemed a purchaser in good faith…</u>

791 N.W. 2d at 36 (brackets in original, emphasis added).  The reorganization plan

language in *Missouri Breaks* is much broader than the Plan language here; the *Missouri*

*Breaks* plan transferred property of the estate to a good faith purchaser, free and clear of

not only claims and liens, but "charges, encumbrances and interests," while the Plan here

is limited to revesting free and clear of "Liens, Claims and Equity Interests . . . . " in the

reorganized debtor.  Plan at ¶ 10.1.

     The decision in the *Missouri Breaks* case turned on the creditor's clear notice of

his need to object to confirmation of the plan which conveyed his property to a good faith

purchaser.  The *Missouri Breaks* creditor claimed he held a 5% working interest in the

Missouri Breaks Unit No. 1 oil and gas well (the "Well"), which was allegedly

transferred to him by the debtor shortly before the debtor filed for bankruptcy, but the

conveyance was not recorded.  The debtor listed the creditor in its Schedules as an owner

of a 5% working interest in the Well.  791 N.W. 2d at 36.  In addition to the quoted plan

language above, the *Missouri Breaks* plan provided for the transfer of Debtor's 50%

working interest in the Well to a new entity, Missouri Breaks, despite the fact that the

creditor asserted that he had been transferred a 5% working interest out of such 50%

before the bankruptcy.  791 N.W.2d at 36.  Because the creditor did not object to

confirmation of the plan which expressly conveyed his purported property to a bona fide

purchaser for value without constructive notice of the unrecorded interest, the Court

determined that his claim to such interest was barred by res judicata.  791 N.W.2d at 39.

Here, however, BWAB was paid throughout the bankruptcy, it was not owed *any* amount

prior to confirmation, there was no dispute as to its interest, and there was not any

transfer of BWAB's property to a purchaser in good faith.  *See* Roitman Dec. at ¶¶ 27,

28, 31, 34, 35.  *Missouri Breaks* is simply not applicable here.

**IV.**    **The Motion should be denied as to the alleged "excess" payments.**

Movants make several fundamental errors in arguing that the alleged "excess" payments to BWAB should be disgorged via summary judgment adjudication.  Movants have not produced documents relevant to those alleged "excess" payments despite their obligation to do so and BWAB's affirmative request.  A ruling on the Motion should await BWAB's needed discovery.  More fundamentally, without any factual or legal basis, it appears that Movants make the erroneous argument in calculating the alleged "excess" payments by assuming later-granted interests in Point Arguello burden earlier-granted interests.  They do not.  Finally, the transfers constitute neither unjust enrichment, nor fraudulent transfers, nor are they avoidable under the sections of the Bankruptcy Code cited by Movants.

### A.    Summary judgment as to the allegedly "excess" payments is not appropriate at this time as demonstrated by BWAB's 56(d) Motion

First, Movants argue that the 1994 BWAB ORRI should have been reduced by certain costs of production that burden Whiting's interest.  Motion at 19.  Movant's brief however, does not contain any admissible evidence in this regard.  Moreover, despite their obligation to affirmatively disclose such documents in initial disclosures and BWAB's affirmative request for same, Movants have produced  only very limited documents relating to the transfer of money from Whiting to Delta in connection with the 1999 Delta NOI or BWAB's 1994 BWAB ORRI and those documents were not produced until March 7, 2013.  Wilkie Dec. at ¶ 14.  These documents would demonstrate whether and to what extent the historical deductions were correctly made.  Due to Movants' failure to produce those documents, and in light of BWAB's contemporaneously-filed Motion to Permit Discovery Pursuant to Fed. R. Bankr. P. 7056 and Fed. R. Civ. P. 56(d) Prior to Decision Regarding Plaintiffs' Motion for Summary Judgment (henceforth

"56(d) Motion"), the Court should decline to decide the alleged "excess" payment issue

pending further discovery.

Second, Movants aver that the alleged "excess" payments resulted from a

"miscalculation" or were "mistakenly" made for over a decade. Motion at 19-20. This

claim is questionable on its face, and BWAB is entitled to discovery on this issue and

seeks to conduct that discovery to inform its defenses to Movants' allegations. *See* 56(d)

Motion at § IV.A.

