## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                             :

In re:                         :      Chapter 11
                             :

DELTA PETROLEUM CORPORATION, :     Case No. 11-14006 (KJC)
et al.,                       :
                             :      Jointly Administered

                Debtors.    :
                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DELTA PETROLEUM GENERAL     :
RECOVERY TRUST               :
and                           :
PAR PETROLEUM CORPORATION,   :
                             :      Adv. Pro. No. 12-50898 (KJC)
             Plaintiffs,     :
                             :

     v.                               :
                             :

BWAB LIMITED LIABILITY      :
COMPANY,                   :
                             :
             Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR SUMMARY JUDGMENT

<table>
<tr><td>SKADDEN, ARPS, SLATE,<br>  MEAGHER & FLOM LLP</td><td>SKADDEN, ARPS, SLATE,<br>  MEAGHER & FLOM LLP</td></tr>
<tr><td>Anthony W. Clark (I.D. No. 2051)<br>Kristhy M. Peguero (I.D. No. 4903)<br>One Rodney Square<br>P.O. Box 636<br>Wilmington, Delaware 19899-0636<br>(302) 651-3000</td><td>Ron Meisler<br>David R. Pehlke<br>155 North Wacker Drive<br>Chicago, Illinois 60606-1720<br>(312) 407-0700</td></tr>
<tr><td>Dated: Wilmington, Delaware<br>        April 5, 2013</td><td>*Counsel for Plaintiffs Delta Petroleum*<br>*General Recovery Trust and Par Petroleum*<br>*Corporation*</td></tr>
</table>

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT ........................................................................1

ARGUMENT ...................................................................................................4

    I.      BWAB HELD DISCHARGEABLE PERSONAL PROPERTY
            INTERESTS, NOT NON-DISCHARGEABLE REAL
            PROPERTY INTERESTS. ...........................................................4

         A.      The Transfer Between Delta And Whiting Did Not Convey
                A Real Property Interest....................................................5

              1.      In 1999, Whiting conveyed to Delta only what it
                      could convey – a net operating interest, not a real
                      property interest. ...................................................6

              2.      The 1999 net operating interest is not a rejected
                      executory contract. ................................................7

              3.      The 1999 Agreement conveyed to BWAB a
                      personal property right to payment that became a
                      general unsecured pre-petition claim when
                      bankruptcy was filed. ............................................8

               4.      BWAB's 1994 interests also are ordinary pre-
                      petition claims. ...................................................10

          B.      There Is No Basis In Equity To Save BWAB's Claims
                  From Discharge.............................................................11

          C.      BWAB Could Have Perfected An Interest In The Purported
                  Real Property And, Therefore, That Interest May Be
                  Avoided Under Section 544(a)(3)..................................13

    II.     THE EXCESS PAYMENTS TO BWAB SHOULD BE
            DISGORGED. ..........................................................................16

          A.      The Post-Petition Payments To BWAB Were Not
                  Authorized By The Court, And The Bankruptcy Code
                  Provides No Basis To Protect Them From Disgorgement
                  Now..............................................................................16

B.      Under The Unambiguous Language Of The 1994
        Agreement, Subsequently Granted Interests Were To Be
        Counted Against Prior Interests, And The 1997 Letter
        Agreement Does Not Change That Term. ....................................17

C.      BWAB's Laches Defense Is Without Merit. ..................................19

D.      Additional Fact Discovery Solely To Fix The Amount Of
        The Prepetition Excess Payments Is Unnecessary. ........................20

CONCLUSION ............................................................................................................21

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Aguayo v. Amaro*, 213 Cal. App. 4th 1102 (Cal. App. 2d Dist. 2013) .............................15

*In re APF Co.*, 270 B.R. 567 (Bankr. D. Del. 2001) ...........................................................9

*B. Cohen & Sons Caterers, Inc. v. New Plan Realty Trust* (In re B. Cohen
    & Sons Caterers, Inc.), 97 B.R. 808 (Bankr. E.D. Pa. 1989), *aff'd in
    part and remanded in part*, 108 B.R. 482 (E.D. Pa. 1989), *appeal
    dismissed*, 908 F.2d 961 (3d Cir. 1990) ...................................................................12

*Cohen v. TIC Financial Systems* (In re Amspace Corp.), 279 B.R. 145
    (Bankr. D. Del. 2002) ...........................................................................................12

*In re Estill Medical Technologies, Inc.*, No. 4-01-48064-DML-11, 2004
    Bankr. LEXIS 333 (Bankr. N.D. Tex. Mar. 26, 2004) .........................................12

*Exide Technologies v. Enersys Delaware, Inc.* (In re Exide Technologies),
    No. 02-11125 (KJC), 2013 Bankr. LEXIS 66 (Bankr. D. Del. Jan.
    8, 2013) ..................................................................................................9, 10, 13

*FCC v. NextWave Personal Communications Inc.*, 537 U.S. 293 (2003) ..........................9

*In re JZ, L.L.C.*, 371 B.R. 412 (B.A.P. 9th Cir. 2007).........................................................5

*L.R.S.C. Co. v. Rickel Home Centers, Inc.* (In re Rickel Home Centers,
    Inc.), 209 F.3d 291 (3d Cir. 2000) ........................................................................17

*Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635 (3rd Cir.
    1991) ....................................................................................................................17

*Midlantic National Bank v. Bridge* (In re Bridge), 18 F.3d 195 (3d Cir.
    1994) ....................................................................................................................14

*N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513 (1984).........................................................7

