# Exhibit A to Cross Motion

Case 12-50898-KJC   Doc 75-1   Filed 06/21/13   Page 2 of 12

In Re: Delta Petroleum Corp. (Debtor)     KEVIN NANKE                         6/5/2013

## Page 1

```
               IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE DISTRICT OF DELAWARE

    Case No. 11-14006(KJC)    (Jointly Administered)
    Adv. Pro No. 12-50898(KJC)
    Adv. Pro No. 12-50877(KJC)

    IN RE:

    DELTA PETROLEUM CORPORATION, et al.,

    Debtors,

    DELTA PETROLEUM GENERAL RECOVERY TRUST and PAR PETROLEUM
    CORPORATION,
    Plaintiffs,
    v.
    BWAB LIMITED LIABILITY COMPANY,
    Defendant.
    and
    DELTA PETROLEUM GENERAL RECOVERY TRUST and PAR PETROLEUM
    CORPORATION,

    Plaintiffs,

    v.

    ALERON LARSON, JR.,

    Defendant.
    _____
    DEPOSITION OF:   KEVIN NANKE - June 5, 2013
    _____
```

## Page 2

         PURSUANT TO NOTICE, the deposition of
KEVIN NANKE was taken on behalf of the Defendants at
1999 Broadway, Suite 3150, Denver, Colorado 80202, on
June 5, 2013, at 9:02 a.m., before Rita DeRouen,
Registered Professional Reporter and Notary Public
within Colorado.


                    A P P E A R A N C E S
For the Plaintiffs:
        DAVID R. PEHLKE, ESQ.
        Skadden, Arps, Slate, Meagher & Flom, LLP
        155 North Wacker Drive
        Chicago, Illinois  60606-1720

For the Defendants:
        STUART N. BENNETT, ESQ.
        Jones & Keller, P.C.
        1999 Broadway
        Suite 3150
        Denver, Colorado  80202

## Page 3

```
                          I N D E X
EXAMINATION OF KEVIN NANKE:                           PAGE
June 5, 2013

By Mr. Bennett                                          5

By Mr. Pehlke                                          98

                                                   INITIAL
DEPOSITION EXHIBITS:                             REFERENCE
Exhibit 18   Defendants BWAB Limited Liability          6
             Company and Aleron Larson, Jr.'s,
             Notice of Deposition
Exhibit 19   Unit Agreement for Outer                  24
             Continental Shelf Exploration,
             Development, and Production
             Operations on the Point Arguello
             Unit, 10-1-96
Exhibit 20   Unit Operating Agreement, Point           24
             Arguello Unit, Pacific Offshore,
             California, 10-1-96
Exhibit 21   Purchase and Sale Agreement               32
             between Whiting and Delta,
             6-8-99
Exhibit 22   Amendment to Purchase and Sale            36
             Agreement between Whiting and
             Delta, 6-8-99
Exhibit 23   DPT000039                                 51
Exhibit 24   Point A Net Cash Flow Activity            56
             During the Month of May 2012
Exhibit 25   Invoice from Whiting to Delta,            62
             11-27-12
Exhibit 26   Copies of Checks                          63
Exhibit 27   Pay Stub from Delta to Larson,            71
             8-21-12
```

## Page 4

```
Exhibit 28   Letter from Hazlett to Roulier,           73
             re: Point Arguello Unitization,
             6-24-97
Exhibit 29   Amended Complaint for Avoidance           76
             and/or Discharge of Interests,
             Enforcement of Bar Date Order,
             and Recovery of Property of the
             Estate
Exhibit 30   Letter from Mills to Delta, re:           82
             Point Arguello BWAB Overriding
             Royalty, 3-19-01
Exhibit 31   Delta Owner Detail Sales for              84
             BWAB Limited Liability Company,
             12-31-01 to 12-31-12
Exhibit 32   Delta Nonrecurring Expenses - Net         85
Exhibit 33   Global Notes Regarding Debtors'           89
             Schedules of Assets and Liabilities
             and Statements of Financial Affairs
Exhibit 34   Delta Owner Detail Sales for              93
             Aleron H. Larson, Jr., 12-31-01
             to 12-31-12
Exhibit 35   (Withdrawn)                               94
Exhibit 36   Whiting GL Detail Drill Down              96

PREVIOUSLY MARKED EXHIBITS:
Exhibit 4    Assignment of Overriding Royalty          31
             between Whiting and BWAB, 12-16-94

Exhibit 5    Agreement between BWAB and Delta,         13
             4-1-99
Exhibit 9    Conveyance and Assignment between         43
             Whiting and Delta

Exhibit 10   Assignment of Overriding Royalty          45
             Interest between Delta and BWAB,
             12-1-99
```

Case 12-50898-KJC    Doc 75-1    Filed 06/21/13    Page 3 of 12

In Re: Delta Petroleum Corp. (Debtor)    KEVIN NANKE    6/5/2013

Page 5

1    WHEREUPON, the following proceedings were
2 taken pursuant to the Federal Rules of Civil
3 Procedure.
4        * * * * *
5    KEVIN NANKE,
6 having been duly sworn to state the whole truth,
7 testified as follows:
8        EXAMINATION
9 BY MR. BENNETT:
10    Q. Good morning, Mr. Nanke. How are you this
11 morning?
12    A. I'm great. How are you?
13    Q. Good. My name is Stuart Bennett. I
14 represent BWAB Limited Liability Company, a defendant
15 in a case brought by Delta Petroleum General Recovery
16 Trust and Par Petroleum. I also represent Aleron
17 Larson in a separate case brought by Delta Petroleum
18 General Recovery Trust and Par Petroleum. We just met
19 this morning; is that right?
20    A. That is correct.
21    Q. And you are appearing here today pursuant
22 to a subpoena that you have accepted service of; is
23 that correct?
24    A. That's right.
25        (Deposition Exhibit 18 was marked.)