Third, Movants concede that the alleged mistaken calculation which gives rise to

their claim of overpayment is based upon a theory that the 1999 BWAB ORRI, an

interest granted <u>after</u> the 1994 BWAB ORRI was granted, reduces the amounts due under

the 1994 BWAB ORRI. This calculation reflects a fundamental misunderstanding of the

1994 BWAB ORRI. Roitman Dec. at ¶ 14. Subsequently granted ORRIs in the same oil-

producing property do not reduce prior grants of ORRIs in that property. Here, the 1994

BWAB ORRI only was subject to reduction by costs that burden <u>Whiting</u>'s "fractional or

percentage share[,]" not Delta's. Roitman Dec. at ¶ 12.a. (emphasis added). The 1999

BWAB ORRI was carved out of <u>Delta</u>'s 1999 NOI, and was not carved from any interest

held by Whiting. Therefore, the "miscalculation" aspect of Movants' claim should be

denied. In the alternative, BWAB asks the Court to defer ruling on that aspect of

Movants' claim pending further discovery. *See* 56(d) Motion at § I.

Fourth, Plaintiffs have not disclosed or produced the documents underlying their

purported "audit" of Delta's financial records which led to their determination of the

extent of the alleged excess payments. *See* Bullock Declaration at ¶ 20; Wilkie Dec. at

¶ 14. BWAB is seeking to obtain those documents, and summary judgment is not

appropriate, if at all, until BWAB has had a chance to conduct discovery concerning the audit. *See* 56(d) Motion at § IV.A.  Plaintiffs themselves state that the "Audit remains ongoing and Plaintiffs expressly reserve the right to amend the numbers, and calculations thereof, set forth herein and in the Excess Payments Chart."  Bullock Dec. at ¶ 21 n. 3.  As Plaintiffs themselves apparently have not settled on the amount of the allegedly excess payments, the Court should not enter summary judgment in Plaintiffs' favor in light of the apparently still-fluid nature of their claim.

**B.      The alleged "excess" payments neither constitute unjust enrichment, nor do they constitute fraudulent transfers, nor are they avoidable under the Bankruptcy Code**

The basis for Movants' claim that the pre-petition alleged "excess" payments should be disgorged is based partially on the supposed "miscalculation" of those payments.  Motion at 19-20.  As described above, the legal basis for Movant's so called "miscalculation" is fatally flawed and summary judgment should be summarily denied.  At a minimum however, questions remain concerning whether any miscalculation has occurred at all in the payment of the 1994 BWAB ORRI.  As such, whether BWAB has received any unjust enrichment at all remains in dispute.  The Court should not grant Movants' Motion as to the pre-petition allegedly "excess" payments.

Movants separate their allegations for the post-petition payment disgorgement into the "miscalculation" element and the remainder of the payments.  The Court should decline to grant Movants' Motion as to the post-petition allegedly "miscalculated" payments for the reasons described above.  As to the rest of the payments, they pertain to both the 1994 BWAB ORRI and the 1999 BWAB ORRI.  As Movants correctly note, Delta sought and received permission to pay these amounts by order of this Court.

34

Motion at 22; D.I. 9, 66, 296.  In fact, Delta explicitly represented to the Court that the

post-petition payments were made pursuant to "the ordinary course of business . . . ."

D.I. 9 at ¶ 14.  Had Delta not done so and instead refused to pay BWAB, Delta would

have been committing a tort as to the conversion of those monies received during the

bankruptcy which were owned by, and therefore owed to, BWAB.  Claims pertaining to

torts during the administration of a Chapter 11 case are administrative claims under 11

U.S.C. 503(b)(1), entitled to priority distribution pursuant to 11 U.S.C. §§ 507(a)(2) and

726(a)(1).  *See also In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461, 480 (Bankr. D. Del.

2006) ("Damages arising from a post-petition tort committed by a debtor are entitled to

administrative expense status.").  Because BWAB was in fact paid during the pendency

of the bankruptcy, BWAB did not file petitions for allowance of administrative claims

which would have been paid as part of the plan confirmation process.  *See* Roitman Dec.

at ¶ 32-33, 38.  That BWAB did not file such claims constituted consideration for receipt

of those payments.  As such, Delta did in fact receive reasonably equivalent value for the

payments, and cannot claim they were fraudulent transfers.

     Movants' argument concerning Bankruptcy Code section 549(a) similarly fails.