*Octagon Gas Systems, Inc. v. Rimmer*,
    995 F.2d 948 (10th Cir. 1993) ................................................................................8

*Official Committee of Unsecured Creditors v. Aust* (In re Network Access
    Solutions, Corp.), 330 B.R. 67 (Bankr. D. Del. 2005)...........................................19

*Reiner v. Danial*, 211 Cal. App. 3d 682 (Cal. App. 2d Dist. 1989)..................................15

*In re Reynolds*, 470 B.R. 138 (Bankr. D. Colo. 2012) .......................................................13

*Shams v. Howard*, 165 P.3d 876 (Colo. App. 2007) ..........................................................19

*In re Silver Fox, LLC*, No. 07-19443 (NLW), 2010 WL 2572602 (D.N.J. June 24, 2010) ................................................................................................5, 7

*Stewart Foods v. Broecker* (In re Stewart Foods), 64 F.3d 141 (4th Cir. 1995) ................................................................................................................9

*In re Waste Systems International, Inc.*, 280 B.R. 824 (Bankr. D. Del. 2002) ..............................................................................................................7, 9

*In re Worldwide Direct, Inc.*, 280 B.R. 819 (Bankr. D. Del. 2002) ...................................11

## STATUTES AND RULES

11 U.S.C. § 101(5)(A) ...............................................................................................3, 8, 9

11 U.S.C. § 363(b)(1) .......................................................................................................17

11 U.S.C. § 542(a) ............................................................................................................17

11 U.S.C. § 544(a)(3) ......................................................................................3, 14, 15, 16

11 U.S.C. § 546(a)(1) .......................................................................................................19

11 U.S.C. § 549(a) ......................................................................................................16, 17

11 U.S.C. § 550(a) ............................................................................................................17

Cal. Civ. Code § 1060 .......................................................................................................15

## OTHER AUTHORITIES

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ...............................9

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5887 ...................................9

Plaintiffs respectfully submit this reply brief in support of their motion for summary judgment[1] (D.I. 34) against defendant BWAB and in response to BWAB's opposing memorandum of law (the "Response").  (D.I. 44)

## PRELIMINARY STATEMENT

Plaintiffs' Opening Brief makes a straight-forward case for summary judgment based on undisputed, and unequivocally supporting, facts.  The strategy in BWAB's Response is transparent:  it attempts to obfuscate, confuse and complicate the issues with alternative and illusory theories that have no support in fact or law, all in an effort to make it appear that summary judgment at this stage would be premature.  But BWAB's arguments ignore the undisputed facts and basic principles of bankruptcy law. This case presents nothing more than garden variety prepetition unsecured claims that have been discharged.  No amount of argument or additional discovery will change that.

As set forth in Plaintiffs' Opening Brief, the undisputed facts establish that BWAB held only personal property interests in connection with the Leases at issue. These undisputed facts – each of which BWAB concedes – include the following:

- In 1994, BWAB received a contractual right to payment from the net proceeds Whiting received from the Lease revenues (the "1994 Agreement").  (Response at 7-8)

- In 1999, Delta and Whiting entered into a transaction which initially contemplated that Whiting would convey its complete interests in the Leases – *i.e.*, including Whiting's real property interests.  But as things turned out, Whiting admittedly was unable to convey its real property interests to Delta.  As a result, Whiting only conveyed to Delta the economic benefit of the Leases – what the parties referred to as a "net operating interest," which, undeniably, is only a contractual right to payment.  (*Id.* at 10-12)

---

[1]    Terms defined, and record citation forms used, in Plaintiffs' opening memorandum of law in support of the summary judgment motion (the "Opening Brief") (D.I. 35) are used herein.

- And to compensate BWAB for its assistance in the 1999 deal with Whiting, Delta conveyed to BWAB a portion of what Delta received from Whiting – *i.e.*, a right to payment from the revenues Delta received from the Leases (the "1999 Agreement").  (*Id.* at 10)

BWAB's right to payment under the 1994 Agreement and the 1999 Agreement are the claims that the bankruptcy discharged.  The post-petition and improper prepetition payments Delta made pursuant to those Agreements are the funds that must be disgorged.

BWAB's only response to these straight-forward and well-supported facts is to assert that, regardless of the facts, its interests are real property interests that are not dischargeable in bankruptcy.  For its 1994 interest, BWAB's real property characterization ignores the plain language of the agreement and focuses solely on the fact that it recorded the interest.  Then, for the 1999 interest, BWAB reverses field and focuses on the fact that the agreement calls it an overriding royalty interest ("ORRI"), which BWAB says makes it a real property interest, while glossing over the additional fact that, for more than a decade, it never bothered to record the interest.  BWAB asks the Court to ignore the facts – most significantly, that Delta did not own a real property interest that it could convey to BWAB in 1999 – and the law – most significantly, the black letter principle that a party cannot convey an interest greater than it holds – and to decide this case based on the *label* attached to the interest, rather than on the *true nature* of the interest.  In the final analysis, labels must yield to substance – the true nature of the conveyances here, as established by the undisputed facts, show that BWAB held only rights to payment under prepetition contracts, and those constitute claims that are dischargeable in bankruptcy and were discharged in this case.

BWAB also ignores basic bankruptcy principles to argue that the Debtors had no actionable interest in the 1994 and 1999 interests.  To the contrary, Delta's interest

2

in the Leases was burdened by BWAB's 1994 and 1999 interests.  By operation of the

Plan, Plaintiffs can extinguish those interests, as here sought.  BWAB's argument that it

held no "claim" in the Debtors' bankruptcy cases because it received timely post-petition

payments fares no better.  BWAB's interests constituted rights to payment under

prepetition contracts.  Any such right to payment falls squarely within the definition of a

"claim" under section 101(5)(A) of the Bankruptcy Code and is, therefore, subject to

discharge and was, in fact, discharged.