Page 6

1    Q. The court reporter has marked in front of
2 you a notice of deposition and a subpoena and your
3 acceptance of service, it's been marked as Exhibit 18.
4 Do you see that on the stamp below?
5    A. I do.
6    Q. Would you please confirm for me that on
7 the last page of this document is your signature on a
8 waiver and acceptance of service?
9    A. That is my signature.
10    Q. Have you had the pleasure of having your
11 deposition taken before?
12    A. I have.
13    Q. On how many occasions?
14    A. Three or four different occasions.
15    Q. Have you ever testified in court?
16    A. One time.
17    Q. What was the nature of that case or that
18 one time?
19    A. It was, I believe, a land dispute case
20 many, many years ago; probably, I don't know, almost
21 20 years ago.
22    Q. Did it involve oil and gas issues at all?
23    A. It did.
24    Q. Do you know if, in the case you testified
25 in court, whether you were qualified as an expert in

Page 7

1 any regard?
2    A. I do not recall that.
3    Q. How many other depositions have you had?
4    A. I would say three others.
5    Q. And have they been all involving oil and
6 gas matters?
7    A. Yes.
8    Q. Can you give us a brief description of
9 your background in the oil and gas business?
10    A. My background is, first I started off in
11 public accounting through a couple of regional firms,
12 Hammond & Nelson here in town that has, I think,
13 changed their name subsequent; I worked there only for
14 one public season. And then I moved over to Hein &
15 Associates, another local or regional firm here in
16 town; I worked there for three or four years, all
17 primarily on oil and gas clients.
18        And then I moved from there to KPMG and
19 worked there for, I believe, two busy seasons;
20 primarily also working on oil and gas clients, some
21 real estate. And then I was hired by Delta Petroleum,
22 which I was employed for approximately 17 years, which
23 is a public oil and gas company.
24    Q. You worked for Delta Petroleum Company
25 until approximately July of 2012; is that right?

Page 8

1    A. August.
2    Q. August?
3    A. August 2.
4    Q. Can you give us a description of your jobs
5 at Delta Petroleum?
6    A. I was brought on as the controller, served
7 as controller for I think it was approximately five
8 years, and then was promoted to CFO and retained
9 treasurer and chief financial officer until I was
10 released in August of 2012, approximately ten years of
11 CFO experience.
12    Q. And by CFO, you mean chief financial
13 officer?
14    A. Correct, yes.
15    Q. Were you the treasurer of the company as
16 well?
17    A. Correct.
18    Q. Were you the treasurer for the entire time
19 once you became CFO?
20    A. I believe so, or right around that
21 particular time, yes.
22    Q. As treasurer and CFO, who did you report
23 to?
24    A. I reported to the chief executive officer,
25 whoever that may have been, usually Roger Parker,

Case 12-50898-KJC   Doc 75-1   Filed 06/21/13   Page 4 of 12

In Re: Delta Petroleum Corp. (Debtor)   KEVIN NANKE   6/5/2013

Page 13

1  Delta.
2  Q. And who would have been the primary person
3  from Delta's standpoint that dealt with the
4  transaction?
5  A. It would have been Roger Parker primarily,
6  Buzz maybe to a lesser extent or an equal extent.
7  Q. What was your role in the transaction?
8  A. At that particular time, my role was
9  probably observing the negotiation and helping
10 evaluate that the best that I could.
11 Q. Did you have any role in reviewing any
12 kind of evaluation of the value of the interest to
13 Delta, projections of cash flow, that sort of thing?
14 A. I'm sure I looked at stuff, but I do not
15 remember what I looked at.
16 Q. Were you involved at all in reviewing or
17 negotiating an agreement to pay BWAB a fee for its
18 services in connection with Delta's acquisition of the
19 Whiting properties?
20 A. I did not negotiate it, but I was aware of
21 the discussion to that.
22 Q. And have you ever seen that agreement?
23 A. I believe so, yes.
24 Q. It's been previously marked in this
25 deposition as Exhibit 5. There are a stack of

Page 14

1  exhibits in front of you, if you will turn to Exhibit
2  5, I think you will find that.
3  A. Yes, I've seen this.
4  Q. On Exhibit 5, paragraph 3 deals with a fee
5  schedule that Delta agrees to pay BWAB. Do you see
6  that paragraph?
7  A. Yes.
8  Q. The first item of the fee is the issuance
9  of 200,000 shares of restricted common stock in Delta
10 Petroleum Corporation, right?
11 A. Yes.
12 Q. And the second is two alternatives, one is
13 a 3 percent overriding royalty interest out of the net
14 revenue interest acquired by Delta; and the second is,
15 should Delta acquire a net operating interest, BWAB's
16 overriding royalty interest will be 3 percent of the
17 actual gross revenue generated from and accrued to
18 Delta's interest. Do you see that?
19 A. Yes.
20 Q. Did I read those two provisions correctly?
21 A. Yes.
22 Q. Do you have any knowledge as to why these
23 two alternatives were included in the fee agreement,
24 services agreement, with BWAB?
25 A. Well, at the time, when Delta was

Page 15

1  negotiating this particular transaction, the structure
2  of the transaction was unclear on what Delta would
3  actually own. At the beginning, we were planning on
4  owning a direct -- purchasing a direct working
5  interest in the Point Arguello acquisition.
6  Delta was not qualified to be an operator
7  and, therefore, the structure of the transaction was
8  converted to really what I call a path-through
9  transaction, which is really a net profits type
10 accounting, if you will, or ownership in this deal;
11 and that's why, when you look at this, they're trying
12 to get back to the same fee under either scenario.
13 Q. When you say that Delta was not qualified
14 to be an operator, qualified in what sense?
15 A. The existing owners of the Point Arguello
16 unit are made up of very large oil and gas companies,
17 and I believe in their operating agreement, they
18 require a certain financial ability or level before
19 you can be let in as a working interest owner, and
20 Delta did not meet those requirements; not only did
21 Delta not meet those requirements, I believe the prior
22 owner did not meet those requirements, meaning Whiting
23 Petroleum and their parent, who was a public utility,
24 was the only person that met those requirements, which
25 is why they were also on this particular -- I believe