Movants recognize that section permits avoidance where a transfer occurs that is not

authorized "by the court."  Motion at 21-22.  Here, however, the payments were made

pursuant to "the ordinary course of business" (D.I. 9 at ¶ 14) and the Court in fact

authorized the payments.  D.I. 66 and 296.  Movants provide no support for their

statement that the post-petition payments to BWAB "were not" under "the guise" of

those orders.  Motion at 22.  If the Court is not inclined to simply reject Movants'

argument, BWAB requests that the Court defer judgment on this issue pending the sought

35

discovery described in the 56(d) Motion to determine under what "guise" the payments were in fact made.

Finally, Movants' argument that Bankruptcy Code section 542(a) entitles Movants to summary judgment concerning the post-petition payments also fails.  That section, through its incorporating reference to section 363(b)(1), makes clear that it only pertains to "property of the estate . . . ."  11 U.S.C. 363(b)(1) (emphasis added).  As discussed above, the 1994 BWAB ORRI and funds payable thereunder were never property of the estate.  Rather, they were BWAB's property, duly conveyed to BWAB by Whiting, and the funds payable thereunder were merely money from Whiting payable to BWAB.  Likewise, the 1999 BWAB ORRI was duly conveyed out of the estate to BWAB over a decade ago.  Movants' argument on this point boils down to their contention that the 1999 BWAB ORRI is subject to avoidance.  As described above, the 1999 BWAB ORRI cannot be avoided as a matter of law.

    **C.**    **The existence of disputed issues of material fact concerning BWAB's affirmative defenses compels the denial of the Motion as to the alleged miscalculation of the 1994 ORRI.**

"The equitable defense of laches is available when a party has <u>knowledge</u> of a claim, there is an <u>inexcusable delay</u> in bringing the action, and the delay is <u>prejudicial</u> to the defendant."  *In re Network Access Solutions, Corp.*, 330 B.R. 67, 79 (Bankr. D. Del. 2005) (emphasis added).  "Whether to apply the equitable doctrine of laches is left to the sound discretion of the court."  *In re Am. Home Mortg. Holding*, 458 B.R. 161, 172 (Bankr. D. Del. 2011).  In BWAB's Amended Answer to the Amended Complaint,

BWAB asserted, *inter alia*, the affirmative defense of laches[7] to Counts II through IX of Plaintiffs' Amended Complaint.  Adv. D.I. 29.   These Counts encompass Plaintiffs' claim for the allegedly miscalculated 1994 ORRI payments.  Adv. D.I. 22; Motion at 19-20.  Because disputed material facts exist concerning BWAB's laches defense, the Court should deny the Motion with respect to the alleged miscalculation of payments.

While BWAB and Whiting explicitly agreed in 1997, pursuant to the BWAB/Whiting 1997 Agreement, as to how BWAB's 1994 ORRI would be calculated, the actual calculation of sums due pursuant to BWAB's 1994 ORRI has never been under BWAB's control.  Roitman Dec. at ¶ 15.  Rather, that calculation was undertaken by Whiting or Delta or both.  *Id.*  As Whiting or Delta or both had access to all the relevant documents for calculating the 1994 ORRI, one of those parties had knowledge about the alleged miscalculation.  BWAB seeks discovery concerning how its 1994 ORRI was calculated and who had knowledge of any alleged overpayment.  *See* 56(d) Motion at § IV.A.  BWAB also is seeking documents pertaining to the "audit" of Delta's financial records described in the Bullock Dec. at ¶ 20.  In the meantime, BWAB disputes that Plaintiffs simply "discovered the [alleged] Excess Payments during the course of this Adversary Proceeding[,]" (Bullock Dec. at ¶ 20) because indeed Delta had, or could have reasonably had, access to documents which would have revealed any alleged miscalculation of the 1994 ORRI over a decade ago.  Roitman Dec. at ¶¶ 34, 36-37.  As such, a genuine dispute of material fact concerning Plaintiffs' knowledge of its claim exists.

---

[7] BWAB additionally asserted other affirmative defenses.  The disputed nature of those defenses is detailed throughout this pleading as well as in the 56(d) Motion.

The extraordinary passage of time between the commencement of the alleged miscalculation and Plaintiffs' assertion of an overpayment speaks for itself as "an inexcusable delay in bringing the action . . . . " *In re Network Access Solutions, Corp.*, 330 B.R. at 79. Indeed, Plaintiffs make <u>no</u> effort to explain why Delta could not have discovered the alleged miscalculation years ago.