But BWAB argues that none of this matters because it held, not a

dischargeable personal property claim but, rather, a real property interest outside of the

Debtors' estates.  However, as Plaintiffs argued alternatively in their Opening Brief

(at 14-18), even if BWAB's interests were real property interests, they can be avoided

under the strong arm provision of section 544(a)(3).  BWAB's counter – that it would

have been "impossible" for it to record its interest, and that, therefore, section 544(a)(3)

does not apply – is completely inconsistent with the fact that BWAB did record its 1994

non-real property interest.  Moreover, it was not "impossible" for BWAB to record and

perfect its interest in 1999 or at some point over the next 10+ years.  As explained below,

BWAB had many options to record – and the fact that it did record its 1994 interest

demonstrates that BWAB knew how, and why, to do so.  At bottom, BWAB's argument

is that, even though none of the parties ever recorded anything related to the 1999

Agreement, and even though Delta admittedly received only the economic benefit of the

Leases from Whiting and not title to them, BWAB's interest is nonetheless a real property

interest.  That makes no sense.  The simplest conclusion is the right one:  BWAB held

only a personal property interest, and that is why it never recorded the interest.

3

Finally, BWAB's arguments against disgorgement have no merit.  Laches fails because this action was filed well within the statutorily prescribed period.  BWAB's other arguments fail, as a matter of law, because, as a result of the bankruptcy, and once its 1994 and 1999 interests were extinguished, it was not entitled to any post-petition payments, which must be disgorged.

Accordingly, for the reasons set forth below and in Plaintiffs' Opening Brief, the Court should grant summary judgment to Plaintiffs.

## ARGUMENT

## I.    BWAB HELD DISCHARGEABLE PERSONAL PROPERTY INTERESTS, NOT NON-DISCHARGEABLE REAL PROPERTY INTERESTS.

BWAB concedes that Delta had originally intended to acquire a real property interest from Whiting in 1999, but Whiting was unable to convey legal title. (Response at 11)  So, instead, Whiting conveyed only the economic benefit of Whiting's interests in the Leases – what the parties to the agreement designated as a "net operating interest."  (*Id.*)  Yet, the Response (at 19-20) argues that Delta was nonetheless able to convey to BWAB a real property interest and, therefore, its interest is outside of the Debtors' estates.  Moreover, BWAB's supposed "real property" interest is one that it never sought to record, despite holding it for well over a decade, and which it received from another party with an unrecorded supposed "real property" interest.   The facts plainly reflected in the unambiguous controlling contracts refute BWAB's unbelievable and convoluted contentions based on a history of unrecorded titles.  BWAB got only what Delta could, and did, convey – a personal property interest, not a fictional real property interest.

4

**A.    The Transfer Between Delta And Whiting Did Not Convey A Real Property Interest.**

BWAB's argument that its interests must be considered real property, not personal property, interests ultimately rests upon a false choice.  According to BWAB, the Court has only two choices – it must either find that (i) the "1999 [net operating interest] was an executory contract which has been rejected" or (ii) the "1999 [net operating interest] was in fact an interest in real property."  (Response at 21)  BWAB needs the 1999 assignment of a net operating interest from Whiting to Delta to be a real property interest – since it could not have acquired more than Delta owned – so BWAB tries to distract the Court with this false choice and lead it to the unsupported conclusion that the 1999 net operating interest could not have been a personal property interest. BWAB's argument ignores the undisputed facts and controlling provisions of the Bankruptcy Code.

The applicable facts and legal principles are simple:  (1) Whiting conveyed to Delta only what it could convey, a contractual right to payment (*i.e.*, a net operating interest), not a real property interest; (2) even if the contract between Whiting and Delta were executory, and it is not, that makes no difference, because the contract could have ridden through the bankruptcy;[2] and (3) BWAB's 1999 Agreement with Delta supports only a personal property claim, because it is nothing more than a simple factoring agreement that conferred a right of payment to BWAB in exchange for its assistance to Delta in the Whiting deal.

---

[2]    *See, e.g.*, *In re Silver Fox, LLC*, No. 07-19443 (NLW), 2010 WL 2572602, at *6 (D.N.J. June 24, 2010) ("An executory contract that is not assumed in a chapter 11 case is not 'deemed rejected.' As a matter of straightforward statutory construction, it follows that some other alternative, i.e. 'ride through,' must be available." (quoting *In re JZ, L.L.C.*, 371 B.R. 412 (B.A.P. 9th Cir. 2007)).

1.      **In 1999, Whiting conveyed to Delta only what it could convey – a net operating interest, not a real property interest.**

The 1999 net operating interest that Whiting conveyed to Delta transferred only the economic benefit of the Leases.  Section (g) of the Conveyance Agreement defined the "net operating interest" that Delta purchased from Whiting as the net of the oil and gas revenues after deducting certain expenses, fees, and overriding royalties.  As BWAB concedes, the parties agreed to this specific conveyance – the sale of only the economic benefit in the Leases – because Whiting was unable to convey anything more than that (*e.g.*, title to its interests).  (Response at 11; *see also* Bullock Decl. ¶ 14)  Because Whiting could not convey a real property interest, it conveyed what it could – the economic (but not legal) equivalent of a real property interest.