Page 16

1  they are the actual listed group.
2  Q. And who was Whiting Petroleum's parent?
3  A. I should know this because my brother
4  worked for them. The utility out of Iowa, Wisconsin.
5  I'll come up with it.
6  Q. If you think of it, just let me know. Do
7  you know when in the process of evaluating Whiting
8  that it became apparent that Delta would not be
9  required to acquire a working interest?
10 A. I'm not --
11 Q. Let me rephrase it for you, that might not
12 be very clear. There was a purchase and sale
13 agreement signed between Whiting and Delta Petroleum,
14 right?
15 A. Correct.
16 Q. And was it understood at the time the
17 purchase and sale agreement was entered into that
18 Delta would not be able to qualify under the operating
19 agreement to become a working interest owner in the
20 Point Arguello properties?
21 A. I don't know if there were one or two
22 purchase and sale agreements, one of which we probably
23 might have thought that we would be able to be
24 qualified, but if you couldn't pass title, then the
25 deal would never get closed, so then they would have

Case 12-50898-KJC   Doc 75-1   Filed 06/21/13   Page 5 of 12

In Re: Delta Petroleum Corp. (Debtor)    KEVIN NANKE    6/5/2013

Page 17

```
 1   went to a second agreement, if that was the case. So
 2   I don't know if there was one or two or that was
 3   determined before you actually signed a purchase and
 4   sale agreement.
 5       Q.  The Point Arguello properties are federal
 6   leases; is that right?
 7       A.  Correct.
 8       Q.  Was there any requirement to your
 9   knowledge that Delta Petroleum be qualified under any
10   federal regulations to own a working interest in the
11   Point Arguello property?
12       A.  No, not that I know of. We already owned
13   interest in other federal units at that particular
14   time.
15       Q.  So in other -- any federal offshore units?
16       A.  Yes.
17       Q.  So as far as the federal government was
18   concerned, at least as to other properties, Delta was
19   capable of being approved as a working interest owner?
20       A.  I believe that's true.
21       Q.  And you know that in order to become a
22   working interest owner in a federal offshore lease,
23   one has to apply for and be approved by, at that time,
24   the Minerals Management Service, correct?
25       A.  That's correct. I don't know if they
```

Page 18

```
 1   called it a working interest on undeveloped leases,
 2   but your question would still apply. We owned
 3   interest in undeveloped leases.
 4       Q.  What other term would apply to an
 5   ownership interest in a federal offshore undeveloped
 6   oil and gas lease?
 7       A.  I don't recall what that would be, if it
 8   is different.
 9       Q.  As we know, ultimately, Delta did acquire
10   a net operating interest in the Point Arguello
11   properties, correct?
12       A.  Right.
13       Q.  So it is the second of the two options
14   under paragraph 3, subparagraph 2 that BWAB ultimately
15   obtained?
16       A.  That is correct.
17       Q.  Now, it says here that this 3 percent
18   overriding royalty would be calculated as 3 percent of
19   the actual gross revenue generated from and accrued to
20   Delta's interest. What do you understand that to
21   mean?
22       A.  I'll tell you how I recorded it, because I
23   was the person who set it up.
24       Q.  Then that probably tells me what you
25   understood it to mean at the time then, correct?
```

Page 19

```
 1       A.  Correct. What -- how I treated the
 2   royalties on not only BWAB but all royalties was
 3   similar to the royalty -- overriding royalty interest,
 4   no different. So whatever the gross revenue
 5   deductions that were applied to an overriding royalty
 6   was also applied to the gross revenue royalty
 7   interest.
 8       Q.  So --
 9       A.  These two had no difference, in effect, on
10   how I treated -- under number 3, sub 2, whether the
11   commission fell under either one of them, they were
12   treated exactly the same.
13       Q.  Let's look at the last page of Exhibit 5.
14   There is an Exhibit A, which describes the interests
15   which are the subject of this agreement, correct?
16       A.  Yes.
17       Q.  With respect to the first three interests,
18   the Point Arguello Pipeline Company, Point Arguello
19   Natural Gas Line Company, and the G-a-v-i-o --
20       A.  Gaviota.
21       Q.  Is that G-a-v-i-o-t-a?
22       A.  Yes.
23       Q.  -- Gaviota Gas Plant, those were all
24   partnership interests; is that correct?
25       A.  That is correct.
```

Page 20

```
 1       Q.  So the only oil and gas interests or
 2   property interests are the Point Arguello unit and
 3   then these Blocks 452 and 453; is that right?
 4       A.  That is correct.
 5       Q.  As to the Point Arguello unit, Whiting
 6   owned a unit interest of 6.06521; is that right?
 7       A.  That's correct.
 8       Q.  And that was its working interest?
 9       A.  That is correct.
10       Q.  And that means, then, that that was the
11   share of operating and capital expenditures that
12   Whiting was responsible for paying?
13       A.  That is correct.
14       Q.  Then the net revenue interest is
15   characterized here as a 4.8425 percent interest,
16   right?
17       A.  Correct.
18       Q.  And from the two notes, A and B set forth
19   opposite the net revenue interest, A indicates that it
20   is net of BWAB overriding royalty interest, and B
21   indicates that the revenue interest does not reflect
22   any MMS royalty reduction; correct?
23       A.  Correct.
24       Q.  Let's deal with each of those separately.
25   First, as to the BWAB overriding royalty interest, you
```