Plaintiffs' delay in bringing their claim for the alleged miscalculation is prejudicial to BWAB. Having received payments under the 1994 ORRI for many years, BWAB made decisions to invest or spend those payments which it may not have otherwise made in the absence of those payments. Roitman Dec. at ¶ 37. This prejudices BWAB. *Id.* Furthermore, as Plaintiffs freely admit, they no longer have "payment records for before 2002 . . . . " Bullock Dec. at ¶ 23. Had Delta timely brought its miscalculation claim, these records—which very well may show there was no miscalculation at all (Roitman Dec. at ¶ 37)—may still have been available. Furthermore, important witnesses with knowledge of the facts may still have been alive. *Id.* That BWAB must now defend against the miscalculation claim in the absence of these records and witnesses prejudices BWAB.

In sum, the elements of BWAB's laches defense are either established or genuinely disputed. As such, the Court should deny the Motion as to the miscalculation claim.

V.     **The Motion should be denied because the Bullock Declaration upon which it relies lacks foundation.**

Repeatedly and throughout the Motion, Movants refer to the Declaration of Seth Bullock ("Bullock Dec.") and the documents attached thereto. *See* Motion, generally.

Although the transactions and events at issue in this case date back to 1994, the Bullock

Declaration plainly states the following:

> I have consulted for Par Petroleum or its predecessor, Delta Petroleum
> Corporation ("Delta"), since November 2011, and have held officer
> positions at Par Petroleum (or Delta) since July 2012.

Bullock Dec. at ¶ 1.  Mr. Bullock admits he is a relative newcomer to this dispute.

Mr. Bullock cannot possibly have sufficient personal, firsthand, non-hearsay

knowledge concerning transactions which predated his involvement with Delta and its

successors by over a decade.  Indeed he admits as much, stating that the bases his

Declaration on his "personal knowledge and/or upon [his] review of the books and

records . . . ."  Bullock Dec. at ¶ 4 (emphasis added).  Given his November 2011 arrival

at Delta, he has no more knowledge concerning the truth, accuracy, completeness,

genuineness, or authenticity of the documents attached to his Declaration (see Bullock

Dec. at ¶ 5) than a stranger to this case.  Nor can he opine with any authority concerning

the circumstances surrounding Delta's 1999 NOI (Bullock Dec. at ¶¶ 8-9) or the

supposed historical errors concerning payment calculations (Bullock Dec. at ¶ 17).  Nor

can he opine as to Delta's normal business practices and the documents maintained

pursuant thereto, as he arrived only shortly before Delta's bankruptcy filing.

As the basis for the Bullock Declaration is in such doubt on its face, it cannot be

the basis for summary judgment.  Declarations must pass evidentiary muster, and as the

Bullock Declaration by its very terms offers numerous pieces of hearsay evidence, it

should not be considered as a basis for summary judgment.  *In re Am. Remanufacturers,*

*Inc.*, 2010 WL 1027803 at **4-5 (Bankr. D. Del. Mar. 19, 2010).  At the very least,

BWAB should be permitted to depose Mr. Bullock, as requested in BWAB's 56(d) Motion, to discover the basis for his Declaration prior to the determination of the Motion.

### CONCLUSION

For all of the foregoing reasons, BWAB respectfully requests that the Court deny the Motion.  In the alternative, for the foregoing reasons and those set forth in BWAB's contemporaneously-filed 56(d) Motion, BWAB requests that the Court defer ruling on the Motion until BWAB can conduct the discovery sought by the 56(d) Motion and submit briefing related thereto.

Dated: March 12, 2013

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

By:    /s/ Raymond H. Lemisch
Raymond H. Lemisch, Esquire (No. 4204)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
(302) 442-7010 telephone
(303) 442-7012 facsimile
rlemisch@beneschlaw.com

– and –

Barry L. Wilkie, Esq.
Stuart N. Bennett, Esq.
**JONES & KELLER, P.C**
1999 Broadway, Suite 3150
Denver, CO  80202
(303) 573-1600 telephone
(303) 573-8133 facsimile
bwilkie@joneskeller.com

*Counsel to BWAB Limited Liability Company*

40