BWAB ignores these facts and, instead, asks the Court to proceed in reverse.  BWAB starts with the assertion that its 1999 interest was described as an "overriding royalty interest" and, therefore, was a real property interest, and then concludes that the preceding 1999 net operating interest conveyed from Whiting to Delta must also have been a real property interest. (Response at 18-21)  In other words, BWAB would have the Court move backwards from its preferred outcome, rather than assess each conveyance when made and determine, at each stage, what the *true nature* of that conveyance was.  Considering the true nature of each conveyance as made, the only possible conclusion is that Whiting conveyed a net operating interest to Delta, and Delta conveyed a right to payment to Larson.  Neither a net operating interest nor a right to payment is a real property interest.  The inquiry should end there.

**2.      The 1999 net operating interest is not a rejected executory contract.**

BWAB argues that the Court cannot find that the 1999 net operating interest conveyed exactly that – a net operating interest – without also finding that the interest is an executory contract that has been rejected.  (Response at 20)  Once again, in its effort to avoid summary judgment, BWAB obfuscates to make the issues here more complex than they really are.

With the 1999 net operating interest transfer, Whiting sold the economic benefits in the Leases to Delta.  It is a fully executed contract, but for the payment of money and, therefore, is not an executory contract.[3]  And even if the contract were executory, BWAB ignores basic principles of bankruptcy law to argue that it then must be a *rejected* executory contract.  BWAB bases this argument on the incorrect conclusion that any executory contract that is not assumed must necessarily be rejected.  (Response at 21)  But a debtor's estate is not required to assume or reject an executory contract, and if it does neither – as was the case here – then the contract rides through bankruptcy.[4]

What BWAB asserts are the Court's only choices – finding that the 1999 net operating interest is either a real property interest or a rejected executory contract – are contrary to the relevant facts and law.  The 1999 transfer did not convey an interest in real property, because Delta didn't own one, and that fact does not transform the fully executed 1999 net operating interest into an impliedly rejected executory contract.

---

[3]    *In re Waste Sys. Int'l, Inc.*, 280 B.R. 824, 827 (Bankr. D. Del. 2002) ("[A] contract is not executory if the only remaining obligation is the payment of money by the debtor.").

[4]    *In re Silver Fox*, 2010 WL 2572602, at *6; *see also N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 546 n.12 (1984) (holding that if "contract is neither accepted nor rejected, it will 'ride through' the bankruptcy proceeding and be binding on the debtor even after a discharge is granted" (citations omitted)).

3.      **The 1999 Agreement conveyed to BWAB a personal property right to payment that became a general unsecured pre-petition claim when bankruptcy was filed.**

BWAB's characterization of its 1999 interest from Delta as a real property right assumes and proceeds from its desired outcome, rather than the facts. The facts establish that BWAB held a personal property interest in the form of a right to payment, and not a real property interest.

As explained in Plaintiffs' Opening Brief and above, BWAB's 1999 interest cannot be considered a real property interest because Delta did not have a real property interest to convey. Delta only held the economic benefit of the Leases. BWAB assisted Delta in connection with the 1999 deal with Whiting. As compensation for that assistance, Delta agreed to pay BWAB a portion of the economic benefit it had purchased from Whiting. In essence, this is akin to a simple factoring agreement. BWAB received a right to payment in exchange for helping Delta with its acquisition. Delta did not convey an interest in real property – as it could not convey more than it held – it conveyed only a right to payment.[5] The fact that the agreement refers to the interest as an ORRI cannot alter what it actually is.[6]

BWAB also argues that because Delta timely made all payments due under the Agreements, BWAB never held a "claim" subject to the bankruptcy. (Response at 5, 28)   This argument ignores the broad definition of a "claim" under Bankruptcy Code section 101(5)(A) – a "right to payment, whether or not such right is

---

[5]     *See* Opening Brief at 12.

[6]     *Octagon Gas Systems, Inc. v. Rimmer*, 995 F.2d 948, 952 n.3 (10th Cir. 1993) (looking past description of interest as an "overriding royalty interest" and finding the use of the term incorrect "for lack of an oil and gas leasehold estate").

reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,

disputed, undisputed, legal, equitable, secured, or unsecured[.]"[7]  BWAB's interests give

it only a right to payment due under the terms of the prepetition contracts.  Non-

executory prepetition contracts requiring a debtor to pay money are routinely dealt with

in bankruptcy as giving rise to prepetition claims.[8]

        Even *In re Exide Technologies*, upon which BWAB relies, adopts the

broad definition of "claim" that includes a prepetition contract that provides for a right to

payment.[9]  The court specifically noted that "[t]he definition of a 'claim' includes a 'right

to payment' that may be contingent or unmatured, but it necessarily requires a pre-

confirmation event that triggers a 'right to payment,' whether based upon a breach of

---

[7]   11 U.S.C. § 101(5)(A).  *See also* H.R. Rep. No. 95-595, at 309 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6266; S. Rep. No. 95-989, at 21-22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5887, 5807-08 (the term "claim" encompasses the "broadest possible definition" and "contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case [and] permits the broadest possible relief in the bankruptcy court").  *See also FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 302 (2003) (the term "claim" "has 'the broadest available definition'" (citation omitted)).