Case 12-50898-KJC   Doc 75-1   Filed 06/21/13   Page 6 of 12

In Re: Delta Petroleum Corp. (Debtor)  KEVIN NANKE  6/5/2013

21

1    were aware that there was a previously granted 3.5
2    percent overriding royalty to BWAB?
3        A.  Yes, I was aware of it.
4        Q.  So if we were to determine what the net
5    revenue interest was for Whiting and subsequently
6    Delta, just taking into account the 3.5 percent
7    override, you would multiply the 6.06 times 96 1/2
8    percent, and that would give you the net revenue
9    interest attributable to the lease just subtracting
10   BWAB's override, correct?
11       A.  Correct.
12       Q.  Now, if you also then want to take into
13   account the MMS royalty, you would have to multiply it
14   by 1 minus whatever the MMS royalty was, correct?
15       A.  Correct.
16       Q.  In this case, the MMS royalty was 1/6.  Do
17   you recall that?
18       A.  I recall that the MMS royalty changed
19   during the process up and down.
20       Q.  It was 1/6 for part of the time and it was
21   1/12 for part of the time, correct?
22       A.  Correct.
23       Q.  So if it's 1/6, the net revenue interest
24   after deducting 1/6 landowner's royalty is 83.333
25   percent?

22

1        A.  Correct.
2        Q.  And if it's 1/12, it's 91 and change?
3        A.  Correct.
4        Q.  Then adding the two together and
5    multiplying by 6.06521 gives you this net revenue
6    interest of 4.8425?
7        A.  Correct.
8        Q.  So in terms of what Delta was looking to
9    acquire in the Point Arguello unit that was the
10   subject of this finder's fee agreement, it was a
11   6.06521 working interest and a 4.8425 percent net
12   revenue interest?
13       A.  I believe that's correct, yes.
14       Q.  At the time?
15       A.  Yes.
16       Q.  And as noted in Footnote B, it did not
17   reflect -- excuse me, this net revenue interest did
18   not reflect any reduction in the MMS royalty from 1/6
19   to 1/12?
20       A.  Correct.
21       Q.  And that did --
22       A.  May I see your calculator, please?
23       Q.  You bet.  That's why I brought it.  Did
24   you confirm that the royalty interest -- that the net
25   revenue interest reflected on Exhibit 5 is the working

23

1    interest less BWAB's overriding royalty interest less
2    the landowner's royalty, or MMS royalty, at 1/6?
3        A.  This does not reflect the MMS royalty, is
4    what it says.
5        Q.  It says it does not reflect the MMS
6    royalty reduction.
7        A.  Can I write on this?
8        Q.  Please don't write on that.  Do you want a
9    piece of paper?
10       A.  I've got one.
11       Q.  I think, if you do the math, you'll see
12   that this 4.8425 percent is after the BWAB override
13   and after a 1/6 royalty.  And you can use the
14   calculator to confirm that if you'd like.
15       A.  Yes, I agree with your calculation.
16       Q.  So the record should reflect that you have
17   used a calculator to confirm that the net revenue
18   interest set forth on Exhibit A is the 6.06521 working
19   interest less BWAB's override less the MMS royalty at
20   1/6.
21       A.  That is correct.
22       Q.  Did you ever have occasion to review the
23   Point Arguello unit agreement?
24       A.  Yes, I've reviewed it.
25       Q.  So you are familiar with it?

24

1        A.  Yes.
2        Q.  And have you also seen the Point Arguello
3    operating agreement?
4        A.  I believe so, yes.
5        Q.  We'll go off the record for a moment.
6            (Discussion off the record.)
7            (Deposition Exhibits 19 and 20 were
8    marked.)
9        Q.  The court reporter has handed you Exhibits
10   19 and 20.  Do you have those in front of you?
11       A.  I do.
12       Q.  Looking through Exhibit 19 first, can you
13   confirm that Exhibit 19 is the Point Arguello unit
14   agreement?
15       A.  Yes.
16       Q.  And can you confirm for me that Exhibit 20
17   is the Point Arguello unit operating agreement?
18       A.  Correct.
19       Q.  And in the course of your business at
20   Delta Petroleum, you became familiar with each of
21   these agreements?
22       A.  That is correct.
23       Q.  Can you describe for me just generally
24   what a unit agreement is and does?
25       A.  A unit agreement generally outlines the

Case 12-50898-KJC   Doc 75-1   Filed 06/21/13   Page 7 of 12

In Re: Delta Petroleum Corp. (Debtor)   KEVIN NANKE   6/5/2013

25

1  activities and costs that are shared between all the
2  unit interest owners.
3      Q. And the unit interest owners are owners of
4  oil and gas leases in an area that is the subject of
5  the unit; is that right?
6      A. That is correct.
7      Q. So conceptually, do working interest
8  owners who have adjoining or adjacent leases get
9  together and agree to combine their operations and
10 allocate expenses and revenues among them?
11     A. That's correct.
12     Q. And that's what a unit agreement does?
13     A. That's correct.
14     Q. So if we look at this unit agreement on --
15 there are Bates numbers at the bottom of the page,
16 you'll see the DPT number. Do you see that? It's on
17 the very tiny bottom of the page.
18     A. Yes.
19     Q. If you'll turn to DPT 2120 of Exhibit
20 19 -- do you have that page?
21     A. Yes, I do.
22     Q. -- this shows the leases that were subject
23 to the unit agreement; is that right?
24     A. That's correct.
25     Q. So there are four leases, OCS-P 450, 451,

26

1  315, and 316, correct?
2      A. Correct.
3      Q. And then if we turn to the next page,
4  DPT 2121, it shows an exhibit of each of the working
5  interest owners in each of those four leases and their
6  percentage interest in the lease; is that right?
7      A. Correct.
8      Q. So if we look at lease 451, the three
9  working interest owners were Chevron, Phillips, and
10 Whiting; is that correct?
11     A. That's correct.
12     Q. And Whiting's lease interest was 11.112,
13 correct?
14     A. Correct.
15     Q. And then there is an asterisk next to the
16 column called ORR and net profits; you understand that
17 to mean overriding royalties and net profits interest,
18 right?
19     A. Yes.
20     Q. And the asterisk indicates that Whiting's
21 interest was burdened by a 3 1/2 percent overriding
22 royalty payable out of Whiting's net revenue, correct?
23     A. Correct.
24     Q. And you understand that that 3 1/2 percent
25 was the previously granted BWAB 3 1/2 percent