[8]   *Stewart Foods v. Broecker* (In re Stewart Foods), 64 F.3d 141, 145 (4th Cir. 1995) ("[R]egardless of the nature of the contract, if at the time of the bankruptcy filing the debtor has an obligation under the contract to pay money to the non-debtor party, that obligation is handled as a pre-petition claim in the bankruptcy proceedings."); *In re Waste Systems Int'l, Inc.*, 280 B.R. 824, 827 (Bankr. D. Del. 2002) (royalty payments due to non-debtor under a non-executory prepetition contract gave rise to general unsecured claims); *In re APF Co.*, 270 B.R. 567, 572 (Bankr. D. Del. 2001) (debtors' payment obligations due under deferred compensation portion of prepetition merger agreement was prepetition claim).  There can be no dispute that BWAB's agreement with Delta is non-executory.  There is no additional performance required from BWAB under the agreement.

[9]   *See Exide Technologies v. Enersys Delaware, Inc.* (In re Exide Technologies), No. 02-11125 (KJC), 2013 Bankr. LEXIS 66, at * 20 (Bankr. D. Del. Jan. 8, 2013).

contract, tortious conduct, *or a prepetition contract that provides for a right to payment*, even if that right to payment is contingent."[10]

That precisely describes the facts here:  BWAB held a right to payment under a prepetition contract.  In contrast, the *Exide Technologies* court ultimately found that the agreement there did not give rise to a claim because it did *not* confer a "right to payment," and the debtor had only alleged a "potential rejection damage claim."[11]  But here, BWAB's interest *is* a right to payment conferred by a prepetition contract.  That BWAB received payments through the bankruptcy does not alter that fact.[12]

### 4.    BWAB's 1994 interests also are ordinary pre-petition claims.

The principles that apply to the 1999 interest also apply to the 1994 interest.  First, and as with the 1999 interest, BWAB cannot argue that its 1994 Agreement with Whiting conveyed anything other than what it actually conveyed.  Despite the recording of that interest,  it is clear from the face of the agreement that it conveyed only an interest in Whiting's proceeds from the Leases.  BWAB did not receive a real property interest in anything that generated those proceeds.  Thus, like the 1999 interest, BWAB's 1994 interest was simply a right to payment that became a claim subject to the bankruptcy like any other right to payment against the debtor.

---

[10]    *Id.* (emphasis added) (analyzing when claim arose under prepetition trademark license that required payment only upon breach).

[11]    *Id.* at *25.

[12]    BWAB may argue that because it received payments up to and through the bankruptcy, any claims it has are post-petition claims.  Such an argument would ignore the basic bankruptcy principles that apply here.  BWAB's claim is triggered by the *right to payment*, not the absence of payment.  That right to payment is the only thing that was conferred upon BWAB in the subject agreements, and it existed at the time of the chapter 11 petition.

For these reasons, BWAB's argument that the 1994 interest was never property of the estate (Response at 16-17) misses the point. The 1994 interest was a right to payment that created a claim against the estate that is now extinguished. Moreover, any improper payments made to BWAB in connection with that interest are property of the estate and must be disgorged. (*See infra* Section II.B.)

**B.      There Is No Basis In Equity To Save BWAB's Claims From Discharge.**

BWAB also attempts to raise equitable arguments to avoid discharge of its claims. These arguments ultimately rest upon BWAB's complaint that it was somehow unaware that its interests were even potentially implicated in this bankruptcy. The undisputed facts and applicable law refute this assertion.

BWAB concedes that it received notice of Plan confirmation. (Ans. ¶ 42) The Debtors' Plan (§ 10.14(a)) reserves "[a]ll Causes of Action … rights of setoff and other legal and equitable defenses of any Debtor or any Estate … for the benefit of the Recovery Trusts unless expressly released, waived, or relinquished under [the] Plan or Confirmation Order."[13] Under the Plan (§ 1.1), Causes of Action include all Avoidance Actions, which, in turn, include all actions under Bankruptcy Code section 544. Contrary to BWAB's suggestion (Response at 30), a plan need not spell out every possible defense or objection; a broad reservation of rights is sufficient to alert creditors of potential causes of action.[14] Accordingly, the Plan's reservation of the general right to pursue

---

[13]    The Plan (§ 10.14(a)) further provides that "[n]o Person may rely upon the absence of a specific reference under [the] Plan or Disclosure Statement to any Cause of Action … against them as an indication that the Recovery Trusts will not pursue a Cause of Action … against them."

[14]    *In re Worldwide Direct, Inc.*, 280 B.R. 819, 823 (Bankr. D. Del. 2002) (holding broad reservation of rights is sufficient to alert creditors of potential causes of action because it is "impractical and unwarranted to require a debtor to provide . . . excruciating detail [for all]

avoidance actions post-confirmation was sufficient to place BWAB on notice that an

avoidance action might be brought against it.[15]  Despite this notice, BWAB elected to

take no action to preserve whatever rights it believed it had.[16]  As a result, BWAB's

claims were extinguished by the Plan.  BWAB cannot now penalize the estate and escape

the consequences of its own failure to act.

    BWAB's judicial estoppel argument (Response at 21-23) does nothing to

avoid the consequences of its inaction.   The fact that Delta referred to its own interests in

the Leases as real property interests does not preclude Plaintiffs from exercising the right

to extinguish BWAB's personal property claim.[17]  BWAB's interests were discharged by

the Plan because those interests are dischargeable claims under the Bankruptcy Code and

the Plan.  How Delta referred to its own interests during the bankruptcy – mistakenly –

does not alter the status of BWAB's claims.  It also does not give rise to grounds to apply

judicial estoppel to block the discharge of those claims, and the cases BWAB relies on do

not say otherwise.

---

possible defenses or objections which the estate may have to every single claim being treated in plan").