27

1  overriding royalty?
2      A. Correct.
3      Q. Then once the unit is formed, the working
4  interest owners interest in the unit may differ from
5  their ownership in their leases, correct?
6      A. Correct.
7      Q. So if we turn to page 2126, DPT 2126,
8  there is Exhibit B to the operating agreement, right?
9      A. Exhibit B, yes.
10     Q. On Exhibit B at the bottom of the page it
11 shows the participating interests in the unit
12 resulting from the working interest owners ownership
13 of the leases, correct?
14     A. This is the agreed-upon working interest
15 of the unit, yes.
16     Q. So while Whiting Petroleum owned an 11.112
17 interest in lease 451, when it comes to the unit
18 sharing of revenue -- excuse me, the sharing of
19 expenses, it is reduced to a 6.06521 percent?
20     A. That is correct.
21     Q. Now, there is a provision in the unit
22 agreement, and I'll direct your attention to page 211,
23 or page 9 of the unit agreement might be easier,
24 there's a paragraph 21.1. Do you see that paragraph?
25     A. I see that paragraph.

28

1      Q. This paragraph says that, The covenants in
2  this unit agreement are to be construed as covenants
3  running with the land with respect to the interest of
4  the parties hereto and their successors in interest
5  until this agreement terminates. Right?
6      A. I see it.
7      Q. What do you understand an agreement that
8  has covenants that run with the land to mean?
9      A. That means the covenants will stay in
10 place as long as the agreements are in place no matter
11 who owns it.
12     Q. So it runs with and effects an interest in
13 land?
14     A. Correct.
15     Q. Now, the unit operating agreement is
16 Exhibit 20. Do you have that in front of you?
17     A. I do.
18     Q. If we look at the last page of Exhibit 20,
19 it has the same schedule Exhibit B that shows the
20 ownership -- lease ownership interest of the parties
21 as well as their participating interest in the unit,
22 correct?
23     A. Correct.
24     Q. And Whiting Petroleum's interest was the
25 same was as we've talked about, 6.06521, right?

Case 12-50898-KJC   Doc 75-1   Filed 06/21/13   Page 8 of 12

In Re: Delta Petroleum Corp. (Debtor)   KEVIN NANKE   6/5/2013

**37**

1  Q. What was the purpose of this amendment?
2  A. The purpose was to outline the purchase or
3  the structure of not obtaining the ability to have a
4  working interest in the unit.
5  Q. So there are three events set forth in
6  paragraph 2 of the amendment under which this
7  amendment becomes effective?
8  A. Correct.
9  Q. And the first listed event is the unit
10 owners or the partnership's partners failing to
11 approve the transaction contemplated by the purchase
12 and sale agreement?
13 A. Correct.
14 Q. The second is the unit owners and the
15 partnership owners approval of such transaction but
16 conditioning the approvals on selling 100 percent of
17 the right, title, and interest of Whiting and buyer,
18 i.e., Delta, failing to make its second installment
19 payment?
20 A. First installment.
21 Q. And first installment, right?
22 A. Correct.
23 Q. Items two and three never occurred, did
24 they?
25 A. Correct.

**38**

1  Q. So the event that occurred that gave rise
2  to the effectiveness of this amendment was the event
3  listed in subparagraph 1?
4  A. That is correct.
5  Q. Now, this amendment describes a net
6  operating interest that will be acquired instead of a
7  working interest.
8  A. That is correct.
9  Q. And it's defined in the subparts in
10 paragraph 3 of the amendment, correct?
11 A. Correct.
12 Q. Do you have any knowledge of whether the
13 items that go into the calculation of the net
14 operating interest constitute all of the rights and
15 obligations that a working interest owner would
16 otherwise have?
17   MR. PEHLKE: Object to form.
18 A. They are identical to what a working
19 interest owner would have.
20 Q. (BY MR. BENNETT) So in describing this
21 net operating interest, what one is describing is the
22 right to the revenue and the obligation to pay the
23 expenses that any working interest owner would have?
24 A. That's exactly correct.
25 Q. And the only exception to that is that

**39**

1  there were some future costs that might be associated
2  with this property that Delta was not assuming or that
3  the seller was retaining?
4  A. That is correct.
5  Q. And those future costs, those are not
6  current costs, those are future costs relating to
7  abandonment of the wells and platforms of the unit?
8  A. Of the platform and certain costs relating
9  to the wells, correct.
10 Q. So other than that reservation to Whiting,
11 by virtue of that net operating interest, Delta was
12 acquiring all of the rights and all of the obligations
13 of a working interest owner?
14 A. Similar to a working interest owner, yes.
15 Q. And this transaction closed on the basis
16 of this amendment to the purchase and sale agreement?
17 A. That is correct, yes.
18 Q. Was there a closing book that you remember
19 that contained all of the closing documents?
20 A. I'm sure there was; I don't know, to be
21 honest with you.
22 Q. Do you know if there was ever a written
23 assumption agreement whereby Delta assumed the
24 obligations under the unit agreement and the unit
25 operating agreement?

**40**

1  A. I'm not aware of that.
2  Q. Do you know if the participating interest
3  owners in the Point Arguello unit other than Whiting
4  ever consented to this net operating interest
5  assignment?
6  A. I'm not sure if they formally consented to
7  that or not.
8  Q. Do you know if the other participating
9  interest owners were aware of Whiting's assignment of
10 this net operating interest to Delta?
11 A. Yes.
12 Q. And how do you know that?
13 A. Certain operating meetings were attended
14 by not only Whiting employees but also Delta
15 employees.
16 Q. And you were never excluded from any of
17 the operating -- or the meetings among the
18 participating interest owners?
19 A. Not that I'm aware of.
20 Q. Were Delta's representatives able to
21 provide input into the operations by virtue of its net
22 operating interest?
23 A. I know that they attended the meetings.
24 Q. Whether anybody listened to them or not is
25 another question?