[15] *See Cohen v. TIC Fin. Sys.* (In re Amspace Corp.), 279 B.R. 145, 160 (Bankr. D. Del. 2002) ("[A] general reservation in a plan of reorganization indicating the type or category of claims to be preserved should be sufficiently specific to provide creditors with notice that their claims may be challenged post-confirmation.").

[16] *See In re Estill Med. Techs., Inc.*, No. 4-01-48064-DML-11, 2004 Bankr. LEXIS 333, at *12 (Bankr. N.D. Tex. Mar. 26, 2004) (the "very absence of disclosure of the Eagle/Debtor relationship should have alerted Eagle to its peril" and Eagle could and should have protected its interest by raising it during confirmation process).

[17] While the Schedules and Statements (Jan. 6, 2012) listed the Debtors' interest in the Leases on the Schedule of Real Property (D.I. 148), the Debtors and Plaintiffs are not bound by such designation.  *See B. Cohen & Sons Caterers, Inc. v. New Plan Realty Trust* (In re B. Cohen & Sons Caterers, Inc.), 97 B.R. 808, 817 (Bankr. E.D. Pa. 1989) (finding debtor not bound by schedules), *aff'd in part & remanded in part*, 108 B.R. 482 (E.D. Pa. 1989), *appeal dismissed*, 908 F.2d 961 (3d Cir. 1990).

In *In re Exide Technologies*, the debtors attempted to reject certain licensing agreements as executory contracts.[18]  After an eight-day trial, an appeal to the district court, and an appeal to the Third Circuit, the circuit court determined that the licensing agreements were not executory contracts.[19]  Following that decision, the debtor brought an adversary proceeding to declare the licensee's claims discharged under the Plan.[20]  In that action, the court applied the "extraordinary remed[y]"[21] of judicial estoppel in part because the debtors' switch in position was "made in bad faith to circumvent the decision of the Third Circuit in the Rejection Litigation."[22]  As pointed out above, *Exide Technologies* is inapposite, because the interest at issue was a trademark licensing agreement that did not confer a right to payment.  But more to the point here, that case is also inapposite because Plaintiffs have not switched positions or sought to avoid the effect of a court ruling but, rather, are simply seeking to enforce the plain terms of the Plan.

In re Reynolds[23] is also inapposite.  There, the debtors listed debts they owed to a bank and credit card companies in their schedules, but later objected when the creditors filed proofs of claim solely on the basis that the creditors failed to include the agreements on which their claims were based.[24]  The court applied judicial estoppel to

---

[18]   *In re Exide Techs.*, 2013 Bankr. LEXIS 66, at *5.

[19]   *Id.* at *5-8.

[20]   *Id.* at *7-8.

[21]   *Id.* at *26 (alteration in original) (citation omitted).

[22]   *Id.* at *28.

[23]   470 B.R. 138 (Bankr. D. Colo. 2012).

[24]   *Id.* at 140-41.

prevent the debtor from "obtain[ing] a discharge of [the] debts by listing them in their bankruptcy schedules and, in the same proceeding, repudiat[ing] the very same debts to avoid providing for them in their [C]hapter 13 plan."[25]   Again, nothing of the sort has happened here.  The Debtors gained no tactical advantage from listing their interests in the Leases on the Schedule of Real Property.  And, more importantly, that listing said nothing about BWAB's interests and could not alter the fact that those interests were extinguishable claims.

     **C.**     **BWAB Could Have Perfected An Interest In The Purported Real Property And, Therefore, That Interest May Be Avoided Under Section 544(a)(3).**

BWAB also argues that if it was impossible for it to perfect its alleged interest in real property, then section 544(a)(3) does not apply, citing *In re Bridge*,[26] for the principle that "[i]f under applicable law, it is not possible for a transferee to perfect such transfer, then such transfer is not avoidable under Section 544(a)(3)."  (Response at 23-25)  BWAB's argument turns the case on its head.

The court in *Bridge* did observe that section 544(a)(3) does not mandate the impossible – it does not require a party to record what cannot be recorded *by law* in order to defeat the strong arm powers of the trustee.[27]  The specific interest at issue in *Bridge* was an equitable lien, which the lienholder conceded was recordable and which the court held was avoidable under section 544(a)(3).[28]  But the court also noted that if

---

[25]   *Id.* at 147.

[26]   *Midlantic Nat'l Bank v. Bridge* (In re Bridge), 18 F.3d 195 (3d Cir. 1994).

[27]   *Id.* at 200-03.

[28]   *Id.*

the interest had been un-recordable – that is, if it had been impossible to record as a matter of law – then it could have defeated a section 544(a)(3) avoidance action.[29] BWAB, however, does not hold an un-recordable interest.  BWAB asserts that it held a valid ORRI, which it concedes is recordable under California law.  (Response at 13, 24) Accordingly, its interest is subject to avoidance under section 544(a)(3).

       BWAB's argument about "wild" deeds (Response at 24 n.6) does not alter this outcome.  It was always possible for BWAB to perfect its interest – if it did, in fact, hold a real property interest as it asserts.  BWAB could have initiated an action to quiet title, brought an action for declaratory relief or recorded evidence of its interest.[30]  The fact that BWAB held a recordable interest that it could have recorded, but failed to record, ends the inquiry here.  Since section 544(a)(3) does in fact apply, BWAB's interest is avoidable under the statute.