Case 12-50898-KJC   Doc 75-1   Filed 06/21/13   Page 9 of 12

In Re: Delta Petroleum Corp. (Debtor)   KEVIN NANKE   6/5/2013

**Page 45**

1     Q. So the Exhibit A to the assignment of the
2 net operating interest is, as respecting to the Point
3 Arguello unit, identical to the Exhibit A that was
4 attached to the original purchase and sale agreement?
5     A. Correct.
6     Q. Same description of the property, same
7 interest of the unit, same description of the leases?
8     A. Correct.
9     Q. Now, Exhibit 10, which you should have in
10 front of you, is the assignment dated December 1, 1999
11 from Delta Petroleum to BWAB Limited Liability
12 Company.
13     A. Correct.
14     Q. Of a 3 percent overriding royalty,
15 correct?
16     A. Correct.
17     Q. And the overriding royalty is described on
18 the attached Exhibit A of the property that is subject
19 to the overriding royalty as attached -- described on
20 the attached Exhibit A, correct?
21     A. Correct.
22     Q. And as it concerns the Point Arguello
23 unit, it is the same description as attached to the
24 purchase and sale agreement, the same description as
25 attached to the finder's fee agreement, correct?

**Page 46**

1     A. It is.
2     Q. And the same description as attached to
3 the net operating interest, correct?
4     A. Correct.
5     Q. So all of seller's right, title, and
6 interest into this leasehold estate is created by
7 lease 451 and lease 360, correct?
8     A. Correct.
9     Q. Now, were you aware of this assignment at
10 the time it was made?
11     A. I was.
12     Q. And it was in fulfillment of the services
13 that BWAB performed pursuant to Exhibit 4, the fee
14 arrangement, correct?
15     A. Correct. Was it 4?
16     Q. I think it's 4.
17     A. It may have been 3.
18     Q. It's 5, excuse me, I may have misspoke.
19 The agreement is Exhibit 5. Thank you for correcting.
20 And this 3 percent overriding royalty was the 3
21 percent described in the second of the two options in
22 the fee agreement, correct?
23     A. Correct.
24     Q. So it is payable out of the gross revenue
25 received by Whiting with respect to the Arguello unit;

**Page 47**

1 is that right?
2     A. Correct.
3     Q. Did you set the accounting records up to
4 record this 3 percent interest in the books and
5 records of Delta?
6     A. Yes.
7     Q. And the gross interest that Delta received
8 was the 6.06521 working interest, correct?
9     A. Correct.
10     Q. So this 3 percent is payable as 3 percent
11 of that 6.06521?
12     A. That is not how we recorded it, no.
13     Q. Tell me how you recorded it.
14     A. We recorded the gross revenue, meaning
15 gross entitled to a revenue interest owner based on
16 the revenue interest owned by Whiting Petroleum,
17 meaning the 6.06521 minus all of the required
18 deductions that would be applicable to a royalty
19 owner.
20     Q. So as we looked at on the exhibit, are you
21 saying that you recorded the 3 percent overriding
22 royalty as 3 percent of the 4.8425 percent net revenue
23 interest that was being obtained?
24     A. Yes.
25     Q. So the way you recorded this on the books

**Page 48**

1 and records of Delta, you were deducting from the
2 interest that BWAB was going to be paid not only the
3 MMS royalty but also the BWAB pre-existing 3 1/2
4 percent royalty?
5     A. That is not correct. The only deduction
6 that I recorded against any of the royalties,
7 including the original 3 1/2 percent, was the MMS
8 royalty deduction. So we take the gross revenue minus
9 the MMS deduction, and then they would be entitled to
10 their royalty percentage of that.
11     Q. All right.
12     MR. PEHLKE: I'm confused now on what
13 gross revenue is because of the back and forth there.
14     MR. BENNETT: I'll try to clear this up a
15 bit.
16     Q. (BY MR. BENNETT) So the gross revenue
17 that Delta acquired was the 0.0606521 percent of the
18 royalty -- percent of revenue, right?
19     A. Correct.
20     Q. And from that, in setting up the 3 percent
21 royalty to BWAB, you deducted the MMS royalty?
22     A. Correct.
23     Q. Which was either 1/6 or 1/12 depending on
24 the time?
25     A. Correct.

Case 12-50898-KJC   Doc 75-1   Filed 06/21/13   Page 10 of 12

In Re: Delta Petroleum Corp. (Debtor)    KEVIN NANKE    6/5/2013

49

1  Q. And then multiply that times 0.03?
2  A. Correct.
3  Q. And that became the interest that you
4  would pay BWAB?
5  A. That is correct.
6  Q. Did you consider in determining the -- did
7  you reduce -- strike that. When you set up the -- I
8  assume you had to set up the 3 1/2 percent BWAB
9  royalty as well on the books and records of Delta?
10 A. That's correct.
11 Q. Because once Delta acquired the
12 properties, Delta agreed to pay BWAB the previous
13 Whiting royalty, correct?
14 A. That's correct.
15 Q. And then Delta also agreed to pay these
16 new overriding royalties that it granted in 1999?
17 A. That's correct.
18 Q. So you had to set up on the books and
19 records of Delta the payment of all of these?
20 A. That is correct. The original BWAB
21 royalty wasn't an actual overriding royalty as opposed
22 to a royalty in what Delta obtained pursuant to the
23 amended agreement.
24 Q. In setting up the 3 1/2 percent BWAB
25 royalty, did you consider whether it should be reduced