       The recording options outlined above are likely what a true holder of a real property interest would have done here.  At some point since 1999, it would have taken the steps necessary to perfect its title.  That is perhaps the most remarkable aspect of BWAB's argument.  BWAB asserts that it holds an unrecorded real property interest at the end of a chain of unrecorded real property interests.  By contrast to this incredible series of unrecorded real property interests, when BWAB obtained another alleged ORRI subject to the same title issues in 1994, it did record.  On these uncontested facts, the far

---

[29]   *Id.* at 203 n.6.

[30]   *See generally*  Cal. Civ. Code § 1060 (authorizing the commencement of actions for declaratory relief to determine an interest in property); *Aguayo v. Amaro*, 213 Cal. App. 4th 1102 (Cal. App. 2d Dist. 2013) (affirming superior court ruling quieting title in connection with a dispute involving a wild deed); *Reiner v. Danial*, 211 Cal. App. 3d 682, 690 (Cal. App. 2d Dist. 1989) (explaining that a bona fide purchaser can assert his status affirmatively in actions to quiet title or remove a cloud from title).

more reasonable conclusion is that Delta's net operating interest and BWAB's right to payment are *not* real property interests, and BWAB knows it.

## II.    THE EXCESS PAYMENTS TO BWAB SHOULD BE DISGORGED.

### A.    The Post-Petition Payments To BWAB Were Not Authorized By The Court, And The Bankruptcy Code Provides No Basis To Protect Them From Disgorgement Now.

BWAB's various defenses to Plaintiffs' request to return the payments it received post-petition fail to overcome the clear bankruptcy provisions that require disgorgement of the payments.

BWAB mistakenly argues that Bankruptcy Code section 549(a) is not available to Plaintiffs because the post-petition payments were made in the ordinary course of business and were authorized by the Court.  (Response at 35-36)  BWAB ignores that the ORRI payments authorized by the December 19, 2011 and February 13, 2012 court orders (D.I. 66, 296) only applied to *true* ORRIs,  *i.e.*, real property interests that were not property of the estate, and only to avoid the risk that the underlying leasehold interests would be terminated due to non-payment (*see* D.I. 9), and did not apply to BWAB's prepetition general unsecured claims.  Moreover, even if the 1999 interest was a real property interest – and it was not – it was avoided under section 544(a)(3) at the commencement of the case.  Thus, under the code, BWAB had no right to receive any post-petition payments in connection with its interests.

Moreover, each of the relevant orders (in ¶ 5) explicitly provides that "[n]othing … in this Order shall be construed as impairing the Debtors' right to contest the validity, priority or amount of any Royalties or ORRI that may be due to any of the Royalty Owners or ORRI Owners."  Therefore, even if the post-petition payments to BWAB had been made pursuant to those orders – and they were not – they were

16

improperly made and are subject to the estates' reservation of rights to challenge the validity of the payments.  Thus, the post-petition excess payments to BWAB can and should be avoided under section 549(a) and recovered by the Reorganized Debtors under section 550(a).

The fact that BWAB had no right to post-petition payments also disposes of its claim for conversion.  (*See* Response at 35)  And without a conversion claim, BWAB cannot argue that its decision not to bring such a nonexistent claim served as reasonably equivalent value for the payments.[31]

Finally, BWAB's argument that Bankruptcy Code section 542(a) does not apply is without merit because it ignores section 363(b)(1), under which the post-petition payments constitute "property of the estate" that the Debtors would have been authorized to use.[32]

    **B.**    **Under The Unambiguous Language Of The 1994 Agreement, Subsequently Granted Interests Were To Be Counted Against Prior Interests, And The 1997 Letter Agreement Does Not Change That Term.**

BWAB's argument that "[s]ubsequently granted ORRIs in the same oil-producing property do not reduce prior grants of ORRIs in that property" (Response 33)

---

[31]  *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3rd Cir. 1991) ("The purpose of [fraudulent conveyance] laws is estate preservation; thus, the question whether the debtor *received* reasonable value must be determined from the standpoint of the creditors.").

[32]  *L.R.S.C. Co. v. Rickel Home Ctrs., Inc.* (In re Rickel Home Ctrs., Inc.), 209 F.3d 291, 297 (3d Cir. 2000) ("'Property of the estate' includes, inter alia, 'all legal or equitable interests of the debtor in property as of the commencement of the case.'  As the legislative history makes clear, 'the scope of this paragraph is broad. It includes all kinds of property, including tangible or intangible property, causes of action . . . [and] also includes 'title' to property, which is an interest, just as are a possessory interest, or leasehold interest, for example.'") (alteration in original) (citations omitted).

conflicts with the plain language of the 1994 Agreement.[33]  Under that term of the 1994

Agreement, the Leases were burdened by BWAB's 1999 interest and other interests held

by Kaiser-Francis Oil Company, Aleron Larson, Jr., and Roger Parker.   (Bullock Dec. ¶

19)  Thus, payments made with respect to those interests should have been, but were not,

deducted from the gross receivable under the formula to reduce the amount payable to

BWAB.  (*Id.*)

Despite the fact that the 1994 Agreement is unambiguous on this point,

BWAB seeks to alter that unambiguous provision by incorporating into the 1994

Agreement a letter agreement dated June 25, 1997, between itself and Whiting.

According to BWAB, this letter agreement governs the calculation of the 1994 interest.