50

1  by the newly granted overriding royalties in 1999?
2  A. I considered it, but I'm comfortable with
3  the way I recorded it.
4  Q. And you recorded it by not reducing the
5  3 1/2 percent by the subsequently granted overrides in
6  1999?
7  A. Correct.
8  Q. In your experience in the oil and gas
9  business, did you record the -- or set up the
10 accounting records in an appropriate fashion?
11 A. I did.
12 Q. There was no mistake made as far as you're
13 concerned?
14 A. Based on the information that I had and
15 the discussions I had, I recorded them, to my
16 knowledge, that these are correct.
17 Q. Is there something called an oil deck in
18 the books and records of Delta?
19 A. An oil deck is really just the allocation
20 that the system calculates on a revenue stream to then
21 be paid out to working and revenue interest.
22 Q. So it is a record maintained by Delta
23 Petroleum or it's a --
24 A. It's part of the accounting software
25 maintained by Delta Petroleum, yes.

51

1  Could we maybe take about five minutes?
2  MR. BENNETT: You may.
3  (Recess taken, 10:18 a.m. to 10:25 a.m.)
4  (Deposition Exhibit 23 was marked.)
5  Q. (BY MR. BENNETT) I have handed you
6  Exhibit 23, which is a document produced by the
7  plaintiffs bearing Bates number DPT 4039.
8  A. I have it in front of me.
9  Q. This appears to be, for the Point Arguello
10 unit, the oil deck from Delta Petroleum; is that what
11 this appears to you to be?
12 A. It appears to be that, yes.
13 Q. It references a division order, it looks
14 like 2603 Whiting - oil deck. Do you know what that
15 reference is to?
16 A. I'm not familiar with who set this up or
17 what it refers to.
18 Q. There's some sort of an accounting --
19 account, and it probably has a number that relates to
20 this Point Arguello unit.
21 MR. PEHLKE: Objection to foundation.
22 Q. (BY MR. BENNETT) Is there an account
23 where all the revenue and expense was run through for
24 this Point Arguello unit?
25 A. Well, the system, when you're inputting a

52

1  revenue receipt, requires that a deck which allocates
2  ownership be applied to the revenue that's input.
3  Q. And as far as you know, this oil deck
4  would, for every dollar received with respect to sales
5  of oil and gas from the Point Arguello unit, would be
6  allocated according to this appointment?
7  A. I believe so, yes.
8  Q. Now, the first owner listed is BWAB
9  Limited Liability Company, right?
10 A. Correct.
11 Q. And the ownership interest is listed as
12 0.00414980; is that right?
13 A. Correct.
14 Q. And would it be your understanding that
15 that percentage is the percentage of the revenue
16 received by Delta that BWAB would be entitled to?
17 MR. PEHLKE: Object to form.
18 Q. (BY MR. BENNETT) Do you understand the
19 question? Maybe I can rephrase it and make it a
20 little clearer. If Delta Petroleum received a dollar
21 of revenue attributable to its 6.06521 working
22 interest, would I multiply that dollar revenue times
23 this 4.14980 to get the amount of money that BWAB was
24 entitled to?
25 A. That would be the gross amount that they

Case 12-50898-KJC   Doc 75-1   Filed 06/21/13   Page 11 of 12

In Re: Delta Petroleum Corp. (Debtor)   KEVIN NANKE   6/5/2013

73

1  Q. Less his share of transportation and other
2  costs?
3  A. Correct.
4  Q. Did you become aware of an agreement
5  between BWAB and Whiting with respect to sharing of
6  the dilution to Whiting's interest caused by the
7  unitization?
8  A. I don't recall that.
9  (Deposition Exhibit 28 was marked.)
10  MR. PEHLKE: Object to foundation.
11  MR. BENNETT: I haven't asked him any
12  questions yet.
13  MR. PEHLKE: I know. I'm putting it down.
14  Q. (BY MR. BENNETT) I have placed in front
15  of you Exhibit 28. It appears to be a letter dated
16  June 24, 1997 from Whiting Petroleum Corporation to
17  BWAB, Inc. Have you ever seen this letter before?
18  A. I believe I've seen this letter.
19  Q. In this letter, which appears to be signed
20  by both BWAB and Mr. Hazlett for Whiting, there is a
21  calculation relating to some dilution calculations
22  performed by Mr. Bruce Williams, and it appears to be
23  adjusting BWAB's 3 1/2 percent overriding royalty to
24  give effect to an agreement to share half of this
25  dilution. Is that a fair characterization of this

74

1  agreement as you understand it?
2  A. I'm not familiar with what this agreement
3  was meant to do, to be honest with you.
4  Q. If you don't know, that's fine. Do you
5  recall having a conversation or an exchange of
6  information with BWAB about this calculation once
7  Delta acquired its interest in the Point Arguello
8  unit?
9  A. What I did when we acquired this interest,
10  I sat down with the Whiting accounting group and went
11  through how they calculated everything affecting the
12  BWAB royalty and duplicated that effort once we took
13  over.
14  Q. Are you aware, in the Whiting oil deck,
15  that BWAB's percentage interest attributable to the
16  3 1/2 percent interest is this decimal figure,
17  0.0021184, set forth on about the bottom third of
18  Exhibit 28?
19  MR. PEHLKE: Object to foundation.
20  A. I don't recall seeing the deck that
21  Whiting used to calculate their payment to BWAB. What
22  I did see is their calculation on an Excel
23  spreadsheet, which is the same Excel spreadsheet that
24  we then carried our accounting methodology post
25  acquisition.