(Response at 36)  The 1997 agreement, however, does not explicitly supersede or refer to

any terms within the 1994 Agreement.  Thus, even if the 1997 agreement does govern the

interest calculations under the 1994 Agreement, it does not address or alter the term in the

1994 Agreement that requires the deduction of "all lessors royalties, overriding royalties,

and other burdens and payments out of gross production that burden Whiting's fractional

or percentage share."  That provision is unambiguous and unaltered by the 1997

---

[33]   Under section 1 of the 1994 Agreement, BWAB received "an undivided Three and One-Half
Percent (3.5%) interest in Whiting's Net Revenue Interest from the Subject Properties, to be
determined as set forth below.  As used herein, the term 'Net Revenues' to the BWAB interest
shall mean the difference between (A) the gross revenues received by Whiting from the sale
of its fractional or percentage share of Hydrocarbons from the Subject Properties, ***after the
deduction of all lessors royalties, overriding royalties, and other burdens and payments out
of gross production that burden Whiting's fractional or percentage share***, and (B) the sum
of Whiting's fractional or percentage share of third party (i) transportation expenses, (ii)
treatment and processing expenses, (iii) compression expenses, and (iv) severance taxes,
occupation taxes, and other like taxes based on the production of Hydrocarbons."  (Emphasis
added)  Delta, as Whiting's successor in interest, is entitled to deduct the royalties, other
burdens and payments out of gross production that burden its (not Whiting's) fractional or
percentage share.

agreement – no matter what that 1997 agreement is considered to be.  The 1997

agreement cannot be used to rewrite the 1994 Agreement simply to suit BWAB's needs.[34]

     **C.**       **BWAB's Laches Defense Is Without Merit.**

           BWAB also raises a laches defense based upon the unsupported assertion

that Mr. Bullock's testimony – that Plaintiffs only discovered the excess payments during

the course of this litigation – lacks credibility.  (Response at 36-38)  But BWAB never

explains how it can bring a laches defense against an avoidance claim that was filed well

within Bankruptcy Code section 546(a)(1)'s statutory filing period of two years from the

appointment of a debtor-in-possession.  This action was timely filed and is not subject to

a laches defense.[35]

           BWAB's argument also fails because it rests only upon vague complaints

regarding Mr. Bullock's experience.   BWAB questions whether Mr. Bullock has

"sufficient personal, firsthand, non-hearsay knowledge concerning transactions which

predated his involvement with Delta and its successors by over a decade."  (Response at

39)  But Mr. Bullock has only presented testimony regarding the calculation of the

prepetition excess payments with which he is intimately familiar, as he oversaw and

assisted in preparing the chart summarizing the historical overpayments.  (Bullock Dec.

at Exhibit F)  That is the only testimony that was required here, because Plaintiffs'

---

[34]   *Shams v. Howard*, 165 P.3d 876, 880 (Colo. App. 2007) ("Extraneous evidence is considered only when the contract is ambiguous.").

[35]   The case BWAB cites is instructive in this regard.  *See Official Comm. of Unsecured Creditors v. Aust* (In re Network Access Solutions, Corp.), 330 B.R. 67, 77 (Bankr. D. Del. 2005).  It finds no facts supporting inexcusable delay where an avoidance action was filed by the creditors' committee within the statute of limitations for avoidance actions.  *Id.*  The court also found that the defendants had not met their burden to show prejudice necessary to invoke the equitable doctrine of laches where the pertinent records were not destroyed or beyond the defendants' reach using legal process.  *Id.*

summary judgment motion rests entirely on basic bankruptcy law and the operative

agreements as unambiguously written.

      **D.**      **Additional Fact Discovery Solely To Fix The Amount Of The Prepetition Excess Payments Is Unnecessary.**

      Lastly, BWAB argues that summary judgment as to the prepetition excess

payments is not appropriate because Plaintiffs have produced few documents

"demonstrat[ing] whether and to what extent the historical deductions were correctly

made." (Response at 32) But the Court need only consider the language of the 1994

Agreement to determine whether Plaintiffs' position has merit. As Plaintiffs note in their

objection (D.I. 48) to BWAB's motion to permit discovery (D.I. 45), what the contractual

formula requires is fundamentally a question of law for the Court to decide based on the

plain language of the 1994 Agreement. Once that is determined, the mechanical

application of that formula to determine the proper amount of the monthly payments that

should have been made likely will be agreed to by the parties or, if not, can be reserved

for a trial on that limited issue. Thus, BWAB's desire to take further discovery into the

calculation of Plaintiffs' post-petition excess payments damages does not support

delaying the Court's consideration of Plaintiffs' summary judgment motion.

## CONCLUSION

For all of the foregoing reasons and those stated in Plaintiffs' Opening Brief, Plaintiffs respectfully request that the Court (i) grant their motion in all respects and enter summary judgment in favor of Plaintiffs, and (ii) grant Plaintiffs such other and further relief, including costs, expenses and attorney's fees, as the Court deems just and proper.

Dated:      April 5, 2013
            Wilmington, Delaware


                          */s/ Anthony W. Clark*
                          Anthony W. Clark (I.D. No. 2051)
                          Kristhy M. Peguero (I.D. No. 4903)
                          Skadden, Arps, Slate, Meagher & Flom LLP
                          One Rodney Square
                          P.O. Box 636
                          Wilmington, Delaware 19899-0636
                          Telephone: (302) 651-3000
                          Fax: (302) 651-3001

                          - and -

                          Ron E. Meisler
                          David R. Pehlke
                          Skadden, Arps, Slate, Meagher & Flom LLP
                          155 N. Wacker Dr.
                          Chicago, Illinois 60606
                          Telephone: (312) 407-0700
                          Fax: (312) 407-0411

                          *Counsel for Plaintiffs Delta Petroleum General Recovery*
                          *Trust and Par Petroleum Corporation*

21