75

1  Q. (BY MR. BENNETT) Do you know what became
2  of that Excel spreadsheet? Did you maintain that in
3  your books and records?
4  A. We did. I don't know, once I stopped
5  doing the accounting, how long they used that
6  particular spreadsheet or if they still did or do
7  today.
8  Q. Okay.
9  A. But I have not seen that document in
10  anything you have here yet.
11  Q. And I'm not aware of an Excel spreadsheet
12  that meets the description of what you described
13  that's been produced to us by Delta. Was it an Excel
14  spreadsheet that had Whiting's name on it?
15  A. At one particular time it may have. It
16  then became Delta's Excel spreadsheet, which is what I
17  used to make sure that all the calculations of the
18  revenue stream -- it was more of a check to make sure
19  that the checks that were written through the system
20  matched what I had within this particular document.
21  And I know it was used for a long period
22  of time, and I represent -- because there were a
23  number of accounts that had been reconciled; I have
24  gone back and, at quarter's end, had to look at that
25  particular document to make sure other amounts on

76

1  Delta's books were reported correctly.
2  Q. Using Whiting's Excel spreadsheet at
3  Delta, do you know whether you included the dilution
4  adjustment set forth in Exhibit 28 when reporting the
5  percentage interest that BWAB was entitled to as a
6  result of the 3 1/2 percent override?
7  A. I don't know if those particular amounts
8  matched or not. I would guess that they would have
9  matched that.
10  Q. It was your intention to record the 3 1/2
11  percent override at Delta in the same fashion that
12  Whiting had paid it previously?
13  A. Correct.
14  Q. And to the extent you did that correctly,
15  that would have been the result?
16  A. That is correct.
17  Q. Have you ever seen the complaint filed in
18  this case?
19  A. I may have seen the complaint, but I have
20  not read it.
21  (Deposition Exhibit 29 was marked.)
22  Q. I'll represent to you that this is the
23  amended complaint filed in this case by the
24  plaintiffs.
25  A. Okay.

Case 12-50898-KJC   Doc 75-1   Filed 06/21/13   Page 12 of 12

In Re: Delta Petroleum Corp. (Debtor)    KEVIN NANKE                6/5/2013

**81**

1  monthly and filed.
2      Q. And by "this document," you mean the recap
3  sheet from Whiting Petroleum?
4      A. Yes.
5      Q. Which is part of Exhibit 24?
6      A. Yes.
7      Q. And it should also exist on the system in
8  an Excel spreadsheet file in the accounting system?
9      A. It should. I don't know how long they
10 maintain that, but in past years it sure was.
11     Q. And was it there, as far as you know, when
12 you left employment at Delta Petroleum in August of
13 2012?
14     A. It would have been in the archives of
15 that, sure; whether they were still using it and
16 moving it forward each month or quarter, I don't know.
17     Q. Okay.
18     A. It was not only used for the override
19 calculations but other information relating to the
20 investment in Whiting's Point Arguello unit.
21     Q. What other information was reflected?
22     A. Like the partnership, our interest in the
23 partnerships.
24     Q. While you were employed at Delta
25 Petroleum, was there ever an audit performed of the

**82**

1  payments to the overriding royalty interest owners?
2      A. I don't believe so.
3         (Deposition Exhibit 30 was marked.)
4      Q. Exhibit 30 is a March 19, 2001 memorandum
5  from Mr. Mills to Delta Petroleum, attention Kevin,
6  and apparently was resent on May 3, 2001. Do you
7  recognize this document?
8      A. I'm sure I saw it since it was addressed
9  to me.
10     Q. Is the Kevin to whom this is addressed
11 you?
12     A. Yes.
13     Q. This document references the dilution
14 adjustment that we looked at previously in the
15 agreement between BWAB and Whiting. Do you know if
16 you used any information from this document in setting
17 up the payment to BWAB with respect to the 3 1/2
18 percent override royalty?
19     A. Yes. It was modified, I believe, at one
20 particular time, this information from Bill.
21     Q. I notice that you did some calculations
22 before providing a response. What did you calculate?
23     A. Well, I calculated the royalty that was
24 given for the Delta transaction net of what was in our
25 system. And we have the bottom calculation that Bill

**83**

1  provided, and I'm guessing, if you go back to the
2  records, you would see a modification that was paid at
3  this particular interest at one time and was modified
4  to Bill's correspondence here.
5      Q. So when you say the calculation you did
6  was to subtract what BWAB was being paid, the 414980?
7      A. Correct.
8      Q. And subtracted the percentage number from
9  Exhibit 30?
10     A. That is correct.
11     Q. And the result was then the 3 percent
12 override relating to the 1999 override?
13     A. Say that last part again.
14     Q. After subtracting the percentage set forth
15 on Exhibit 30 from the decimal figure on which BWAB
16 was paid, the remainder was the 3 percent override?
17     A. Correct.
18     Q. Okay.
19     A. And this would have been discussed before
20 making that modification, would have been discussed
21 with other executives at Delta.
22     Q. Now, having reviewed Exhibit 30 and done
23 your calculations, can you now answer my question of
24 whether the figure on which BWAB was simply applying
25 the same formula at to the 3.5 percent override as was

**84**

1  applied to the 3 percent?
2      A. I do not believe so.
3      Q. In fact, the 3.5 percent override was paid
4  on the basis of the dilution adjustment agreed to by
5  Whiting, correct?
6      A. Correct.
7      Q. And the 3 percent override was paid on the
8  basis of the provisions of the 3 percent overriding
9  agreement?
10     A. That is correct.
11     Q. So they weren't just lumped together and
12 the same formula applied to each, were they?
13     A. They were not, based on -- prior to this
14 part of the discussion; I've never gone back and
15 determined what the other part of the 3 1/2 percent of
16 the working interest calculated out to be.
17        (Deposition Exhibit 31 was marked.)
18     Q. Exhibit 31 is a document produced by Delta
19 to us in this case bearing Bates numbers DPT 000019.
20 It appears to be a schedule of payments from July 2002
21 through maybe May 2011 from Delta to BWAB. Do you
22 recognize this document?
23     A. Never seen it before. I mean, I know what
24 it is, but I have not actually seen it.
25     Q. What is it?