# Exhibit A-1 to Cross Motion

As of June 19, 2013

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

Case No. 11-14006(KJC)     (Jointly Administered)
Adv. Pro No. 12-50898(KJC)
Adv. Pro No. 12-50877(KJC)

IN RE:

DELTA PETROLEUM CORPORATION, et al.,

Debtors,

DELTA PETROLEUM GENERAL RECOVERY TRUST and PAR PETROLEUM
CORPORATION,

Plaintiffs,

v.

BWAB LIMITED LIABILITY COMPANY,

Defendant.

and

DELTA PETROLEUM GENERAL RECOVERY TRUST and PAR PETROLEUM
CORPORATION,

Plaintiffs,

v.

ALERON LARSON, JR.,

Defendant.

---

## MASTER INDEX OF EXHIBITS

---

A P P E A R A N C E S

For the Plaintiffs:

       DAVID R. PEHLKE, ESQ.
       Skadden, Arps, Slate, Meagher & Flom, LLP
       155 North Wacker Drive
       Chicago, Illinois  60606

For the Defendants:

       STUART N. BENNETT, ESQ.
       Jones & Keller, P.C.
       1999 Broadway
       Suite 3150
       Denver, Colorado  80202

I N D E X

Deposition of Steven A. Roitman, June 4, 2013:

Exhibit 1      Notice of Deposition of BWAB
               Limited Liability Company

Exhibit 2      Letter from Roulier to Searcy,
               re:  Revised Proposal for Purchase
               of Certain Assets, 7-13-94, and
               Exhibit A

Exhibit 3      Letter from Frawley to Roulier and
               Roitman, Acquisition of Union
               Pacific Resources Corp., etc.,
               7-28-94

Exhibit 4      Assignment of Overriding Royalty
               between Whiting and BWAB, 12-16-94

Exhibit 5      Agreement between BWAB and Delta,
               4-1-99

Exhibit 6      Form 8-K/A, 6-9-99

Exhibit 7      Form 8-K/A, Amendment #2, 6-9-99

Exhibit 8      Form 8-K/A, 12-1-99

Exhibit 9      Conveyance and Assignment between
               Whiting and Delta

Exhibit 10     Assignment of Overriding Royalty
               Interest between Delta and BWAB,
               12-1-99

Exhibit 11     Assignment of Overriding Royalty
               Interest between Delta and
               Roger A. Parker, 12-1-99

Exhibit 12     Assignment of Overriding Royalty
               Interest between Delta and
               Aleron H. Larson, Jr., 12-1-99

Exhibit 13     Assignment of Overriding Royalty
               Interest between Delta and
               Kaiser-Francis, 7-25-01

Exhibit 14     Letter from Hazlett to Roulier, re:
               Point Arguello Unitization, 5-7-97,
               and Point Arguello Project
               Spreadsheet

Exhibit 15    Letter from Roitman to Delta, re:
              Oil and Gas Leases, 11-11-99

Exhibit 16    Defendant BWAB Limited Liability
              Company's Response to Plaintiffs'
              First Request for Production of
              Documents

Exhibit 17    Defendant BWAB Limited Liability
              Company's Response to Plaintiffs'
              First Set of Interrogatories


<u>Deposition of Kevin Nanke, June 5, 2013</u>:

Exhibit 18    Defendants BWAB Limited Liability
              Company and Aleron Larson, Jr.'s,
              Notice of Deposition

Exhibit 19    Unit Agreement for Outer
              Continental Shelf Exploration,
              Development, and Production
              Operations on the Point Arguello
              Unit, 10-1-96

Exhibit 20    Unit Operating Agreement, Point
              Arguello Unit, Pacific Offshore,
              California, 10-1-96

Exhibit 21    Purchase and Sale Agreement
              between Whiting and Delta,
              6-8-99

Exhibit 22    Amendment to Purchase and Sale
              Agreement between Whiting and
              Delta, 6-8-99

Exhibit 23    DPT000039

Exhibit 24    Point A Net Cash Flow Activity
              During the Month of May 2012

Exhibit 25    Invoice from Whiting to Delta,
              11-27-12

Exhibit 26    Copies of Checks

Exhibit 27    Pay Stub from Delta to Larson,
              8-21-12

Exhibit 28    Letter from Hazlett to Roulier,
              re:  Point Arguello Unitization,
              6-24-97

Exhibit 29    Amended Complaint for Avoidance
              and/or Discharge of Interests,
              Enforcement of Bar Date Order,
              and Recovery of Property of the
              Estate

Exhibit 30    Letter from Mills to Delta, re:
              Point Arguello BWAB Overriding
              Royalty, 3-19-01

Exhibit 31    Delta Owner Detail Sales for
              BWAB Limited Liability Company,
              12-31-01 to 12-31-12

Exhibit 32    Delta Nonrecurring Expenses - Net

Exhibit 33    Global Notes Regarding Debtors'
              Schedules of Assets and Liabilities
              and Statements of Financial Affairs

Exhibit 34    Delta Owner Detail Sales for
              Aleron H. Larson, Jr., 12-31-01
              to 12-31-12

Exhibit 35    (Withdrawn)

Exhibit 36    Whiting GL Detail Drill Down


Deposition of Aleron H. Larson, Jr., June 6, 2013:

Exhibit 37    Minutes of the Board of Directors
              of Delta Petroleum Corporation,
              7-30-99

Exhibit 38    Agreement between Delta and
              Larson and Parker, 7-30-99

Exhibit 39    Agreement between Delta and
              Larson and Parker, 11-1-99

Exhibit 40    Declaration of Aleron H. Larson,
              Jr., in Support of BWAB's
              Memorandum of Law in Opposition
              to Plaintiff's Motion for Summary
              Judgment Pursuant to Fed.R.Civ.P.56
              and Fed.R.Bankr.P.7056, Exhibit B

Exhibit 41    Declaration of Aleron H. Larson,
              Jr., in Support of BWAB's
              Memorandum of Law in Opposition
              to Plaintiff's Motion for Summary
              Judgment Pursuant to Fed.R.Civ.P.56
              and Fed.R.Bankr.P.7056, Exhibit A,

Exhibit 42    Delta Petroleum Corporation 2004
              Annual Report



Deposition of R. Seth Bullock, June 7, 2013:

Exhibit 43    Notice of Rejection of Executory
              Contracts and Unexpired Leases

Exhibit 44    Assignment of Oil and Gas Lease
              between Union Pacific Resources
              Company and Whiting, 7-1-81

Exhibit 45    Decision and Assignments Approved,
              12-19-94

Exhibit 46    Declaration of Seth Bullock in
              Support of Plaintiffs' Motion for
              Summary Judgment Pursuant to
              Fed.R.Civ.P.56 and
              Fed.R.Bankr.P.7056

Exhibit 47    Plains Marketing Statements

CA.UK.004

# UNIT AGREEMENT FOR OUTER CONTINENTAL SHELF

# EXPLORATION, DEVELOPMENT AND PRODUCTION OPERATIONS ON THE

# POINT ARGUELLO UNIT

## CHANNEL ISLANDS AREA

## AND

## SANTA MARIA BASIN AREA

## OFFSHORE CALIFORNIA

Contract No.: 496001

Effective Date: October 1, 1996

Exhibit No.: 19
Deponent: _Nanke_
Date/RPR: _6-6-13 RPR_
Hunter + Geist, Inc.

CONFIDENTIAL
DPT002100

## APPROVAL BY REGIONAL SUPERVISOR

Pursuant to the authority vested in the Secretary of the Interior under the Outer Continental Shelf Lands Act, approved August 7, 1953, 67 Stat. 462, 43 U.S.C. 1331 et seq. as amended and delegated to the Regional Supervisor, Pacific OCS Region, Minerals Management Service, I do hereby approve the attached Agreement for exploration, development, and production operations of the Point Arguello Unit, Channel Islands Area and Santa Maria Basin Area, on the Outer Continental Shelf offshore California.

EFFECTIVE DATE OF AGREEMENT: October 1, 1996

Dated: _11/20/96_        _Thomas Dunaway_
                              Regional Supervisor
                    Development, Operations, and Safety
                          Pacific OCS Region

CONTRACT NO: 497001

CONFIDENTIAL
DPT002101

# UNIT AGREEMENT FOR OUTER CONTINENTAL SHELF EXPLORATION, DEVELOPMENT AND PRODUCTION OPERATIONS, POINT ARGUELLO UNIT, CHANNEL ISLANDS AREA AND SANTA MARIA BASIN AREA OFFSHORE CALIFORNIA

## TABLE OF CONTENTS

| ARTICLE | | PAGE |
|---|---|---|
| I | DEFINITIONS | 1 |
| II | INCORPORATION BY REFERENCE | 2 |
| III | UNIT AREA AND EXHIBITS | 2 |
| IV | DESIGNATION OF UNIT OPERATOR | 3 |
| V | RESIGNATION OR REMOVAL OF UNIT OPERATOR | 3 |
| VI | SUCCESSOR UNIT OPERATOR | 4 |
| VII | UNIT OPERATING AGREEMENT | 4 |
| VIII | APPEARANCES AND NOTICES | 4 |
| IX | PLAN OF OPERATION | 5 |
| X | REVISION OF UNIT AREA | 5 |
| XI | PARTICIPATING AREAS | 6 |
| XII | ALLOCATION OF PRODUCTION | 6 |
| XIII | RELINQUISHMENT OF LEASES | 7 |
| XIV | RENTALS AND MINIMUM ROYALTIES | 7 |
| XV | EFFECTIVE DATE AND TERMINATION | 7 |
| XVI | LEASES AND CONTRACTS CONFORMED AND EXTENDED | 8 |
| XVII | COUNTERPARTS | 8 |
| XVIIII | SUBSEQUENT JOINDER | 8 |
| XIX | REMEDIES | 8 |
| XX | NO WAIVER OF CERTAIN RIGHTS | 9 |
| XXI | COVENANTS RUN WITH THE LAND | 9 |

iii

CONFIDENTIAL
DPT002102

# UNIT AGREEMENT FOR OUTER CONTINENTAL SHELF EXPLORATION, DEVELOPMENT AND PRODUCTION OPERATIONS POINT ARGUELLO UNIT, SANTA MARIA BASIN AREA AND CHANNEL ISLANDS AREA OFFSHORE CALIFORNIA

## WITNESSETH:

WHEREAS, Section 5(a) of the Act authorizes the Secretary of the Interior (Secretary) to prescribe rules and regulations which shall provide for unitization, pooling and drilling agreements;

WHEREAS, pursuant to the rules and regulations of the Secretary, 30 CFR 250.190, *et seq.*, it is deemed to be in the interest of conservation, prevention of waste, or the protection of correlative rights to unitize the oil and gas interest in the Unit Area; and

WHEREAS, it is deemed to be necessary in the interest of conservation, for the prevention of waste, or for the protection of correlative rights to conduct exploration, development, and production operations in the Unit Area as though the area were subject to a single lease;

NOW, THEREFORE, in consideration of the premises and promises contained herein, it is agreed that:

## ARTICLE I
## DEFINITIONS

The following definitions of terms shall apply to this Agreement:

"Act" means the OCS Lands Act of 1953, as amended, 43 U.S.C. 1331, *et seq.*

"Agreement" means this Unit Agreement, approved by the Regional Supervisor for conducting exploration, development, and production operations within the Unit Area.

"Block" means an area designated as a block on a U. S. Official Leasing Protraction Diagram for an area of the OCS.

"Participating Area" is that part of the Unit Area that is reasonably proven by drilling and completion of producible wells, geological and geophysical information, and engineering data to be capable of producing hydrocarbons in paying quantities.

"Paying Quantities" as used herein means the production of oil and/or gas in quantities sufficient to yield a return in excess of operating costs.

"Regional Supervisor" means the Regional Supervisor of the MMS, U.S. Department of the Interior (DOI), or a designee, authorized and empowered to regulate and approve unit operations.

"Regulations" means all rules prescribed or adopted pursuant to the Act. They include all regulations prescribed or amended at any time to provide for the prevention of waste, conservation of the natural resources of the OCS, and the protection of correlative rights therein.

1

CONFIDENTIAL
DPT002103

"Reservoir" means an underground porous, permeable medium containing an accumulation of oil or gas or both. Each zone of a general structure containing such an accumulation that is separated from any other accumulation of oil or gas or both in the structure is a separate "reservoir."

"Unit Area" means the area of the OCS which is made subject to this Agreement and described in Article III.

"Unit Operating Agreement" means the agreement made between the Working Interest Owners and the Unit Operator providing for the apportionment of costs and liabilities incurred in conducting operations pursuant to this Agreement and the establishment of such other rights and obligations as they deem appropriate.

"Unit Operator" means the person, association, partnership, corporation, or other business entity designated by the Working Interest Owners and approved by the Regional Supervisor to conduct unit operations within the Unit Area in accordance with plans of operations approved pursuant to the Act, applicable Regulations, and this Agreement.

"Unitized Substances" means oil, and/or gas within the Reservoir(s) that underlie the unitized lands, and which are recovered or produced by operations pursuant to this Agreement.

"Working Interest" means an interest in the Unit Area held by virtue of a lease, operating agreement, or other contractual arrangement under which, except as otherwise provided in this Agreement, the rights or authority to explore for, develop and produce oil and gas are conferred. The right delegated to the Unit Operator by this Agreement is not a Working Interest.

"Working Interest Owner" means a party to this Agreement that owns a Working Interest.

<h2 style="text-align:center">ARTICLE II<br>INCORPORATION BY REFERENCE</h2>

All provisions of the Act, the Regulations, other applicable laws and the leases covering OCS lands within the Unit Area are made part of this Agreement.

<h2 style="text-align:center">ARTICLE III<br>UNIT AREA AND EXHIBITS</h2>

3.1    The following described offshore area as shown on the U. S. Official Leasing Protraction Diagram is subject to valid leases and constitutes the Unit Area.

3.2    Exhibit "A", which is attached to this Agreement and made a part hereof, is a plat identifying the Unit Area and component Blocks and leases.

3.3    Exhibit "B", which is attached to this Agreement and made a part hereof, is a schedule listing the component leases and the ownership of each.

3.4    Exhibit "C", which will be submitted in accordance with the provisions of this Agreement and will be made part hereof, is a schedule listing the component parts of the Participating Area(s) by lease and the percentage of oil or gas, or both, that is to be allocated to each lease.

2

CONFIDENTIAL
DPT002104

3.5    Exhibits "A", "B", and "C" shall be revised by the Unit Operator whenever changes in the Unit Area, changes in the Participating Area, changes in the ownership of one or more leases, or changes in the percentages of oil or gas, or both, allocated to the individual leases render such changes necessary. Four copies of the revised exhibits shall be submitted to the Regional Supervisor for approval.

## ARTICLE IV
## DESIGNATION OF UNIT OPERATOR

4.1    Chevron U.S.A. Inc. is hereby designated as the Unit Operator and agrees to accept the rights and obligations of the Unit Operator to explore for, develop, and produce Unitized Substances as provided in this Agreement.

4.2    Except as otherwise provided in this Agreement and subject to the terms and conditions of approved plans of operations, the exclusive rights and obligations of the Working Interest Owners to conduct unit operations to explore for, develop, and produce Unitized Substances in the Unit Area are delegated to and shall be exercised by the Unit Operator. This delegation neither relieves a lessee of the obligation to comply with all lease terms nor transfers title to any lease or the operating agreement.

## ARTICLE V
## RESIGNATION OR REMOVAL OF UNIT OPERATOR

5.1    The Unit Operator shall have the right to resign at any time. Such resignation shall not become effective until ninety (90) days after written notice of an intention to resign has been delivered by the Unit Operator to the Working Interest Owners and the Regional Supervisor and until all platforms, artificial islands, installations, and other devices, including wells used for conducting operations in the Unit Area, are placed in a condition satisfactory to the Regional Supervisor for the transfer of operations, or, if no successor Unit Operator has been designated, for suspension or abandonment of operations. If a successor Unit Operator is designated and approved as provided in Article VI, the resignation shall be effective upon the designation and approval of the successor Unit Operator.

5.2    The Unit Operator may be subject to removal by a vote of the Working Interest Owners as provided in the Unit Operating Agreement. This removal shall not be effective until the Working Interest Owners notify the Regional Supervisor and the Unit Operator and until the Regional Supervisor approves the designation of a successor Unit Operator.

5.3    The resignation or removal of the Unit Operator shall not release the Unit Operator from liability for any failure to meet its obligations which accrued before the effective date of its resignation or removal.

5.4    The resignation or removal of the Unit Operator shall not terminate any of its right, title, or interest as the owner of a Working Interest or other interest in the Unit Area. However, when the resignation or removal of the Unit Operator becomes effective, the Unit Operator shall relinquish to the successor Unit Operator all wells, platforms, artificial islands, installations, devices, records, and any other assets all owned solely by the unit joint account.

3

CONFIDENTIAL
DPT002105

ARTICLE VI
SUCCESSOR UNIT OPERATOR

6.1    Whenever the Unit Operator tenders its resignation as Unit Operator or is removed as provided in Article V, a successor Unit Operator may be designated by (a) an affirmative vote of the Working Interest Owners based on their decision pursuant to the Unit Operating Agreement(s), and (b) the successor Unit Operator's acceptance in writing of the rights and obligations of the Unit Operator. The successor Unit Operator shall file with the Regional Supervisor four executed copies of the designation of successor. However, the designation shall not become effective until approved by the Regional Supervisor.

6.2    If no successor Unit Operator is designated as herein provided within 60 days following notice to the Regional Supervisor of the Unit Operator's intent to resign or removal of a Unit Operator, the Regional Supervisor may elect to designate one of the Working Interest Owners other than the Unit Operator as successor Unit Operator, or may declare this Agreement terminated.

ARTICLE VII
UNIT OPERATING AGREEMENT

7.1    The owners of Working Interests and the Unit Operator shall enter into the Unit Operating Agreement which shall describe how all costs and liabilities incurred in maintaining or conducting operations pursuant to this Agreement shall be apportioned and assumed. The Unit Operating Agreement shall also describe how the benefits which may accrue from operations conducted on the Unit Area shall be apportioned.

7.2    The owners of Working Interests and the Unit Operator may establish by means of one or more Unit Operating Agreements such other rights and obligations as they deem necessary or appropriate. However, no provision of the Unit Operating Agreements shall be deemed to modify the terms and conditions of this Agreement or to relieve the Working Interest Owners or the Unit Operator of any obligation set forth in this Agreement. In case of any inconsistency or conflict between this Agreement and the Unit Operating Agreement, the terms of this Agreement shall prevail.

7.3    Three copies of the Unit Operating Agreement executed in conjunction with the first section of this Article shall be attached to this Agreement when it is filed with the Regional Supervisor with a request for approval. Three copies of all other Unit Operating Agreements and any amendments to the Unit Operating Agreement also shall be filed with the Regional Supervisor within 30 days of final execution.

ARTICLE VIII
APPEARANCES AND NOTICES

8.1    The Unit Operator shall, after notice to other parties affected, have the right to appear on behalf of all Working Interest Owners before the DOI or any other body legally empowered to issue decisions concerning orders or Regulations of the DOI and to appeal from these decisions. The expense of these appearances shall be paid and apportioned as provided in the Unit Operating Agreement. However, any affected Working Interest Owners shall have the right at their own expense to be heard in any proceeding.

8.2    Any order or notice relating to this Agreement which is given to the Unit Operator by the Regional Supervisor shall be deemed given to all Working Interest Owners of the Unit Area. All notices

4

CONFIDENTIAL
DPT002106

required by this Agreement to be given to the Unit Operator or the Working Interest Owners shall be deemed properly given if given in writing and delivered personally or sent by prepaid registered or certified mail to the addresses set forth below or to such other addresses as may have been furnished in writing to the party sending the notice.

## ARTICLE IX
## PLAN OF OPERATION

9.1     The Unit Operator shall submit plans of operation which are consistent with the requirements for Exploration Plans or Development and Production Plans as required by the Act, subpart B of 30 CFR, Part 250, and other sections of the Regulations.   All operations within the Unit Area shall be conducted in accordance with an approved plan.

9.2     When no Unitized Substances are being produced from the Unit Area and when all or part of the Unit Area is subject to one or more leases beyond the primary term, a continuous drilling or well-reworking program shall be maintained with lapses of no more than 180 days per lapse between such operations unless a suspension of production or other operations has been ordered or approved by the Regional Supervisor or unless extended by the Director pursuant to 30 CFR 250.13(b).  Plans may call for a cessation of drilling operations for a reasonable period of time after the discovery and delineation of a Reservoir when such a pause in drilling activities is warranted to permit the design, fabrication, and erection of platforms and other installations needed for development and production operations, provided a suspension of production or other operation has been ordered or approved by the Regional Supervisor.

9.3     An acceptable initial plan of operation shall be submitted at the time this Agreement is filed for the Regional Supervisor's approval. Each plan of operation shall expire on the date specified in the plan. At least 60 days before the scheduled expiration of any plan, unless the Regional Supervisor grants an extension for good cause, the Unit Operator shall file an acceptable subsequent plan of operation, for approval in accordance with this Article.

## ARTICLE X
## REVISION OF UNIT AREA

10.1    The Unit Area may be further revised by additions necessary for unit operations or for the inclusion of an area capable of producing oil and / or gas whenever such action appears proper to include additional lands, or may be further revised by the contraction of the Unit Area when such contraction is necessary or advisable to conform with the purposes of this Agreement.  Such additions or contractions shall be effected by the Unit Operator on its own motion after preliminary concurrence of the Regional Supervisor or on demand of the Regional Supervisor.  The effective date of any expansion or contraction of the Unit Area shall be the first day of the month following the date of approval of the expansion or contraction by the Regional Supervisor provided, however, that a more appropriate effective date may be used if justified by the Unit Operator and approved by the Regional Supervisor.

10.2    The Unit Area shall not be reduced on account of the depletion of the Unitized Substances for which it was established, but the Unit Area established under the provisions of this Article shall terminate automatically whenever operations are permanently abandoned in the Unit.

5

CONFIDENTIAL
DPT002107

## ARTICLE XI
## PARTICIPATING AREAS

11.1 Prior to the commencement of production of Unitized Substances, or as soon thereafter as required by the Regional Supervisor, the Unit Operator shall submit to the Regional Supervisor, as Exhibit "C," a schedule by lease of (a) all land reasonably proven to be productive of Unitized Substances by the drilling and completion of producible wells, geological and geophysical information, and engineering data, and (b) the percentage of Unitized Substances to be allocated as provided in Article XII to each lease. All lands in said schedule, upon approval by the Regional Supervisor, shall constitute the initial Participating Area, effective as of the effective date of this agreement. The Participating Area shall be described in parcels no smaller than 1/4 x 1/4 x 1/4 Blocks.

11.2 Subject to approval of the Regional Supervisor, the Participating Area(s) so established shall be revised from time to time to include additional land reasonably proven to be productive in the same manner as provided in section 11.1 of this Article, or lands proven not to be productive to be excluded in the same manner, and Exhibit "C" shall be revised accordingly. The effective date of any revision shall be the first of the month in which the information is obtained which provides the basis for the approval of the revision by the Regional Supervisor provided, however, that a more appropriate effective date may be used if justified by the Unit Operator and approved by the Regional Supervisor. No land shall be excluded from the Participating Area(s) on account of depletion of the Unitized Substances.

11.3 A separate Participating Area may be established for each accumulation of Unitized Substances or for any group thereof which is produced as a single pool or zone and any two or more Participating Areas so established may be combined into one, all subject to approval of the Regional Supervisor.

11.4 Nothing herein contained shall be construed as requiring any retroactive adjustment for production obtained prior to the effective date of the revision of the Participating Area.

## ARTICLE XII
## ALLOCATION OF PRODUCTION

12.1 Each Working Interest Owner shall pay its share of production royalties and/or make deliveries of oil and gas which are payments of royalties taken-in-kind or which, pursuant to the Act, are purchased by the United States. Unitized Substances shall be allocated within the Participating Area(s) on the basis of a combination of (a) reservoir quality factors, (b) reservoir bulk rock volumes, and (c) oil and/or gas production and proportionally credited to the respective leases committed hereto. The Unit Operator shall furnish the Regional Supervisor geological and engineering maps and data sufficient to support the allocation between leases. Oil and gas produced from the Unit Area prior to the effective date of this Agreement shall not be allocated under this Agreement. The royalty payments under leases subject hereto shall be based and calculated upon the production allocated to the leases as specifically provided herein. The Unitized Substances saved, removed, or sold from the Unit Area shall be allocated in this manner, regardless of where any well is drilled and produced in the Unit Area.

12.2 For the purpose of determining royalty obligations, Unitized Substances on which royalty has been paid and which are used for repressuring, stimulation of production, or increasing ultimate recovery from the Unit Area, in conformity with an approved plan of operation, may be deemed to be a portion of the gas and liquid-hydrocarbon substances subsequently saved, removed, or sold from the Unit Area. In such instances, a like amount of gas and liquid-hydrocarbon substances similar to that

6

CONFIDENTIAL
DPT002108

previously used may be saved, removed, or sold from the Unit Area without paying a royalty thereon. However, as to dry gas, only dry gas and not products extracted therefrom may be saved, removed, or sold royalty-free. The royalty-free withdrawal shall be accomplished in accordance with an approved plan of operation and the amount of gas and liquid-hydrocarbon substances withdrawn that are to be recognized as free of royalty charges shall be computed in accordance with a formula approved or prescribed by the Regional Supervisor. Any withdrawal of royalty-free gas or liquid-hydrocarbon substances shall terminate upon the termination of this Agreement, unless otherwise permitted. For the purposes of this paragraph, liquid-hydrocarbon substances include natural gasoline and liquid petroleum gas fractions.

## ARTICLE XIII
## RELINQUISHMENT OF LEASES

Pursuant to the provisions of the leases and applicable Regulations, a lessee of record shall, subject to the provisions of the Unit Operating Agreement, have the right to relinquish any of its interests committed hereto, in whole or in part, provided that no relinquishment shall be made of any interests within a Participating Area without the prior approval of the Regional Supervisor. In the event such relinquishments result in the leasehold interest of only one lease remaining committed hereto, this Agreement shall terminate automatically effective as of the date that only one lease remains subject to the Agreement.

## ARTICLE XIV
## RENTALS AND MINIMUM ROYALTIES

14.1   Rentals or minimum royalties due on leases committed hereto shall be paid by the Working Interest Owners responsible therefor at the time and rates specified in their respective lease from the United States unless such rental or minimum royalty is suspended or reduced by law or by approval of the Secretary.

14.2   If there is production from the Unit Area during the lease year, the amount of royalty paid for production allocated to a lease during the lease year shall be credited against the minimum royalty obligation of the lease.

## ARTICLE XV
## EFFECTIVE DATE AND TERMINATION

15.1   This Agreement shall be effective on October 1, 1996 and shall terminate when oil or gas is no longer being produced from the Unit Area and drilling or well-reworking operations are no longer being conducted in accordance with the provisions of Article IX of this Agreement. If the Regional Supervisor has ordered or approved a suspension of operations or production on all or part of the Unit Area pursuant to the Regulations, this Agreement shall be continued in force and effect for the period of time equal to the length of the authorized suspension and thereafter so long as operations are being conducted in accordance with the provisions of Article IX herein.

15.2   This Agreement may be terminated, with the approval of the Regional Supervisor, at any time by an affirmative vote of all of the Working Interest Owners or as otherwise specified in the Unit Operating Agreement.

## ARTICLE XVI
## LEASES AND CONTRACTS CONFORMED AND EXTENDED

7

CONFIDENTIAL
DPT002109

16.1    The terms, conditions, and provisions of all leases, subleases, and other contracts relating to exploration, drilling, development, or production operations for oil or gas on lands committed to this Agreement are hereby modified and amended only to the extent necessary to make the same conform to the provisions hereof but otherwise shall remain in force and effect.

16.2    The Regional Supervisor, by the approval hereof, does hereby establish, alter, suspend, change, or revoke the drilling, production, rental, minimum royalty, and royalty requirements of the Federal leases committed hereto, to conform said requirements to the provisions of this Agreement, and, without limiting the generality of the foregoing, all leases, subleases, and contracts are particularly modified in accordance with the following:

(a)    Drilling and/or producing operations performed hereunder upon any unitized lease will be accepted and deemed to be performed upon and for the benefit of each and every unitized lease, and no lease committed to this Agreement shall be deemed to expire by reason of failure to drill or produce a well thereon.

(b)    Suspension of drilling or producing operations on all unitized lands, pursuant to direction or consent of the Secretary or a duly authorized representative, shall be deemed to constitute such suspension pursuant to such direction or consent as to each and every unitized lease.

(c)    Suspension of drilling or producing operations on less than all unitized lands, pursuant to direction or consent of the Secretary or a duly authorized representative, shall be deemed to constitute such suspension pursuant to such direction or consent only as to unitized lands specified in the document providing direction or consent.

(d)    Each lease committed hereto shall continue in force as to all lands covered thereby for the term so provided therein, or as extended by law, and so long thereafter as oil or gas and / or condensate is produced from a unit well, drilling or well-reworking operations pursuant to the Regulations are conducted within the Unit Area, or operations are suspended hereunder as provided herein, and operations are being conducted pursuant to the provisions of Article IX of this Agreement.  This subsection shall not operate to continue in force any whole lease excluded from the Unit Area by adjustment pursuant to Articles X.

16.3    Upon termination of this Agreement, the leases committed hereto may be continued in force and effect in accordance with the terms and conditions contained in the Act, the Regulations, and the leases.

ARTICLE XVII
COUNTERPARTS

This Agreement may be executed in any number of counterparts, no one of which needs to be executed by all parties.  If this Agreement is executed in counterparts, all counterparts taken together shall have the same effect as if all parties had signed the same instrument.

ARTICLE XVIII
SUBSEQUENT JOINDER

The Regional Supervisor may order or, upon request, approve a subsequent joinder to this Agreement pursuant to expansion provisions of Article X. A request for a subsequent joinder shall be

8

CONFIDENTIAL
DPT002110

accompanied by a signed counterpart to this Agreement and shall be submitted by the Unit Operator at the time a notice of proposed expansion is submitted pursuant to Article X. A subsequent joinder shall be subject to the requirements which may be contained in the Unit Operating Agreement, if any, except that the Regional Supervisor may require modifications of any provision in the Unit Operating Agreement which would prevent a subsequent joinder.

## ARTICLE XIX
### REMEDIES

19.1   The failure of the Unit Operator to conduct operations in accordance with an approved plan of operation, to timely submit an acceptable plan for approval by the Regional Supervisor, or to comply with any other requirement of this Agreement in a timely manner shall, after notice of default to the Unit Operator with copies to all Working Interest Owners by the Regional Supervisor and after failure of the Unit Operator to remedy any default within a reasonable time as determined by the Regional Supervisor, result in automatic termination of this Agreement effective as of the first day of the default.

19.2   This remedy is in addition to any remedy which is prescribed in the Act, the Regulations, or a lease committed to this Agreement or any action which may be brought by the United States to compel compliance with the provisions thereof.

## ARTICLE XX
### NO WAIVER OF CERTAIN RIGHTS

Nothing contained in this Agreement shall be construed as a waiver by any party hereto of the right to assert any legal or constitutional right or defense pertaining to the validity or invalidity of any law of the United States, or regulations issued thereunder, in any way affecting such party or as a waiver by any such party of any right beyond such party's authority to waive.

## ARTICLE XXI
### COVENANTS RUN WITH THE LAND

21.1   The covenants herein shall be construed to be covenants running with the land with respect to the interest of the parties hereto and their successors in interest until this Agreement terminates, and any grant, transfer, or conveyance of interest in land or leases subject hereto shall be and hereby are conditioned upon the assumption of all privileges and obligations hereunder by the grantee, transferee, or other successor in interest.

21.2   No assignment or transfer of any Working Interest or other interest subject hereto shall be binding upon Unit Operator until the first day of the calendar month after the Unit Operator is furnished with the original, photostatic, or certified copy of the instrument of transfer.

9

CONFIDENTIAL
DPT002111

IN WITNESS WHEREOF, the Working Interest Owners and the Unit Operator have caused this Agreement to be executed as follows:

### ACCEPTANCE OF RIGHTS AND OBLIGATIONS BY UNIT OPERATOR

I hereby accept and assume all rights and obligations of the Unit Operator as set forth herein.

Dated: _____ October 25, 1996 _____

Authorized Signature: _____

Name: _____ A. Cornelius _____

Title: _____ Assistant Secretary _____

Corporation: _____ Chevron U.S.A. Inc. _____

Subscribed and sworn to me this 25th day of October, 1996.

Notary Public: _____

My Commission Expires: _____



SHIRLEY THOMPSON
COMM. # 982777
Notary Public — California
VENTURA COUNTY
My Comm. Expires JAN 18, 1997

### APPROVAL BY WORKING INTEREST OWNER

As an owner of a Working Interest in the Unitized Area, I hereby agree to the terms and conditions as set forth in this Agreement.

Dated: _____

Authorized Signature: _____

Name: _____

Title: _____

Corporation: _____ Phillips Petroleum Company _____

Address: _____

Subscribed and sworn to me this __ day of _____, 1996.

Notary Public: _____

My Commission Expires: _____

10

October 1, 1996
Contract 497001

CONFIDENTIAL
DPT002112

IN WITNESS WHEREOF, the Working Interest Owners and the Unit Operator have caused this Agreement to be executed as follows:

## ACCEPTANCE OF RIGHTS AND OBLIGATIONS BY UNIT OPERATOR

I hereby accept and assume all rights and obligations of the Unit Operator as set forth herein.

Dated: _____October 25, 1996_____

Authorized Signature: _____

Name: _____A. Cornelius_____

Title: _____Assistant Secretary_____

Corporation: ___Chevron U.S.A. Inc._____

Subscribed and sworn to me this 25th day of October, 1996.

Notary Public: _____

My Commission Expires: _____

## APPROVAL BY WORKING INTEREST OWNER

As an owner of a Working Interest in the Unitized Area, I hereby agree to the terms and conditions as set forth in this Agreement.

Dated: _____October 28, 1996_____

Authorized Signature: _____

Name: _____S. M. Park_____

Title: _____Attorney-In-Fact_____

Corporation: ___Phillips Petroleum Company___

Address: ___P. O. Box 1967, Houston, TX  77251-1967___

Subscribed and sworn to me this 28 day of October, 1996.

Notary Public: _____Gale Lyles_____

My Commission Expires: _____

GALE LYLES
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
JAN. 11, 1998

10

October 1, 1996
Contract 497001

CONFIDENTIAL
DPT002113

## APPROVAL BY WORKING INTEREST OWNER

As an owner of a Working Interest in the Unitized Area, I hereby agree to the terms and conditions as set forth in this Agreement.

Dated: __October 29, 1996__

Authorized Signature: _John R. Hazlett_

Name: __John R. Hazlett__

Title: __Vice President__

Corporation: __Whiting Petroleum Corporation__

Address: __1700 Broadway, Suite 2300
Denver, CO 80290-2301__

Subscribed and sworn to me this 29 day of October, 1996.

Notary Public: _____

My Commission Expires: __March 24, 1999__

## APPROVAL BY WORKING INTEREST OWNER

As an owner of a Working Interest in the Unitized Area, I hereby agree to the terms and conditions as set forth in this Agreement.

Dated: _____

Authorized Signature: _____

Name: _____

Title: _____

Corporation: __Texaco Exploration and Production Inc.__

Address: _____

Subscribed and sworn to me this __ day of _____, 1996.

Notary Public: _____

My Commission Expires: _____

October 1, 1996
Contract 497001

11

CONFIDENTIAL
DPT002114

## APPROVAL BY WORKING INTEREST OWNER

As an owner of a Working Interest in the Unitized Area, I hereby agree to the terms and conditions as set forth in this Agreement.

Dated: _____

Authorized Signature: _____

Name: _____

Title: _____

Corporation: ___Whiting Petroleum Corporation___

Address: _____

Subscribed and sworn to me this __ day of _____, 1996.

Notary Public: _____

My Commission Expires: _____


## APPROVAL BY WORKING INTEREST OWNER

As an owner of a Working Interest in the Unitized Area, I hereby agree to the terms and conditions as set forth in this Agreement.

Dated: ___10-23-96___

Authorized Signature: _Alan A. Kleier_

Name: ___Alan A. Kleier___

Title: _Attorney-in-Fact_

Corporation: ___Texaco Exploration and Production Inc.___

Address: _P.O. Box 5197X, Bakersfield, CA 93388_

Subscribed and sworn to me this 3c day of Oct , 1996.

Notary Public: _Carolyn Ronald_

My Commission Expires: ___6-30-99___



CAROLYN RONALD
Comm. # 1061385
NOTARY PUBLIC - CALIFORNIA
Kern County
My Comm. Expires June 30, 1999

11

October 1, 1996
Contract 497001

CONFIDENTIAL
DPT002115

## APPROVAL BY WORKING INTEREST OWNER

As an owner of a Working Interest in the Unitized Area, I hereby agree to the terms and conditions as set forth in this Agreement.

Dated: _October 29, 1996_

Authorized Signature: _Thomas M Gladney_

Name: _THOMAS M. GLADNEY_

Title: _ATTORNEY-IN-FACT_

Corporation: _Sun Operating Limited Partnership, by Oryx Energy Company, its Managing General Partner_

Address: _P.O. Box 2380 Dallas, Tx 75221_

Subscribed and sworn to me this _29th_ day of _October_, 1996.

Notary Public: _Wilma J Maley_

My Commission Expires: _8-31-99_

WILMA G MALEY
Notary Public, State of Texas
My Comm. Expires 08/31/99

## APPROVAL BY WORKING INTEREST OWNER

As an owner of a Working Interest in the Unitized Area, I hereby agree to the terms and conditions as set forth in this Agreement.

Dated: _____

Authorized Signature: _____

Name: _____

Title: _____

Corporation: _Pennzoil Exploration and Production Company_

Address: _____

Subscribed and sworn to me this __ day of _____, 1996.

Notary Public: _____

My Commission Expires: _____

12

October 1, 1996
Contract 497001

CONFIDENTIAL
DPT002116

## APPROVAL BY WORKING INTEREST OWNER

As an owner of a Working Interest in the Unitized Area, I hereby agree to the terms and conditions as set forth in this Agreement.

Dated: _____

Authorized Signature: _____

Name: _____

Title: _____

Corporation:  ___Sun Operating Limited Partnership, by Oryx Energy Company, its Managing General Partner_

Address: _____

Subscribed and sworn to me this __ day of _____, 1996.

Notary Public: _____

My Commission Expires: _____

## APPROVAL BY WORKING INTEREST OWNER

As an owner of a Working Interest in the Unitized Area, I hereby agree to the terms and conditions as set forth in this Agreement.

Dated:   Ocotber 31, 1996

Authorized Signature: *Paul L. Bruce*

Name:   Paul L. Bruce

Title:   Agent & Attorney-in-Fact

Corporation:  _Pennzoil Exploration and Production Company_

Address: P.O. Box 2967
Houston, Texas 77252-2967

Subscribed and sworn to me this *31* day of *October*, 1996.

Notary Public: *Lillian Mattox*

My Commission Expires: *09-25-2000*



LILLIAN MATTOX
Notary Public, State of Texas
My Commission Expires 09-25-2000

12

October 1, 1996
Contract 497001

CONFIDENTIAL
DPT002117

## APPROVAL BY WORKING INTEREST OWNER

As an owner of a Working Interest in the Unitized Area, I hereby agree to the terms and conditions as set forth in this Agreement.

Dated: _____October 31, 1996_____

Authorized Signature: _J. W. Moeller_

Name: ___J. W. Moeller___

Title: __Executive Vice President. Koch__ Industries, Inc.

Corporation: __Koch Industries, Inc.__

Address: _P.O. Box 2256, Wichita, KS  67201-2256_

Subscribed and sworn to me this 1st day of _October_, 1996.

Notary Public: _____Dorothy a. Keil_____

My Commission Expires: _____8-21-98_____

## APPROVAL BY WORKING INTEREST OWNER

As an owner of a Working Interest in the Unitized Area, I hereby agree to the terms and conditions as set forth in this Agreement.

Dated: _____

Authorized Signature: _____

Name: _____

Title: _____

Corporation: __Oxbow Energy, Inc.__

Address: _____

Subscribed and sworn to me this __ day of _____, 1996.

Notary Public: _____

My Commission Expires: _____

13

October 1, 1996
Contract 497001

CONFIDENTIAL
DPT002118

## APPROVAL BY WORKING INTEREST OWNER

As an owner of a Working Interest in the Unitized Area, I hereby agree to the terms and conditions as set forth in this Agreement.

Dated: _____

Authorized Signature: _____

Name: _____

Title: _____

Corporation:____Koch Industries, Inc._____

Address: _____

Subscribed and sworn to me this ____ day of _____, 1996.

Notary Public: _____

My Commission Expires:_____

## APPROVAL BY WORKING INTEREST OWNER

As an owner of a Working Interest in the Unitized Area, I hereby agree to the terms and conditions as set forth in this Agreement.

Dated: ____November 20, 1996_____

Authorized Signature: _____B Acton_____

Name: ____Brian L. Acton_____

Title: ____President_____

Corporation:____Oxbow Energy, Inc._____

Address:  1601 Forum Place, West Palm Beach, FL 33401

Subscribed and sworn to me this _20th_ day of _November_, 1996.  He is personally known to me.

Notary Public: _Janice C. Develle_____

My Commission Expires:_____

October 1, 1996
Contract 497001

13

JANICE C. DEVELLE
Comm. No. CC 475139
My Comm. Exp. June 21, 1999
Bonded thru Richard Ins. Agcy.

CONFIDENTIAL
DPT002119



# EXHIBIT "A"
## POINT ARGUELLO UNIT AGREEMENT

OCS-P 0451

① OCS-P 0450

② 

OCS-P 0316

③ OCS-P 0315

④

N

## LEGEND

- – – PARTICIPATING AREA

──── UNIT BOUNDARY

(#) TRACT NUMBER

Chevron U.S.A. Inc.
Western Region–Exploration, Land and Production

**EXHIBIT "A" TO
POINT ARGUELLO UNIT
AGREEMENT
OFFSHORE CALIFORNIA**

| SCALE | DATE | |
|---|---|---|
| NTS | October 1, 1986 | Contract No. 497001 |

CONFIDENTIAL
DPT002120

## EXHIBIT "B"
## POINT ARGUELLO UNIT AGREEMENT
## OIL AND GAS LEASES AND LEASE OWNERSHIP INTERESTS

| Tract Number | Description of Lands in the Unit Area | Number of Acres or Hectacres | U.S.A. Lease Serial Number | Lease Royalty | Lessees of Record | Lease Interest | ORR & Net Profits |
|---|---|---|---|---|---|---|---|
| 1 | E½NW¼, NE¼, S½ Block 464 OCS Official Protraction Diagram NI10-6, (Santa Maria). | 4,419.58 1,788.55 | OCS-P 0450 | 16 2/3% | Chevron U.S.A. Inc. Phillips Petroleum Company | 50.00000% 50.00000% | None None |
| 2 | W½ Block 465, All that portion seaward of the three geographic mile, OCS Official Protraction Diagram NI10-6 (Santa Maria). | 2,459.66 995.39 | OCS-P 0451 | 16 2/3% | Chevron U.S.A. Inc. Phillips Petroleum Company Whiting Petroleum Corporation | 44.44400% 44.44400% 11.11200% | None None * |
| 3 | All Block 55N 85W, OCS Leasing Map, Channel Islands Area, Cal Map No. 6A | 4,269.12 1,727.66 | OCS-P 0315 | 16 2/3% | Texaco Exploration and Production Inc. Pennzoil Exploration and Production Co. Sun Operating Limited Partnership Koch Industries, Inc. Oxbow Energy, Inc. | 40.45189% 25.00000% 20.00000% 10.42136% 4.12675% | None None None None None |
| 4 | All Block 55N 84W, OCS Leasing Map, Channel Islands Area, Cal Map No. 6A Total number of acres in unit. Total number of hectares in unit. | 4,177.93 1,690.76 15,326.29 6,202.36 | OCS-P 0316 | 16 2/3% | Chevron U.S.A. Inc. Phillips Petroleum Company Whiting Petroleum Corporation | 40.00000% 40.00000% 20.00000% | None None * |

* Overriding royalty burdening only Whiting's interest equaling three and one half percent of Whiting's Net Revenue Interest. (Net Revenue Interest is defined as Whiting's gross Working Interest less royalty.)

Point Arguello Unit Agreement
Effective October 1, 1996
Contract No. 497001

CONFIDENTIAL
DPT002121

EX____BIT "C"

## POINT ARGUELLO UNIT AGREEMENT
## INITIAL PARTICIPATING AREA - ALL DEPTHS
### EFFECTIVE OCTOBER 1, 1996

| Tract Number | Description of Lands in the Participating Area | Number of Acres or Hectares | Serial Number | Tract Participation |
|---|---|---|---|---|
| 1 | NE¼, E½NE¼NW¼, NE¼SE¼NW¼, NE¼ SE¼, E½NW¼SE¼, N½SE¼SE¼, and the remaining portion of the S½SE¼SE¼, Block 464, Official Protraction Diagram NI10-06 (Santa Maria). | 2,412.78 acres<br><br>976.42 hectares | OCS-P 0450 | 27.20878% |
| 2 | W½W½NW¼, NW¼SW¼, the remaining portions of the SW¼SW¼, and the SE¼SW¼, Block 465, Official Protraction Diagram NI10-06 (Santa Maria). | 1,036.33 acres<br><br>419.39 hectares | OCS-P 0451 | 2.61187% |
| 3 | S½SE¼NE¼ and the remaining portion of the N½SE¼NE¼, S½SW¼NE¼ and the remaining portion of the N½SW¼NE¼, S½SE¼NW¼ and the remaining portion of the N½SE¼NW¼, and the remaining portion of NE¼SW¼NW¼, NE¼NE¼SW¼, NE¼SE ¼, NW¼SE¼, N½SE¼SE¼, SE¼SE¼SE¼, Block 55N 85W, OCS Leasing Map, Channel Islands Area, Cal Map No. 6A | 2,200.50 acres<br><br>890.51 hectares | OCS-P 0315 | 41.30435% |
| 4 | SW ¼ SE ¼ NW ¼, the remaing portion of the NW ¼ SW ¼ NW ¼, S ½ SW ¼ NW ¼, SW ¼, NW ¼ NW ¼ SE ¼, S ½ NW ¼ SE ¼, SW ¼ SE ¼, Block 55N 84W, OCS Leasing Map, Channel Islands Area, Cal Map No. 6A | 2,417.23 acres<br><br>978.22 hectares | OCS-P 0316 | 28.875% |
| | TOTAL | 8,066.84 acres<br>3,264.54 hectares | | 100% |

Point Arguello Unit Agreement
Effective October 1, 1996
Contract No. 497001

CONFIDENTIAL
DPT002122

# POINT ARGUELLO UNIT

## PLAN OF OPERATION

- Facilitation and coordination of unit activities to minimize operating costs and optimize capital costs and activities to enhance production.

- Optimize recovery from the M3/M4 intervals.

- Develop Upper Monterey reserves early in the project life.

- Evaluate and implement hydraulic fracturing if feasible.

- Extend field life with higher reserves and lower operating costs.

October 1, 1996



CONFIDENTIAL
DPT002123

# EXHIBIT "A"
## POINT ARGUELLO UNIT AGREEMENT



## LEGEND

- - - -   UNIT BOUNDARY

(#)   TRACT NUMBER



Chevron U.S.A. Inc.
Western Region—Exploration, Land and Production

**EXHIBIT "A" TO
POINT ARGUELLO
UNIT AGREEMENT
OFFSHORE CALIFORNIA**

| SCALE | DATE |
|-------|------|
| NTS | 5/20/96 |

CONFIDENTIAL
DPT002124

## EXHIBIT "B"
## POINT ARGUELLO UNIT AGREEMENT
## OIL AND GAS LEASES AND LEASE OWNERSHIP INTERESTS

| Tract Number | Description of Lands in the Unit Area | Number of Acres or Hectares | U.S.A. Lease Serial Number | Lease Royalty | Lessees of Record | Lessee Interests | ORR & Net Profits |
|---|---|---|---|---|---|---|---|
| 1 | E½NW¼, NE¼, S½ Block 464 OCS Official Protraction Diagram NI10-6, (Santa Maria). | 4,419.58<br>1,788.55 | OCS-P 0450 | 16 2/3% | Chevron U.S.A. Inc.<br>Phillips Pt. Arguello Production Company | 50.00000%<br>50.00000% | None<br>None |
| 2 | W½ Block 465, All that portion seaward of the three geographic mile, OCS Official Protraction Diagram NI10-6 (Santa Maria). | 2,459.66<br>995.39 | OCS-P 0451 | 16 2/3% | Chevron U.S.A. Inc.<br>Phillips Pt. Arguello Production Company<br>Whiting Petroleum Corporation | 44.44000%<br>44.44000%<br>11.11200% | None<br>None<br>* |
| 3 | All Block 55N 85W, OCS Leasing Map, Channel Islands Area, Cal Map No. 6A | 4,269.12<br>1,727.66 | OCS-P 0315 | 16 2/3% | Texaco Exploration and Production Inc.<br>Pennzoil Exploration and Production Co.<br>Sun Operating Limited Partnership<br>Koch Industries, Inc.<br>Oxbow Energy, Inc. | 40.45189%<br>25.00000%<br>20.00000%<br>10.42136%<br>4.12675% | None<br>None<br>None<br>None<br>None |
| 4 | All Block 55N 84W, OCS Leasing Map, Channel Islands Area, Cal Map No. 6A<br>Total number of acres in unit.<br>Total number of hectares in unit | 4,177.93<br><u>1,690.76</u><br>15,326.29<br>6,202.36 | OCS-P 0316 | 16 2/3% | Chevron U.S.A. Inc.<br>Phillips Pt. Arguello Production Company<br>Whiting Petroleum Corporation | 40.00000%<br>40.00000%<br>20.00000% | None<br>None<br>* |

* Overriding royalty burdening only Whiting's interest equaling three and one half percent of Whiting's Net Revenue Interest. (Net Revenue Interest is defined as Whiting's gross Working Interest less royalty.)

Point Arguello Unit Agreement
Effective October 1, 1996
Contract No. 497001
Revised 9/03/97

CONFIDENTIAL
DPT002125

EXHIBIT "B"
POINT ARGUELLO UNIT OPERATING AGREEMENT
OIL AND GAS LEASES SUBJECT TO THE AGREEMENT, INTERESTS OF THE PARTIES

A.    Leases subject to this Agreement:

| Unit Tract Number | Description of Lands subject to the Unit Operating Agreement | Number of Acres or Hectare | Lease Ownership | Lessee Interests | ORR & Net Profits |
|---|---|---|---|---|---|
| 1 | Federal OCS P-0450<br>E1/2NW1/4, NE1/4, S1/2 Block 464<br>OCS Official Protraction Diagram NI 10-6 | 4,419.13<br><br>1,788.40 | Chevron U.S.A. Inc.<br>Phillips Pt. Arguello Production Company | 50.00000%<br>50.00000% | None<br>None |
| 2 | Federal OCS P-0451<br>W1 /2 Block 465, All that portion seaward of the three geographic mile, OCS Official Protraction Diagram NI 10-6, Santa Maria | 2,422.37<br><br>980.32 | Chevron U.S.A. Inc.<br>Phillips Pt. Arguello Production Company<br>Whiting Petroleum Corporation | 44.4440%<br>44.4440%<br>11.1120% | None<br>None<br>* |
| 3 | Federal OCS P-0315<br>All Block 55N 85W,<br>OCS Leasing Map, Channel Islands Area, CAL Map No. 6A | 4,269.12<br><br>1,727.69 | Texaco Exploration and Production Inc.<br>Pennzoil Exploration and Production Company<br>Sun Operating Limited Partnership<br>Koch Exploration Company<br>Oxbow Energy Inc. | 40.4518860%<br>25.0000000%<br>20.0000000%<br>10.4213609%<br>4.1267531% | None<br>None<br>None<br>None<br>None |
| 4 | Federal OCS P-0316<br>All Block 55N 84W, OCS Leasing Map, Channel Islands Area, CAL Map No. 6A | 4,177.93<br><br>1,690.78 | Chevron U.S.A. Inc.<br>Phillips Pt. Arguello Production Company<br>Whiting Petroleum Corporation | 40.00000%<br>40.00000%<br>20.00000% | None<br>None<br>* |
| | Total number of acres in unit. | 15,288.55 | | | |
| | Total number of hectares in unit. | 6,187.19 | | | |

* Overriding royalty burdening only Whiting's interest equaling three and one-half percent of Whiting's Net Revenue Interest.  (Net Revenue Interest is defined as Whiting's gross Working Interest less royalty.)

B.    Participating Interests of the Parties:

| Company | Participating Interest |
|---|---|
| Chevron U.S.A. Inc | 26.31522% |
| Phillips Pt. Arguello Production Company | 26.31522% |
| Texaco Exploration and Production Inc. | 16.70839% |
| Pennzoil E&P Company | 10.32609% |
| Sun Operating Limited Partnership | 8.26087% |
| Whiting Petroleum Corporation | 6.06521% |
| Koch Exploration Company | 4.30448% |
| Oxbow Energy Inc. | 1.70452% |
| **TOTAL** | 100.00% |

Revised 9/3/97

CONFIDENTIAL
DPT002126

# PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "Agreement") dated as of the 8th day of June, 1999, is between **WHITING PETROLEUM CORPORATION**, a Delaware corporation, and **WHITING PROGRAMS, INC.**, a Delaware corporation (collectively, "Seller"), whose address is Mile High Center, 1700 Broadway, Suite 2300, Denver, Colorado 80290-2301, and **DELTA PETROLEUM CORPORATION**, a Colorado corporation ("Buyer"), whose address is 555 - 17th Street, Suite 3310, Denver, Colorado 80202. Seller and Buyer are referred to herein individually as a "Party" and collectively as the "Parties."

In consideration of the mutual promises contained herein, the benefits to be derived by each Party hereunder and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller agree as follows:

## ARTICLE 1
## PURCHASE AND SALE

**1.1    Purchase and Sale.**    Subject to Section 2.4 and the other terms and conditions of this Agreement, Seller agrees to sell and convey and Buyer agrees to purchase and pay for all of Seller's right, title and interest in and to the Interests.

**1.2    Interests.**    All of the following shall be referred to in this Agreement collectively as the "Interests" and individually as an "Interest":

(a)    The oil, gas and mineral leases described on Exhibit "A" attached hereto (collectively, the "Leases"), including, without limitation working interests, overriding royalty interests, royalty interests and any other interests of a similar nature affecting the lands covered by the Leases (collectively, the "Lands").

(b)    The wells described on Exhibit "A" or which are located on the Lands (collectively, the "Wells").

(c)    All unitization, communitization, pooling, agreements, working interest units created by operating agreements, partnership agreements and orders covering the Leases and Lands, or any portion thereof, and the units and pooled or communitized areas created thereby, including the Federal units created by the Unit Agreements described on Exhibit "A" (collectively, the "Units") and the four partnerships created by the Partnership Agreements described on Exhibit "A," i.e., PAPCO, PANGL, GGP and PATC (collectively, the "Partnerships").

(d)    The tangible personal property, tools, machinery, materials, pipelines, plants, gathering systems, equipment, fixtures and improvements, which are incident or

-1-

Exhibit No.: 21
Deponent: Nanke
Date/RPR: 6-5-13 RB
Hunter + Geist, Inc.

DPT002294

attributable to the Leases, Lands, Wells or Units with the production, treatment, sale or disposal of hydrocarbons or water produced therefrom or attributable thereto, on the Effective Time (collectively, the "Equipment").

(e) The licenses, permits, contracts, agreements and other instruments owned by Seller (other than bonds posted by Seller) which concern and relate to any of the Leases, Lands, Wells, Units and/or Equipment, INSOFAR AND ONLY INSOFAR as same concern or relate to the Leases, Lands, Wells, Units and/or Equipment, or the operation thereof; including, without limitation, oil, gas and condensate purchase and sale contracts; permits,; rights-of-way; easements; licenses; servitudes; estates; surface leases; farmin and farmout agreements; division orders and transfer orders; bottomhole agreements; dry hole agreements; area-of-mutual interest agreements; salt water disposal agreements; acreage contribution agreements; operating agreements; balancing agreements and unit agreements; pooling agreements; pooling orders; communitization agreements; processing, gathering, compression and transportation agreements; facilities or equipment leases relating thereto or used or held for use in connection with the ownership or operation thereof or with the production, treatment, sale or disposal of hydrocarbons; and all other contracts and agreements related to the Leases, Lands, Wells, Units and/or Equipment.

(f) Originals or copies of all computer tapes and discs, files, records, information or data relating to the Interests in the possession of Seller, including, without limitation, title records (including abstracts of title, title opinions, certificate of title and title curative documents), accounting records and files, contracts, correspondence, production records, electric logs, core data, pressure data, decline curves, graphical production curves, drilling reports, well completion reports, drill stem test charts and reports, engineering reports, regulatory reports, and all related materials, INSOFAR AND ONLY INSOFAR as the foregoing items constitute materials that may be lawfully conveyed to Buyer (i.e., the materials are not subject to a proprietary agreement precluding their transfer to Buyer), and, to the extent transferable, all other contract rights, intangible rights (excluding Seller's trademarks and service marks), inchoate rights, choses in action, rights under warranties made by prior owners, manufacturers, vendors or other third parties, and rights accruing under applicable statutes of limitation or prescription, attributable to the Interests.

(g) All payments, and all rights to receive payments, with respect to the ownership of the production of hydrocarbons from or the conduct of operations on the Interests accruing after the Effective Time.

1.3    **Reserved Interests.**  Notwithstanding any provision of this Agreement to the contrary, Seller reserves and retains (i) Seller's corporate, financial, tax and legal records and its other business records; (ii) cash, bank accounts, travel letter accounts and prepaid insurance; (iii) the management information systems and other intellectual property rights of Seller used by Seller in the management and administration of its business; (iv) all claims that Seller may have under any policy of insurance, indemnity or bond maintained by Seller other than claims relating

-2-

DPT002295

to property damage or casualty loss affecting the Interests occurring between the Effective Time and Closing (which claims shall be included in the Interests); (v) all accounts receivable, trade credits or notes receivable accrued before the Effective Time; (vi) any files or records that Seller is contractually or otherwise obligated not to disclose to Buyer; (vii) all claims and causes of action arising from acts, omissions or events, or damage or destruction of property occurring prior to the Effective Time; and (viii) all interests and rights not specifically included in the definition of Interests (the "Reserved Interests").

     **1.4**    **Effective Time.** The purchase and sale of the Interests shall be effective as of April 1, 1999, at 7:00 a.m., Pacific Standard Time (herein called the "Effective Time").

     **1.5**    **Ownership of the Interests.** Should Closing occur, Seller shall be entitled to all of the rights of ownership (including, without limitation, the right to all production, proceeds of production and other proceeds), and shall be subject to the duties and obligations of such ownership attributable to the Interests for the period of time prior to the Effective Time and, subject to Section 2.4 and the other provisions of this Agreement, Buyer shall be entitled to all of the rights of ownership (including, without limitation, the right to all production, proceeds of production and other proceeds) and shall be subject to the duties and obligation of such ownership attributable to the Interests for the period of time from and after the Effective Time. All expenses and costs, including, without limitation, all ad valorem, property, production, severance, and similar taxes and assessments based upon or measured by the ownership of the Interests, the production of hydrocarbons, or the receipt of proceeds therefrom) attributable to the Interests, shall be paid by or allocated to Seller if incurred or accruing with respect to operations conducted prior to the Effective Time and, subject to Section 2.4 and the other provisions of this Agreement, all such expenses and costs shall be paid by or allocated to Buyer if incurred or accruing with respect to operations conducted after the Effective Time. All hydrocarbons in storage facilities above or upstream from the pipeline connection to each storage facility, or downstream of delivery point sales meters on gas pipelines, as of the Effective Time, shall belong to Seller. Subject to Section 2.4 and the other provisions of this Agreement, all of the hydrocarbons placed in such storage facilities or upstream of the aforesaid meters on pipelines after the Effective Time shall belong to Buyer and shall become a part of the Interests. In order to accomplish the foregoing allocation of production, the parties shall rely upon the records maintained by the operator of the relevant Interest, unless such records are demonstrated to be inaccurate.

     **1.6**    **Risk of Loss.** Seller shall assume all risk of loss with respect to the Interests prior to Closing and, subject to Section 2.4 and the other provisions of this Agreement, Buyer shall assume all risk of loss from and after the Closing.

DPT002296

## ARTICLE 2
## PURCHASE PRICE

**2.1    Purchase Price.** The purchase price for the Interests shall be (i) 250,000 shares of the Buyer's common stock and (ii) SIX MILLION DOLLARS ($6,000,000.00), herein called the "Purchase Price," payable pursuant to Sections 2.2, 2.3 and 2.4 below. At Closing, the Purchase Price shall be adjusted as set forth in Section 2.5 below.

**2.2    Common Stock.** Following the execution of this Agreement, Buyer shall issue and deliver to Seller 250,000 shares of its restricted common stock (the "Common Stock").

**2.3    Earnest Money Deposit.** Following its execution of this Agreement, Buyer shall deposit with Seller, by wire transfer or other immediately available funds, ONE MILLION DOLLARS ($1,000,000) as an earnest money deposit (the "Earnest Money Deposit").

**2.4    Promissory Note.** Following the execution of this Agreement, Buyer shall execute and deliver to Seller a non-interest bearing promissory note, in the form attached hereto as Exhibit "B" (the "Promissory Note"), in the principal amount of FIVE MILLION DOLLARS ($5,000,000), payable in two installments of TWO MILLION DOLLARS ($2,000,000) on August 2, 1999 (the "First Installment Payment") and THREE MILLION DOLLARS ($3,000,000) on December 1, 1999 (the "Second Installment Payment"). The Promissory Note will be non-recourse to Buyer.

The following procedures shall apply with respect to the Promissory Note:

(a)     If Buyer fails to make the First Installment Payment, this Agreement shall terminate without further obligation by either Party to the other Party and the Earnest Money Deposit shall be returned to Buyer by Seller; provided, however, that Seller shall retain the Common Stock delivered pursuant to Section 2.2 and shall have the registration rights provided in Section 9.3.

(b)     If Buyer makes the First Installment Payment, but fails to make the Second Installment Payment, Seller shall retain the Earnest Money Deposit, the First Installment Payment and the Common Stock and shall convey to Buyer at Closing fifty percent (50%) of its right, title and interest in the Interests pursuant to Section 8.3.

(c)     If Buyer makes the First Installment Payment and the Second Installment Payment, Seller shall convey to Buyer at Closing all of Seller's right, title and interest in the Interests.

**2.5    Adjustments to Purchase Price.** At Closing, the Purchase Price shall be adjusted, depending upon the ownership interest conveyed at the Closing, as follows and the resulting amount shall be referred to herein as the "Adjusted Purchase Price":

-4-

DPT002297

(a)    The Purchase Price shall be adjusted upward by the following:

      i.    The amount of actual operating or capital expenditures or prepaid expenses attributable to the Interests paid by or on behalf of Seller in connection with the operation of the Interests and which are, according to generally accepted accounting principles, attributable to the period of time between the Effective Time and the Closing Date. Such expenditures and expenses shall include, without limitation, royalties, rentals and other charges; ad valorem, property, excise, and any other taxes based upon or measured by the ownership of the Interests, the production of hydrocarbons or the receipt of proceeds therefrom; terminal fees and tariffs and related charges; and expenses payable to a third person under applicable joint operating agreements, including, without limitation, overhead charges and royalty disbursement fees payable to operator, or similar payments to third party operators, or, in the absence of any joint operating agreement, those items customarily billed under such an agreement.

      ii.    Any other amounts agreed upon by Seller and Buyer.

(b)    The Purchase Price shall be adjusted downward by the following:

      i.    Reductions due to Title Failures and uncured Title Defects as provided in Section 11.6.

      ii.    The gross proceeds actually received by Seller, net of applicable severance and production taxes and compression charges and royalty and overriding royalty payments, and derived from the sale of hydrocarbons attributable to the Interests to the extent owned by Buyer pursuant to the provisions of Section 1.5 above.

      iii.    An amount equal to unpaid ad valorem, property, production, severance and similar taxes and assessments (but not including income taxes) based upon or measured by the ownership of the Interests, the production of hydrocarbons, or the receipt of proceeds therefrom, which taxes or assessments become due and payable or accrue (but have not yet become due and payable) with respect to the Interests prior to the Effective Time, which amount shall, where possible, be computed based upon the tax rate and values applicable to the tax period in question; otherwise, the amount of the adjustment under this subsection shall be computed

-5-

DPT002298

based upon such taxes assessed against the applicable portion of the Interests for the immediately preceding tax period just ended.

iv.    Any other amounts agreed upon by Seller and Buyer.

**2.6    Purchase Price Allocation.** The Purchase Price shall be allocated among the Interests as set forth in Exhibit "C" attached hereto.

**2.7    Calculation of Estimated Adjusted Purchase Price; Payment at Closing.**

Seller shall prepare and deliver to Buyer, at least five (5) "Business Days" (which term shall mean any day except a Saturday, Sunday or other day on which commercial banks in New York, New York, or Dallas, Texas are required or authorized by law to be closed) prior to the Closing Date, Seller's estimate of the Adjusted Purchase Price to be paid at Closing, together with a statement setting forth Seller's estimate of the amount of each adjustment to the Purchase Price to be made pursuant to Section 2.5. The parties shall negotiate in good faith and attempt to agree on such estimated adjustments prior to Closing. In the event any estimated adjustment amounts are not agreed upon prior to Closing, the estimate of the Adjusted Purchase Price for purposes of Closing shall be calculated based on Seller's and Buyer's agreed upon estimated adjustments and Seller's good faith estimation of any disputed amounts.

If Buyer fails to make the Second Installment Payment at Closing, the Parties shall calculate fifty percent (50%) of the adjustment amounts determined pursuant to Sections 2.5 and, rather than adjust the Purchase Price, the Party that owes the other Party as a result shall pay such other Party the amount owed, and Seller shall convey to Buyer fifty percent (50%) of Seller's right, title and interest in the Interests pursuant to Section 8.3.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

**3.1    Representations and Warranties of Seller.** Seller represents and warrants to Buyer the following:

(a)    Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Seller is duly qualified to carry on its business in the State of California and each state where failure to so qualify would have a material adverse effect upon its business or the Interests.

(b)    Seller has all requisite power and authority to carry on its business as presently conducted and to enter into this Agreement and to perform its obligations hereunder.

-6-

DPT002299

(c)    The execution, delivery and performance of this Agreement and the transactions contemplated herein has been duly and validly authorized.

(d)    This Agreement has been duly executed and delivered on behalf of Seller, and all documents and instruments required hereunder to be executed and delivered by Seller at or prior to Closing shall have been duly executed and delivered. This Agreement does, and such documents and instruments shall, constitute legal, valid and binding obligations of Seller enforceable in accordance with their terms.

(e)    Except as set forth on Exhibit "D" attached hereto, there are no outstanding authorizations for expenditures ("AFEs") that (i) require the drilling of wells or other material development operations in order to earn or to continue to hold all or any portion of the Interests, or (ii) obligate Seller to make payments of any amounts in connection with drilling of wells or other material capital expenditures affecting the Interests.

(f)    Except as set forth on Exhibit "D", Seller is not obligated to deliver hydrocarbons produced from the Interests at some future time without then or thereafter receiving full payment for the production attributable to Seller's ownership in and to the Interests by virtue of: (i) a prepayment arrangement under any contract for the sale of hydrocarbons and containing a "take or pay", or similar provisions, (ii) a production payment, or (iii) any other arrangement.

(g)    Except for those taxes and assessments for which a Purchase Price adjustment is made under Section 2.5(b)(iii), during the period of Seller's ownership of the Interests, Seller has properly paid all ad valorem, property, production, severance, excise and similar taxes and assessments based on or measured by the ownership of property or the production of hydrocarbons or the receipt of proceeds therefrom on the Interests that have become due and payable before the Effective Time.

(h)    Seller has incurred no liability, contingent or otherwise, for broker's or finder's fees or commissions relating to the transactions contemplated by this Agreement for which Buyer shall have any responsibility whatsoever.

(i)    Except as set forth in Exhibit "D," no suit, action or other proceeding is pending or, to the best of Seller's knowledge, threatened before any court, arbitration panel or governmental agency which relates to the Interests and which might result in a material loss of Seller's title to any portion of the Interests, or a material diminution of the value of any of the Interests, or that might materially hinder or impede the operation of the Leases.

(j)    As used in this Agreement, the term, "Existing Documents" shall mean all of the oil, gas and other mineral leases, assignments or other instruments or agreements that comprise the Interests, and all contractually binding arrangements to which the Interests may be subject and which will be binding on the Interests or Buyer after Closing (including, without limitation, oil, gas and other mineral leases, overriding royalty assignments, farm-out and farm-

-7-

DPT002300

in agreements, option agreements, forced pooling orders, assignments of production payments, partnership agreements, unit agreements, unit operating agreements, joint operating agreements, balancing agreements, unit operating agreements, production contracts, processing contracts, gas sales contracts, marketing and transportation contracts and division orders). To the best of Seller's knowledge, (i) all Existing Documents are in full force and effect and are the valid and legally binding obligations of the parties thereto and are enforceable in accordance with their respective terms (subject to the effects of bankruptcy, insolvency, reorganization, moratorium and similar laws); (ii) Seller is not in material breach or default with respect to any of its obligations pursuant to any such Existing Documents; and (iii) all payments (including, without limitation, royalties, delay rentals, shut-in royalties and valid calls under unit or operating agreements) due thereunder have been timely paid and Seller has received no notice of default under any of the Existing Documents.

(k)    To the best of Seller's knowledge, all information furnished to Buyer by Seller with respect to the Interests will be true and accurate in all material respects, including, but not limited to, the following: (i) the historical lease operating costs for the Interests; (ii) whether the Wells are producing; and (iii) whether Seller is receiving payments for all production of hydrocarbons from the Interests. There are no gas imbalances affecting the Interests.

(l)    None of the hydrocarbons (whether oil, gas or other liquids) comprising a portion of the Interests are committed or subject to any sales contract, dedication or servitude, either expressed or implied by law, except as set forth on Exhibit "D".

(m)    To the best knowledge of Seller, all of the Wells that have been drilled and completed have been so drilled and completed within the boundaries and limits permitted by contract, pooling or unit agreement, and by law; and all drilling, completion, and other operations on or affecting the Leases have been conducted in compliance with all applicable laws, ordinances, rules, regulations and permits, and judgments, orders and decrees of any court or governmental body or agency. No Well is subject to penalties or allowables after the date hereof because of any over-production or any other violation of applicable laws, rules, regulations or permits or judgments, orders of decrees of any court or governmental body or agency.

(n)    Except as set forth in Exhibit "D."

(i)    Seller's operations and activities with respect to the Interests comply in all respects with all applicable governmental laws, including, without limitation, health and safety statutes and regulations and all Environmental Laws.

(ii)    There is no civil, criminal or administrative action, suit, demand, claim, hearing, notice of violation, investigation, proceeding, notice or demand letter ("Environmental Proceeding") known to Seller pending or, to the best knowledge of Seller, threatened

-8-

DPT002301

against Seller or any of the Interests relating in any way to the Environmental Laws.

(iii)   Neither Seller nor to the best knowledge of Seller, any other person has released, placed, stored, buried or dumped any Hazardous Substances, Oil, Pollutants or Contaminants or any other wastes on, beneath, or adjacent to the Leases, except for inventories of such substances to be used in the ordinary course of business of Seller (which inventories and wastes, if any, were and are stored or disposed of in accordance with applicable laws and regulations).

(iv)   Seller has not received any notice or order from any governmental entity or private or public entity advising it that Seller is responsible for or potentially responsible for Cleanup or paying for the cost of Cleanup of any Hazardous Substances, Oils, Pollutants, or Contaminants or any other waste or substance affecting the Interests.  Seller is not aware of any facts which might reasonably give rise to any such notice, order or agreement.

(v)   The term "Cleanup" shall mean all actions required to:  (1) cleanup, remove, treat or remediate Hazardous Substances, Oils, Pollutants or Contaminants; (2) prevent the Release of Hazardous Substances, Oils, Pollutants or Contaminants so that they do not migrate, endanger or threaten to endanger public health or welfare or the environment; (3) perform pre-remedial studies and investigations and post-remedial monitoring and care; or (4) respond to any government requests for information or documents in any way relating to cleanup, removal, treatment or remediation or potential cleanup, removal, treatment or remediation of Hazardous Substances, Oils, Pollutants or Contaminants in the indoor or outdoor environmental.

(vi)   The term "Environmental Laws" shall mean all foreign, Federal, state and local laws, regulations, rules and ordinances relating to polluting or protection of the environment, including, without limitation, laws relating to Releases or threatened Releases of Hazardous Substances, Oil, Pollutants or Contaminants into the indoor or outdoor environment (including, without limitation, ambient air, surface water, groundwater, land, surface and subsurface strata) or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, Release, transport or handling of Hazardous Substances, Oil, Pollutants or Contaminants, and all laws and regulations with regard to record

-9-

DPT002302

keeping, notification, disclosure and reporting requirements respecting Hazardous Substances, Oils, Pollutants or Contaminants.

(vii)    The term "Hazardous Substances, Oils, Pollutants or Contaminants" shall mean all substances defined as such in the National Oil and Hazardous Substances Pollution Contingency Plan, or defined as such by, or regulated as such under, any Environmental Law.

(viii)    The term "Release" means any release, spill, emission, discharge, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environmental (including, without limitation, ambient air, surface water, groundwater, and surface or subsurface strata) or into or out of any property, including the movement of Hazardous Substances, Oils, Pollutants or Contaminants through or in the air, soil, surface water, groundwater or property.

    **3.2    Representations and Warranties of Buyer.** Buyer represents and warrants to Seller the following:

    (a)    Buyer is a corporation, duly organized, validly existing and in good standing under the laws of the State of Colorado. Buyer is or will be prior to Closing duly qualified to conduct business in the State of California.

    (b)    Buyer has all requisite power and authority to carry on its business as presently conducted, to enter into this Agreement, and to purchase the Interests on the terms described in this Agreement and perform its other obligations under this Agreement.

    (c)    The execution, delivery and performance of this Agreement and the transactions contemplated hereby have been duly and validly authorized.

    (d)    This Agreement has been duly executed and delivered by or on behalf of Buyer; all documents and instruments required hereunder to be executed and delivered by Buyer at or prior to Closing shall have been duly executed and delivered; this Agreement does, and such documents and instruments shall, constitute legal, valid and binding obligations of Buyer enforceable in accordance with their terms.

    (e)    Buyer has incurred no liability, contingent or otherwise, for broker's or finder's fees or commissions relating to the transactions contemplated by this Agreement for which Seller shall have any responsibility whatsoever.

-10-

DPT002303

(f)     Buyer is qualified, or shall be qualified by Closing, to hold Federal offshore oil and gas leases.

## ARTICLE 4
## CERTAIN AGREEMENTS OF SELLER

**4.1     Agreements Between Execution of Agreement and Closing.** During the period between the execution of this Agreement and the Closing Date, Seller shall not, without the prior written consent of Buyer, (i) sell, convey, assign, transfer or encumber any of the Interests; (ii) make or agree to make any expenditure in excess of $25,000.00, per well, per month net to Seller's interest, except for obligations under existing contracts, expenditures necessary to maintain the Interests, or in the event of any emergency as to which Seller has notified Buyer; (iii) sell oil, gas or other minerals from the Interests except sales made in the ordinary course of business; (iv) enter into any agreement amending, modifying or terminating any of the Leases; or (v) take any other action with respect to any of the Interests that would cause a material diminution the value thereof or that would materially and adversely affect the use and enjoyment thereof.

**4.2     Notification of Additional Proceedings.** Seller shall promptly notify Buyer of any new suits, actions or other proceedings threatened or pending before any court, arbitrator or governmental agency which relate to the Interests.

## ARTICLE 5
## CERTAIN AGREEMENTS OF BUYER

**5.1     Cooperation.** Buyer shall cooperate with Seller to assist Seller in carrying out the agreements of Seller hereunder.

**5.2     Confidentiality Agreement.** All confidential and proprietary information made available to Buyer by Seller in connection with this Agreement, including, without limitation, any information obtained by Buyer from Seller in connection with its due diligence review, shall be maintained as confidential by Buyer and by Buyer's representatives except to the extent disclosure is necessary to effectuate the purposes of this Agreement, or as required by law.

**5.3     Administrative Services.** If Closing occurs, Buyer shall pay Seller at Closing TWO THOUSAND DOLLARS ($2,000) per month from the Effective Date to Closing for the accounting and other administrative services performed by Seller with respect to the Interests from the Effective Date to the Closing Date.

-11-

DPT002304

## ARTICLE 6
## BUYER'S CONDITIONS TO CLOSING

The obligations of Buyer to consummate the transactions provided for herein are subject, at the option of Buyer, to the fulfillment on or prior to Closing of each of the following conditions:

**6.1    Owner and Partner Approvals.** The Units' owners and the Partnerships' partners shall have approved the transactions contemplated by this Agreement on or before July 1, 1999. If any such approvals are not obtained by such date, either Party may terminate this Agreement upon written notice of termination delivered to the other Party, in which case the Earnest Money Deposit shall be returned to Buyer and neither Party shall have any further obligations hereunder to the other Party; provided, however, that Seller shall retain the Common Stock delivered pursuant to Section 2.2 and shall continue to have the registration rights provided in Section 9.3.

**6.2    Representations.** The representations and warranties by Seller set forth in Section 3.1 above shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date.

**6.3    Changes.** There shall have been no material adverse change in the physical condition of the Interests, except depletion through normal production within authorized allowable and rates of production, depreciation of equipment through ordinary wear and tear, and other transactions permitted under this Agreement or approved in writing by Buyer.

**6.4    Performance.** Seller shall have timely performed and complied with all agreements and covenants required by this Agreement.

**6.5    Oil and Gas Contracts.** Buyer shall have reviewed and verified and approved to its satisfaction the terms and conditions of the Existing Documents and the gas contracts, marketing agreements and accounting and land records relating to the Interests.

**6.6    No Legal Proceedings.** No suit, action or other proceeding shall be pending or threatened before any court, arbitration panel or governmental agency seeking to restrain, prohibit or declare illegal, or seeking substantial damages in connection with the purchase and sale contemplated by this Agreement, or which might result in a material loss of any portion of the Interests, a material diminution in the value of any of the Interests, or materially interfere with the use or enjoyment of the Interests, except (i) matters with respect to which Buyer has been adequately indemnified by Seller or (ii) any suit or proceeding affecting only a portion of the Interests, which portion could be treated as subject to a Title Defect in accordance with Article 11.

-12-

DPT002305

## ARTICLE 7
## SELLER'S CONDITIONS TO CLOSING

The obligations of Seller to consummate the transactions provided for herein are subject, at the option of Seller, to the fulfillment on or prior to Closing of each of the following conditions:

**7.1    Owner and Partner Approvals.** The Units' owners and the Partnerships' partners shall have approved the transactions contemplated by this Agreement on or before July 1, 1999. If any such approvals are not obtained by such date, either Party may terminate this Agreement upon written notice of termination delivered to the other Party, in which case the Earnest Money Deposit shall be returned to Buyer and neither Party shall have any further obligations hereunder to the other Party; provided, however, that Seller shall retain the Common Stock delivered pursuant to Section 2.2 and shall continue to have the registration rights provided in Section 9.3.

**7.2    Representations.** The representations and warranties by Buyer set forth in Section 3.2 above shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date.

**7.3    Performance.** Buyer shall have timely performed and complied with all agreements and covenants required by this Agreement.

**7.4    No Legal Proceedings.** No suit or other proceeding shall be pending before any court or governmental agency seeking to restrain prohibit or declare illegal, or seeking substantial damages in connection with, the sale contemplated by this Agreement, except (i) matters with respect to which Seller has been adequately indemnified by Buyer or (ii) any suit or other proceeding affecting only a portion of the Warranted Interests, which portion could be treated as subject to a Title Defect in accordance with Article 11.

**7.5    Guarantee.** Buyer shall have provided the Units' owners and the Partnerships' partners with its guarantee of Buyer's share of all Unit and Partnership liabilities in the form of guarantee attached hereto as Exhibit "E".

## ARTICLE 8
## CLOSING

**8.1    Date of Closing.** Subject to the conditions stated in this Agreement, the purchase and sale of the Interests pursuant to this Agreement (the "Closing") shall occur on or before December 1, 1999, at 10:00 a.m., Mountain Standard Time, or on such other date and time as Buyer and Seller may agree (the "Closing Date").

-13-

DPT002306

     **8.2**    **Place of Closing.**  The Closing shall be held at the offices of Seller as set forth hereinabove.

     **8.3**    **Closing Obligations.**  At the Closing, the following documents shall be delivered and the following events shall occur, each event being a condition precedent to the others and each being deemed to have occurred simultaneously with the others:

     (i)    Seller shall execute and deliver:  (1) an Assignment, Bill of Sale and Conveyances in the form attached as Exhibit "F" (the "Assignment") (in sufficient counterparts to facilitate recording) conveying the Interests, subject to the Permitted Encumbrances; (2) such other instruments as may be required to convey the Interests to Buyer and otherwise effectuate the transactions contemplated by this Agreement.

     (ii)    Seller and Buyer shall execute and deliver a preliminary settlement statement (the "Preliminary Settlement Statement") prepared by Seller and confirmed by Buyer, which sets forth the Adjusted Purchase Price reflecting each adjustment and the calculation of such adjustments used to determine such amounts as provided in Section 2.5.

     (iii.)    Buyer shall deliver to Seller or to Seller's account (at such place as may be designated by Seller in a written notice delivered to Buyer not less than two (2) Business Days prior to Closing) by direct bank or wire transfer the Adjusted Purchase Price or the Adjustment Payment (if Buyer is the Party that owes the Adjustment Payment).

     (iv)    Seller shall deliver on forms supplied by Buyer transfer orders or letters in lieu thereof, directing the operator to make payment of proceeds attributable to production from the Interests after the Effective Time to Buyer.

     **8.4**    **Records.**  In addition to the obligations set forth under Section 8.3 above, within thirty (30) days after Closing, if Buyer has acquired all of Seller's right, title and interest in and to the Interests, Seller shall deliver to Buyer all original well and land files in its possession or to which it has access.  Buyer shall be entitled to all original records affecting the Interests assigned to Buyer pursuant to the terms of this Agreement.  Seller shall be entitled to keep a copy of such records for its files.

-14-

DPT002307

## ARTICLE 9
### SELLER'S POST-CLOSING LIABILITIES

**9.1    Abandonment Costs.** Should Closing occur, Seller shall retain liability for one hundred percent (100%) of abandonment costs, net of salvage value, as such abandonment costs are incurred, attributable to Seller's pre-Closing interest in the Interests.

**9.2    Preferred Stock.** At Buyer's option, on December 31, 1999 and on December 31, 2000, Seller shall purchase from Buyer newly designated non-voting Series D Convertible Preferred Stock (the "Preferred Stock") for cash in an amount equal to the aggregate amount of the excess of lease operating expenses and capital costs over production revenues, if any (the "Deficit"), net to Buyer's interest in the Interests, for the eight (8) and twelve (12) months periods, respectively, preceding each such date. In no event shall the aggregate amount of such Preferred Stock purchased exceed TWO MILLION DOLLARS ($2,000,000). Seller's obligation to fund the Deficit through the purchase of Preferred Stock shall be reduced to ONE MILLION DOLLARS ($1,000,000) on January 1, 2000, if less than $1,000,000 of Deficit has occurred through December 31, 1999. (For example, if only $800,000 of Deficit occurs and is paid through December 31, 1999, then $200,000 of Seller's obligation to pay such Deficit will expire on December 31, 1999. Likewise, if less than $1,000,000 of Deficit occurs in the second twelve months period, the unused portion of Seller's obligation will expire on December 31, 2000.)

The amount of Seller's commitments under this Section 9.2 shall be reduced by fifty percent (50%) if Closing occurs, but Buyer fails to make the Second Installment Payment.

The Preferred Stock will provide for the following:

(i)    A coupon interest of five percent per annum (5%) payable in cash or Buyer's common stock (at Seller's option).

(ii)    Certain preferences, including a liquidation preference attached to the Interests.

(iii)    Conversion into shares of Buyer's common stock, based on the lowest of the average closing price for Buyer's common stock on the NASDAQ during the months of March 1999, March 2000 or March 2001. Buyer must request such conversion and Seller must consent to such request, or Seller must elect to make such conversion, on or before March 31, 2004. In no event will the conversion of the Preferred Stock into common stock result in Seller's owning more than 19.9% of Buyer's outstanding common stock without Buyer's written authorization.

-15-

DPT002308

**9.3    Registration Rights.** Seller shall have the right to require that Buyer, at Seller's cost, register under the Securities Act of 1933, as amended, any shares of Buyer's common stock held by Seller, including the shares of Buyer's common stock held by Seller on the date hereof, the shares delivered pursuant to Section 2.2 and/or the shares of common stock issued pursuant to Section 9.2.

**ARTICLE 10**
**POST-CLOSING MATTERS**

**10.    Final Settlement Statement.** As soon as practicable after the Closing, but in no event later than sixty (60) days after Closing, Seller shall prepare and deliver to Buyer, in accordance with this Agreement and generally accepted accounting principles, a statement ("Final Settlement Statement") setting forth each adjustment, (other than adjustments for Title Defects) finally determined as of Closing and showing the calculation of such adjustments. Within thirty (30) days after receipt of the Final Settlement Statement, Buyer shall deliver to Seller a written report containing any changes that Buyer proposes be made in good faith to resolve any questions with respect to the amounts due pursuant to such Final Settlement Statement no later than ninety (90) days after the Closing.

**10.2    Unpaid Third Party Funds.** At such time as Buyer and Seller agree on a Final Settlement Statement, Seller will transfer to Buyer all funds held by Seller which are owed to a third party owner of royalty, overriding royalty, working interests, mineral interest or other similar interests, attributable to the Interests, and will deliver all records in Seller's possession which may be useful to determine proper disbursement. Buyer shall thereafter be responsible for determining the proper payment of such amounts and shall indemnify and hold harmless Seller from and against any and all cost, loss or expense of whatever kind, including attorney's fees, arising from or in connection with the claim or any person with respect to the funds transferred to Buyer pursuant to this Section 10.2.

**10.3    Further Assurances.** After Closing, Seller, and Buyer shall execute, acknowledge and deliver or cause to be executed, acknowledged and delivered such instruments and take such other action as may be necessary or advisable to carry out their obligations under this Agreement and under any Exhibit, document, certificate or other instrument delivered pursuant hereto.

**10.4    Survival.** All representations and warranties set forth in this Agreement and the indemnities provided in Section 12.1 and Section 12.2 shall survive the Closing.

-16-

DPT002309

## ARTICLE 11
## TITLE MATTERS

**11.1    Access to Title and Other Documents.**

(a)    After the date hereof, Seller will make available to Buyer and to its representatives (such representatives to include employees, consultants, independent contractors, attorneys and other advisors of Buyer) for Buyer's copying and/or inspection (at Buyer's cost and expense), at Seller's offices during normal business hours the following documents in Seller's possession or under its control:

(i)    All abstracts of title, title opinions, title curative materials, ownership reports, division orders, bills of sale, other documents evidencing transfers of title, tax receipts, and licenses and registrations pertaining to the Interests.

(ii)    All of the lease records, lease files, leases, conveyances and assignments of interest in the Leases; unitization, unit, pooling and operating agreements; division orders; contracts; transfer orders; orders of the applicable regulatory authorities or administrative agencies; mortgages, deeds of trust, security agreements, and financing statements; and all other contracts, agreements and documents affecting the Interests.

(iii)    Instruments and documents concerning proper payment of all general and special assessments, ad valorem and property taxes, and production, severance and similar taxes and assessments based on or measured by the ownership of the Interests, the production of hydrocarbons, or the receipt of proceeds therefrom for 1999 and years prior for which the applicable statute of limitations has not expired.

(iv)    All geological maps, geophysical surveys and engineering studies, ownership maps, reserve reports, seismic surveys, logs, core studies, and surveys relating to the Interests.

(v)    All production records; transportation agreements; contracts concerning the purchase of gas, oil, casinghead gas, distillate, gas condensate or other hydrocarbons; processing agreements; all correspondence relating to the Interests; and data sheets relating to the Interests and to bonuses, rentals and royalties payable with respect thereto.

(vi)    All agreements relating to the purchase, sale, processing, and transportation of production from the Wells.

-17-

DPT002310

(vii)   All bonds, leases, permits, easements, licenses, orders, saltwater disposal agreements, agreements with pumpers and other agreements in any way relating to the Interests or the operation thereof.

(viii)   All environmental reports, assessments and studies relating to any of the Interests.

Reliance on such information shall be at the sole risk of the Buyer, and Seller makes no guaranty or representation as to the accuracy or completeness of such data, except as otherwise provided in this Agreement.

(b)   To the extent such has not already been furnished, after the date hereof Seller shall use its reasonable efforts to obtain and submit to Buyer or its representatives, as promptly as practicable, such abstracts, title reports, status reports, certificates of title, certificates of fact and other evidence of title covering the Interests as Buyer may reasonably request that are in the possession of a third person to which Seller has access. In addition, Seller shall authorize Buyer and its representatives to consult with attorneys, abstract companies and other consultants or independent contractors of Seller (whether utilized in the past or present) concerning title related matters. Reliance on such information of such third parties shall be at the sole risk of the Buyer, and Seller makes no guaranty or representation as to the accuracy or completeness of such data.

**11.2   No Warranty or Representation.** At the Closing, Seller shall convey to Buyer all the Interests. Such conveyance shall be subject to the Permitted Encumbrances and WITHOUT ANY WARRANTY OF TITLE, EITHER EXPRESS OR IMPLIED, AND WHETHER BY COMMON LAW, STATUTE OR OTHERWISE, except for the warranty of title as to persons claiming by, through and under Seller contained in the Assignment. Without limiting Buyer's right to reduce the Purchase Price in the manner provided in this Article 11, Seller makes no warranty or representation, express or implied, with respect to the accuracy or completeness of any information. Records or data now, heretofore, or hereafter made available to Buyer in connection with this Agreement, including, without limitation, any description of the Interests, pricing assumptions, potential for production of hydrocarbons from the Interests, or any other matters contained in any material furnished by Seller to Buyer or its officers, directors, employees, agents, advisors or representatives.

**11.3   Disclaimer.** ALL PERSONAL PROPERTY, MACHINERY, FIXTURES, EQUIPMENT AND MATERIALS CONVEYED HEREBY ARE SOLD AND ASSIGNED AND ACCEPTED BY BUYER IN THEIR 'WHERE IS, AS IS" CONDITION, WITHOUT ANY WARRANTIES, EXPRESS OR IMPLIED OR STATUTORY, OF MARKETABILITY, QUALITY, CONDITION, MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE OR USE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED.

-18-

DPT002311

**11.4    Permitted Encumbrances.**  As used in this Agreement, the term "Permitted Encumbrances" shall mean the following, provided that the same shall not operate to reduce the net revenue interest or increase the gross working interest of an Interest beyond that shown on Exhibit "A":

(a)    Lessors' royalties, non-participating royalties, overriding royalties, division orders, reversionary interests, and similar burdens.

(b)    Preferential rights to purchase and required third party consents to assignments and similar agreements, with respect to which, prior to Closing (i) waivers or consents are obtained from the appropriate parties, (ii) the appropriate time period for asserting such rights has expired without an exercise of such rights, or (iii) arrangements acceptable to Buyer can be made by Buyer and Seller to allow Buyer to receive substantially the same economic benefits as if all such waivers and consents to assign have been obtained.

(c)    Liens for taxes or assessments not yet due or delinquent or, if delinquent, that are being contested in good faith in the normal course of business.

(d)    All rights to consent by, required notices to, filing with, or other actions by governmental entities in connection with the sale or conveyance of oil and gas leases or interests therein, if the same are customarily obtained subsequent to such sale or conveyance and neither Seller nor Buyer has no reason to believe they cannot be obtained.

(e)    Such Title Defects as Buyer may have waived in writing.

(f)    Rights reserved to or vested in any governmental authority.

(g)    Rights of a common owner of any Interest in rights-of-way or easements currently held by Seller and such common owner as tenants in common or through common ownership.

(h)    Easements, conditions, covenants, restrictions, servitudes, permits, rights-of-way, surface leases and other rights in the Interests for the purpose of surface operations, roads, alleys, highways, railways, pipelines, transmission lines, transportation lines, distribution lines, power lines, telephone lines, and removal of timber, grazing, logging operations, canals, ditches, reservoirs and other like purposes, or for the joint or common use of real estate, rights-of-way, facilities and equipment which do not materially impair the rights held by Buyer or the use and enjoyment of the Interests.

(i)    Defects, irregularities and deficiencies in title to any rights-of-way, easements, surface lease or other rights which in the aggregate do not materially impair the use of such right-of-way, easements, surface leases or other rights for the purpose of which such rights will be held by Buyer.

-19-

DPT002312

        (j)     Zoning, planning and environmental laws and ordinances and municipal regulations.

        (k)     Vendors, carriers, warehousemen, repairmen, mechanics, workmen, materialmen, construction or other like liens arising by operation of law in the ordinary course of business or incident to the construction or improvement of any property in respect of obligations which are not yet due, or which are being contested in good faith by appropriate proceedings by or on behalf of Seller.

        (l)     Liens created under operating agreements in respect of obligations that are not yet due or that are being contested in good faith by appropriate proceedings by or on behalf of Seller.

        (m)    The terms and provisions of the Existing Documents.

    **11.5    Good and Defensible Title.**  For the purposes of this Article 11, the term "Good and Defensible Title" shall mean, with respect to each of the Interests, that title of Seller which, subject to and except for Permitted Encumbrances:

        (a)     Entitles Seller, throughout the duration of the relevant Interest, to receive from such Interest (free and clear of all royalties, overriding royalties, non-participating royalties, net profits interests, or other burdens on or measured by production of hydrocarbons) not less than the interest shown as the net revenue interest on Exhibit "A" in all hydrocarbons produced, saved and marketed from the Interest and of all hydrocarbons produced, saved, and marketed from any unit of which the Interest is a part and which is allocated to such Interest; all without reduction, suspension, or termination of the Interest.

        (b)     Obligates Seller to bear the percentage of the costs and expenses relating to the maintenance and development of, and operations relating to, the Interest not greater than the gross working interest shown on Exhibit "A" without increase throughout the duration of such Interest.

        (c)     Is free and clear of liens, encumbrances and defects.

    **11.6    Notice of Title Defect.**  Except for Permitted Encumbrances, any defect in title, lien, encumbrance, or defect that would cause Seller's title to any Interest not to be Good and Defensible Title shall be a title defect ("Title Defect").  Not later than ten (10) days before the Closing Date (the "Warranty Claim Date"), Buyer must notify Seller in writing of any matter that Buyer considers to be a Title Defect ("Notice of Title Defect"), which notice shall include, (i) a specific description of the matter Buyer asserts as a Title Defect, (ii) a specific description of the Interest or the portion of the Interest that is affected by the Title Defect, (iii) Buyer's calculation of the amount ("Title Defect Amount") that the value of the Interest should be reduced because

-20-

DPT002313

of the Title Defect based on the Allocated Value shown on Exhibit "C," and (iv) appropriate supporting documentation.

Notwithstanding anything to the contrary in this Agreement, the Buyer shall be deemed to have waived any Title Defect which the Buyer has not specifically asserted in its Notice of Title Defect presented before the Warranty Claim Date.

**11.7    Title Failure.** Any item that Seller acknowledges is a Title Defect but that Seller is unwilling to cure shall be deemed a Title Failure and the Purchase Price shall be reduced for such Title Defect pursuant to Section 2.5.

**11.8    Defect Notice; Seller's Opportunity to Cure.** To the extent that Seller disputes that any item described in the Notice of Title Defect actually constitutes a Title Defect or disputes the Title Defect Amount assigned by Buyer to any such Title Defect ("Contested Defect"), Seller shall deliver to Buyer a notice so stating ("Defect Notice"). Subject to the provisions of 11.9 below, the portion of the Purchase Price attributable to Title Defects which Seller is willing to cure but which are uncured at Closing, or which are not waived by Buyer at Closing (including Contested Defects), shall be deposited into an escrow account pursuant to an escrow agreement agreed to by the Parties and the Assignment will be revised to delete all of that portion of the Interests affected by such Title Defects (including Contested Defects). If Seller fails to cure a Title Defect within ninety (90) days after Closing, it shall be deemed a Title Failure and the funds attributable to such Title Defect shall be released from escrow to Buyer.

**11.9    Purchase Price Adjustments.** Notwithstanding any provision hereof to the contrary, there shall be no reduction in the Purchase Price and no escrow for Title Defects or Contested Defects unless the cumulative amount of Title Defects (including Contested Defects) exceeds Twenty-Five Thousand Dollars ($25,000).

**11.10    Exclusion of Defect Properties; Modification of General Assignment.** On or before the Closing Date, Seller may elect to retain and exclude from the Interests any portion of the Interests to the extent Buyer has asserted that Seller does not have Good and Defensible Title to such portion. If a Title Defect is determined to exist, and the affected Interest is not excluded, the Parties will revise the Assignment so that no warranty of title will be given as to such affected Interest.

**11.11    Termination Amount.** Notwithstanding any provision hereof to the contrary, in the event the aggregate of the Title Defect Amounts and the value of the properties and Interests rejected as provided in Section 11.12 below amounts to 20% or more of the Adjusted Purchase Price (the "Termination Amount"), either Party shall have the option to terminate this Agreement, without any liability, upon written notice to the other Party.

-21-

DPT002314

**11.12  Preferential Rights and Consents to Assign.**  Some Interests may be subject to existing preferential rights to purchase the Interests or consents may be required in order to assign the Interests.  Seller shall use its best efforts to obtain waivers of any preferential rights and necessary consents.  If a preferential right is exercised prior to Closing, the Purchase Price shall be adjusted downward in an amount equal to the price paid to Seller for the Interest with respect to which the preferential right has been exercised and such Interest shall be deleted from this Agreement.  In such case Seller shall be entitled to all proceeds paid by the third party exercising its preferential right to purchase.  As to any Interest with respect to which a required waiver of preferential purchase right or consent to assignment has not been obtained prior to Closing, except for the approvals referred to in Sections 6.1 and 6.2, Buyer may waive such requirements and accept an assignment covering such Interest.  If Buyer does not waive the requirement, the Interest so affected shall be deleted from this Agreement with a corresponding adjustment made to the Purchase Price.  If a third party preferential purchase right burdening any Interest is exercised after Closing and Buyer has received title to such interest at Closing, Buyer shall be entitled to all proceeds paid for such interest by the third party exercising such preferential purchase right.  Buyer shall be responsible for conveying title to the Interest affected by said preferential right to the party exercising the same.

**11.13  Inspection.**  Buyer and its authorized representatives, at Buyer's expense, shall have the right to enter upon and inspect the real and personal properties comprising the Interests, and to conduct such well, environmental and other tests and assessments as Buyer shall deem appropriate, subject to the approval of the operator in the case of non-operated properties.  The results of all such inspections, tests and assessments must be acceptable to Buyer in its sole judgment and discretion.  No later than ten (10) days before the Closing Date, Buyer must notify Seller in writing of any property or Interest that Buyer rejects based on such inspections, tests or assessments, and of Buyer's calculation of the amount that the Purchase Price should be reduced because of such rejection.  To the extent that Seller disputes the reduction in value described in such notice, Seller shall deliver a notice to Buyer so stating and the reasons therefor.  The portion of the Purchase Price in dispute shall be deposited into the escrow account referred to in Section 11.7 and the property or Interest in question shall be deleted from the Assignment.

## ARTICLE 12
## INDEMNIFICATION

**12.1  Indemnity by Seller.**  Seller shall indemnify and hold harmless Buyer and its subsidiaries, affiliates, and parents, and its and their employees, representatives, officers, directors, attorneys and agents from and against any claim, damage, liability, loss, cost, expenses, attorney's fees, judgment or deficiency that Buyer shall pay or become obligated to pay arising out of, resulting from, related to or on account of the Seller's ownership, management or control of the Interests prior to the  Closing Date, including, without limitation, matters arising under the Environmental Laws and for the abandonment obligations referred to in Section 9.1; provided, however, Seller's indemnity shall not apply to claims, costs, obligations, liabilities and losses

-22-

DPT002315

related to (i) waived Title Defects; or (ii) amounts for which Buyer has received a downward adjustment of the Purchase Price.

**12.2    Indemnity by Buyer.**  Buyer shall indemnify and hold harmless Seller, its subsidiaries, affiliates, and parents, and its and their employees, representatives, officers, directors, attorneys and agents from and against any claim, damage, liability, loss, cost, expense, attorneys' fees , judgment or deficiency that Seller shall pay or become obligated to pay arising out of, resulting from, related to or on account of Buyer's ownership, operation, management or control of the Interests from and after the Closing Date, except for the abandonment obligations referred to in Section 9.1 and the Deficit referred to in Section 9.2.

**12.3    Notice of Claim, Assumption of Defense and Settlement of Claim.**  Promptly upon the discovery thereof Seller or Buyer, as may be the case, shall give written notice to the other of any claim with respect to which the Party giving notice asserts it is entitled to indemnity or payment pursuant to this Article 12.  For the purpose of this Article, the party giving notice of a claim shall be referred to as the "Indemnified Party" and the Party receiving notice of a claim shall be referred to as the "Indemnifying Party."  In the event that the Indemnified Party gives notice of a claim to the Indemnifying Party, such notice shall set forth the facts known to the Indemnified Party pertaining to the claim, and shall specify the manner in which the Indemnified Party proposes to respond to the claim.  Within ten (10) days of receipt of such notice, the Indemnifying Party shall state in writing:  (i) whether the Indemnified Party may proceed to respond to the claim in the manner set forth in its notice; or (ii) whether the Indemnifying Party shall assume responsibility for and conduct the negotiations, defense or settlement of the claim, and if so, the specific manner in which the Indemnifying Party proposes to proceed.

**ARTICLE 13**
**TERMINATION, DEFAULT AND REMEDIES**

**13.1    Right of Termination.**  The Agreement and the transactions contemplated herein may be terminated at any time at or prior to Closing:

      (i)      By Seller, at Seller's option, in the event any of the conditions set forth in Article 7 have not been satisfied as provided therein.

      (ii)      By Buyer, at Buyer's option, in the event any of the conditions set forth in Article 6 have not been satisfied as provided therein.

      (iii)      By either Party if the approvals referred to in Sections 6.1 or Section 7.1 are not obtained.

      (iv)      By either Party in the event that the adjustments to the Purchase Price exceed the Termination Amount, as provided for in Section 11.11.

-23-

DPT002316

(v)    By Buyer's failure to make the First Installment Payment.

**13.2    Effect of Termination.** In the event of the termination of this Agreement pursuant to Section 13.1, the termination shall be without penalty and the Parties shall have no further obligations to, nor rights against, one another except for the obligations set forth in Section 13.3 below and the registration rights provided in Section 9.3.

**13.3    Return of Documentation.** Upon termination of this Agreement, Buyer shall return to Seller all title, engineering, geological data, reports, contracts, and maps and other information furnished by Seller to Buyer and all copies thereof .

**ARTICLE 14**
**MISCELLANEOUS**

**14.1    Fees and Taxes.** Except as otherwise specifically provided, all fees, costs and expense incurred by Buyer or Seller in negotiating this Agreement or in consummating the transactions contemplated by this Agreement shall be paid by the Party incurring the same, including, without limitation, legal and accounting fees, costs and expenses. All required documentary, filing and recording fees for the assignments, conveyance or other instruments required to convey title to the Interests to Buyer shall be borne by Buyer. In addition, the liability for any sales, use, transfer or similar tax associated with the sale and/or transfer of the Interests shall be the liability of, and for the account of, the Buyer and such liability shall not be subject to proration as provided in Section 2.5.

**14.2    Notices.** All notices and communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly made when actually delivered, including delivery by courier, facsimile, telecopy, or other electronic medium, or if mailed by registered to certified mail, postage prepaid, addressed as follows:

**SELLER:**

> **WHITING PETROLEUM CORPORATION**
> **WHITING PROGRAMS, INC.**
> **1700 Broadway, Suite 2300**
> **Denver, Colorado 80290-2301**
> **Attention: J. R. Hazlett, Vice President-Land**
> **Telephone: 303-390-4230**
> **Facsimile:  303-390-4245**

-24-

DPT002317

**BUYER:**

**DELTA PETROLEUM CORPORATION**
555 - 17ᵗʰ Street, Suite 3310
Denver, Colorado 80202
Attention: Roger A. Parker, President
Telephone: 303-293-9133
Facsimile: 303-298-8251

Either Party may, by written notice so delivered to the other, change the address to which delivery shall thereafter be made.

**14.3    Amendments.** This Agreement may not be amended except by an instrument in writing signed by Buyer and Seller.

**14.4    Preparation of Agreement.** Both Seller and Buyer and their respective counsel participated in the preparation of this Agreement. In the event of any ambiguity in this Agreement, no presumption shall arise based on the identity of the draftsman of this Agreement.

**14.5    Headings.** The headings of the articles and sections of this Agreement are for guidance and convenience of reference only and shall not limit or otherwise affect any of the terms or provisions of this Agreement.

**14.6    Counterparts.** This Agreement may be executed by Buyer and Seller in any number of counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute but one and the same instrument.

**14.7    References.** References made in this Agreement, including use of a pronoun, shall be deemed to include, where applicable, masculine, feminine, singular or plural, individuals or corporations. As used in this Agreement, "person" shall mean any natural person, corporation, partnership, trust, estate or other entity.

**14.8    Governing Law.** This Agreement and the transactions contemplated hereby shall be construed in accordance with, and governed by, the laws of the State of Colorado without giving effect to the conflicts of law rules thereof. Any disputes concerning this Agreement or the subject matter hereof shall be brought in a court of competent jurisdiction of the State of Colorado.

**14.9    Entire Agreement.** This Agreement (including the Exhibits hereto) constitutes the entire understanding between the Parties with respect to the subject matter hereof,

-25-

DPT002318

superseding all negotiations, prior discussions and prior agreements and understanding relating to such subject matter.

**14.10  Parties in Interest.**  This Agreement shall be binding upon, and shall inure to the benefit of, the Parties hereto and their respective successors and assigns.

**14.11  Further Cooperation.**  After the Closing, Buyer and Seller shall execute and deliver, or shall caused to be executed and delivered from time to time, such further instruments of conveyance and transfer and shall take such other action as any Party may reasonably request to convey and deliver the Interests to Buyer, to accomplish the orderly transfer of the Interests to Buyer, or to otherwise effectuate the transactions contemplated by this Agreement.  If either Party hereto receives monies belonging to the other, such amount shall immediately be paid over to the proper Party.  If an invoice or other evidence of an obligation is received by a Party, which is partially an obligation of both Seller and Buyer, then the Parties shall consult with each other and each shall promptly pay its portion of such obligation to the obligee.

EXECUTED as of the date first above stated, but made effective as of the Effective Time.

**SELLER:**

**WHITING PETROLEUM CORPORATION**

By _____
John R. Hazlett
Vice President

**WHITING PROGRAMS, INC.,**

By _____
John R. Hazlett
Vice President

**BUYER:**

**DELTA PETROLEUM CORPORATION**

By: _____
Roger A. Parker
President

-26-

DPT002319

EXHIBIT "A"
POINT ARGUELLO FIELD
Offshore California

Attached to and made a part of that certain PURCHASE AND SALE AGREEMENT between Whiting
Petroleum Corporation, Seller, and Delta Petroleum Corporation, Buyer, dated the 8 day of June, 1999.

I.

    All of Seller's right, title and interest in and to the following described partnerships:

1.    Partnership Agreement-Point Arguello Pipeline Company dated August 2, 1984; Partnership
      Interest 5.8036%.

2.    Partnership Agreement-Point Arguello Natural Gas Company dated September 1, 1984;
      Partnership Interest 6.0652%.

3.    Partnership Agreement for Ownership of Facilities-Gaviota Gas Plant Company dated
      October 1, 1984; Partnership Interest 5.7013%.

II.

LEASE:

All of Seller's right, title and interest in and to the leasehold estate created by the following described oil
and gas lease:

    A.    Oil and Gas Lease dated July 2, 1981 from Bureau of Land Management to
          Chevron U.S.A. Inc. and Phillips Petroleum Company, bearing Serial No.
          OCS-P 0452

INSOFAR AND ONLY INSOFAR AS SAID LEASE AND INTEREST COVERS THE FOLLOWING
DESCRIBED LAND:

          Block 466, All that certain portion seaward of the three geographical mile line,
          OCS Official Protraction Diagram NI 10-6, Santa Maria. (CA3-2056).

Subject to the following:

a.    Unit Operating Agreement dated February 1, 1985 between Chevron, operator and Phillips
      and Champlin as non-operators covering the Rocky Point Unit;

b.    Unit Agreement dated February 1, 1985 between Chevron, operator and Phillips and
      Champlin as non-operators, covering the Rocky Point Unit;

c.    Letter Agreement dated February 6, 1985 between Chevron, Champlin and Phillips amending
      the Unit Operating Agreement.

LEASE:

All of Seller's right, title and interest in and to the leasehold estate created by the following described oil
and gas lease:

DPT002320

    A.    Oil and Gas Lease dated May 19, 1981 from Bureau of Land Management
           To Chevron U.S.A. Inc. and Phillips Petroleum Company bearing Serial
           No. OCS-P 0453.

INSOFAR AND ONLY INSOFAR AS SAID LEASE AND INTEREST COVERS THE FOLLOWING
DESCRIBED LAND:

           Block 467, all that certain portion seaward of the three geographical mile line,
           OCS Official Protraction Diagram NI 10-6, Santa Maria

Subject to the following:

a.    Lease Operating Agreement dated July 1, 1981;

b.    Unit Agreement dated February 15, 1985;

c.    Rocky Point Unit Operating Agreement dated February 1, 1985.

LEASE:

    A.    Oil and Gas Lease dated July 1, 1981 from Bureau of Land Management to
           Chevron U.S.A. Inc. and Phillips Petroleum Company bearing Serial No.
           OCS-P 0451.

INSOFAR AND ONLY INSOFAR AS SAID LEASE AND INTEREST COVERS THE FOLLOWING
DESCRIBED LAND:

           The E/2 of Block 465, All that portion seaward of the three geographical mile line,
           OCS Official Protraction Diagram NI 10-6 Santa Maria (CA 3-1055).

Subject to the following:

a.    Offset Development Well and Linewell Agreement dated September 12, 1988 between Chevron,
       Phillips and Union Pacific Corp.;

b.    Unit Operating Agreement dated February 1, 1985 between Chevron, operator and Phillips and
       Champlin, as non-operators, covering the Rocky Point Unit;

c.    Unit Agreement dated February 1, 1985 between Chevron, Phillips and Champlin covering
       the Rocky Point Unit;

d.    Letter Agreement dated February 1, 1985 between Chevron, Champlin and Phillips amending
       the Unit Operating Agreement of Rocky Point Unit.

III.

| PROPERTY NAME | Working Interest | Net Revenue Interest |
|---|---|---|
| Point Arguello Unit | .06065210 | .04842500 |

All of the Seller's right title and interest in and to the leasehold estate created by the following described oil
and gas leases:

    A.    Oil and Gas Lease dated July 1, 1981 from Bureau of Land Management
           To Chevron U.S.A. Inc. and Phillips Petroleum Company bearing

DPT002321

Serial No. OCS-P 0451.

INSOFAR AND ONLY INSOFAR AS SAID LEASE AND INTEREST COVERS THE FOLLOWING
DESCRIBED LAND:

The W/2 of Block 465, All that portion seaward of the three geographical mile line,
OCS Official Protraction Diagram Nl 10-6 Santa Maria (CA 3-1055).

B.   Oil and Gas Lease dated September 1, 1979 from Bureau of Land Management to
Chevron U.S.A. Inc., Phillips Petroleum Company, Champlin Petroleum Company and
ICl Delaware Inc. bearing
Serial No. OCS-P 0316.

INSOFAR AND ONLY INSOFAR AS SAID LEASE AND INTEREST COVERS THE FOLLOWING
DESCRIBED LAND:

All of Block 55N-84W, OCS Leasing Map, Channel Island Area, CAL-
Map No. 64 (CA 300316).

WELLS:

A-1, A-2, A-3, A-4, A-5, A-6, A-7, A-8, A-9, A-10, A-11, A-12, A-13, A-14,
A-15, A-16, A-16WB01, A-17, A-18, A-18WB01, A-19, B-1, B-1WB01, B-2,
B-2WB01, B-3, B-6, B-8, B-9, B-9WB01, B-10, B-11, B-12, B-13, B-14, B-15,
B-16, B-17, B-18, C-1, C-2, C-3, C-4, C-5, C-7, C-8, C-9, C-10, and C-11.

Subject to the following:

a.   Offset Development Well and Linewell Agreement dated September 12, 1988
between Chevron, Phillips and Union Pacific Corp.;

b.   Unit Operating Agreement dated February 1, 1985 between Chevron, operator
and Phillips and Champlin, as non-operators, covering the Rocky Point Unit;

c.   Unit Agreement dated February 1, 1985 between Chevron, Phillips and Champlin
covering the Rocky Point Unit;

d.   Letter Agreement dated February 6, 1985 between Chevron, Champlin and
Phillips amending the Unit Operating Agreement of Rocky Point Unit;

e.   Operating Agreement dated July 1, 1979 between Chevron, operator and Phillips and Champlin as
non-operators, covering all of Block 55N-84W and the Hermosa
Platform;

f.   Unit Agreement for Outer Continental Shelf Exploration, development and
Production Operations on the Point Arguello Unit dated effective October 1, 1996
between Chevron U.S.A., operator and Phillips Petroleum, Whiting Petroleum,
Texaco Exploration and Production, Sun Operating Limited Partnership,
Pennzoil Exploration and Production, Koch Industries, and Oxbow Energy
parts of Blocks 55N, 84W and 55N, 85W, Channel Islands Area and Parts of
Blocks 464 and 465, Santa Maria Basin Area, Offshore California.

DPT002322

EXHIBIT 'B'

PROMISSORY NOTE

US $ 5,000,000                                              Denver, Colorado
                                                           June 8, 1999

     1.     For Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, DELTA PETROLEUM CORPORATION, a Colorado corporation ("Delta") whose address is 555 - 17ᵗʰ Street, Suite 3310, Denver, Colorado 80202, hereby promises to pay WHITING PETROLEUM CORPORATION, a Delaware corporation and WHITING PROGRAMS, INC., a Delaware corporation (collectively, "Whiting"), whose address is 1700 Broadway, Suite 2300, Denver, Colorado 80290-2301, the principal amount of Five Million and No Dollars ($5,000,000), payable in two installments of Two Million and No Dollars ($2,000,000) on August 2, 1999 and Three Million and No Dollars ($3,000,000) on December 1, 1999.

     2.     This Promissory Note shall bear no interest and shall be non-recourse to Delta.

     3.     The parties' rights and obligations with respect to this Promissory Note, including Whiting's rights if Delta fails to make one or both of the installment payments referred to in paragraph 1 above, are set forth in that certain Purchase and Sale Agreement, dated as of the date hereof, between the parties, as amended by that certain Amendment to the Purchase and Sale Agreement, dated as of the date hereof (as amended, the "Agreement"). The terms and conditions of the Agreement are incorporated herein by this reference and such terms and conditions shall govern and control between the parties in the case of a conflict with any of the provisions hereof.

     4.     This Promissory Note is made in and shall be governed by and interpreted in accordance with the laws of the State of Colorado.

     IN WITNESS WHEREOF, the parties hereto have signed this Promissory Note as of the date first above written.

DELTA PETROLEUM CORPORATION

By: _____
    Roger A. Parker, President

WHITING PETROLEUM CORPORATION

By: _____
    John R. Hazlett, Vice President

WHITING PROGRAMS, INC.

By: _____
    John R. Hazlett, Vice President

06/08/99  TUE 10:38 FAX 303 298 8251      DELTA PETROLEUM CORP.                    ☒002

# EXHIBIT C

## PURCHASE PRICE ALLOCATION

The purchase price paid by Delta to Whiting is allocated as follows:

75% to Point Arguello Unit leases and related facilities

25% to Rocky Point Unit leases

DPT002324

EXHIBIT "D"

**SELLER'S DISCLOSURE SCHEDULE**
(Section 3.1)

Item 3.1 (e)                    See attached

Items 3.1 (f) and 3.1 (l)      See attached

Items 3.1 (i) and 3.1 (n)      See attached

DPT002325

# ITEM 3.1 (e)

DPT002326

SECURITIES AND EXCHANGE COMMISSION

Washington, D.C.  20549


FORM 8-K


Pursuant to Section 13 or 15(d) of
The Securities Exchange Act of 1934


DECEMBER 1, 1999


DELTA PETROLEUM CORPORATION
(Exact name of registrant as specified in its charter)


| Colorado | 0-16203 | 84-1060803 |
|---|---|---|
| (State of | Commission | (I.R.S. Employer |
| Incorporation) | File No. | Identification No.) |


Suite 3310
555 17th Street
Denver, Colorado                                    80202
(Address of principal executive offices)      (Zip Code)


Registrant's telephone number, including area code: (303) 293-9133

ITEM 2.    ACQUISITION OF ASSETS

        On  December 1, 1999, the Company completed the acquisition
of  interests in the offshore California Point Arguello Unit, with its
three  producing platforms and related facilities, and in the adjacent
undeveloped Rocky Point Unit from Whiting Petroleum Corporation
("Whiting")  pursuant to a Purchase and Sale Agreement dated  June  9,
1999. (See Exhibit 99.1 to Form 8-K dated June 9, 1999).  The Company
acquired  a  net  operating interest in the Point  Arguello  Unit  and
related  facilities which covers 100% of a 6.07% working interest  as
described  in  the  Conveyance  and Assignment  from  Whiting  to  the
Company,  a  copy  of  which is incorporated herein  as  Exhibit  10.1.
Delta  also acquired an 11.11% interest in the adjacent OCS Block  451
(E/2)  and  100%  interest in OCS Blocks 452  and  453  which  leases
comprise  the  undeveloped Rocky Point Unit.  The Rocky  Point  Unit  is
operated  by  Whiting which also holds the interest as  nominee  for
Delta.  Under the terms of the agreements between the parties, Whiting
has  retained  all liability for abandonment costs associated with the
Point Arguello Unit and related facilities.

        The  purchase price of $6,000,000, less net proceeds  from
revenues  after  the April 1, 1999 effective date was  paid  in  three
installments on June 9, 1999  ($1,000,000), August 2, 1999 ($2,000,000),
and December 1, 1999 (approximately $2,480,000).  The Company borrowed
the funds to purchase the properties.  These financing arrangements
as well  as  other aspects of the acquisition
are described in Forms  8-K dated June 9, 1999, as amended,
and August 25, 1999 and in Item 5 herein.

DPT002327

ITEM 5.   OTHER EVENTS

        On  December  1, 1999, the Company borrowed $8,000,000  from
Kaiser-Francis Oil Company.  The loan agreement (without exhibits) and
promissory note, both dated December 1, 1999, are incorporated  herein
as Exhibits 10.2 and 10.3.  The loan agreement provides for a four and
one-half year loan  with  certain  "prepayment penalties" as described
therein  and  permitted  Kaiser-Francis Oil Company to acquire for its
own account certain mid-continent oil and gas properties which Delta had
previously agreed to acquire.  The Company also issued warrants to
purchase 250,000 shares of its common stock for two years at $2.00 per
share to Kaiser-Francis Oil Company.  Proceeds from this loan were
used to discharge and/or reduce principal and accrued interest on
previous loans from others used to make the first and second
installment payments for the acquisition of the Whiting interests in
Point Arguello and Rocky Point and to discharge a previous loan used
to acquire properties from Whiting in New Mexico and Texas (see Form 8-
K dated November 1, 1999).

ITEM 7.   FINANCIAL STATEMENTS AND EXHIBITS.

        Proforma Financial information and any other exhibits
required will be filed by amendment to this Form 8-K within sixty (60)
days.

        10.1 Conveyance and Assignment from Whiting Petroleum Corporation
             dated December 1, 1999.
        10.2 Loan Agreement (without exhibits) between Kaiser-Francis Oil
             Company and Delta Petroleum Corporation dated December 1, 1999.
        10.3 Promissory Note dated December 1, 1999.

        Pursuant to the requirements of the Securities and Exchange  Act
of 1934,  the Registrant has duly caused this report to be signed  on
its behalf by the undersigned hereunto duly authorized.


                         DELTA PETROLEUM CORPORATION
                         (Registrant)

Date:  December 9, 1999        By:/s/Aleron H. Larson, Jr.
                               Aleron H. Larson, Jr.
                               Chairman/C.E.O.


                         INDEX TO EXHIBITS

(1)  Underwriting Agreement.  Not applicable.

(2)  Plan of Acquisition, Reorganization, Arrangement, Liquidation  or
     Succession.  Not applicable.

(3)  (i)  Articles of Incorporation. Not applicable.
     (ii) Bylaws. Not applicable.

(4)  Instruments  Defining the Rights of Security  Holders,  including
     Indentures.  Not applicable.

(5)  Opinion: re: Legality.  Not applicable.

(6)  Opinion: Discount on Capital Shares.  Not applicable.

(7)  Opinion: re: Liquidation Preference. Not Applicable.

(8)  Opinion: re: Tax Matters.  Not Applicable.

DPT002328

(9)  Voting Trust Agreement.  Not Applicable.

(10) Material Contracts. Not Applicable.

    10.1 Conveyance and Assignment from Whiting Petroleum Corporation
        dated December 1, 1999.
    10.2 Loan Agreement (without exhibits) between Kaiser-Francis Oil
        Company and Delta
        Petroleum Corporation dated December 1, 1999.
    10.3 Promissory Note dated December 1, 1999.

(11) Statement re: Computation of Per Share Earnings.
    Not Applicable.

(12) Statement re: Computation of Ratios.  Not Applicable.

(13) Annual Report to Security Holders, etc. Not Applicable.

(14) Material Foreign Patents.  Not Applicable.

(15) Letter re: Unaudited Interim Financial Information.
    Not Applicable.

(16) Letter re: Change in Certifying Accountant.
    Not applicable.

(17) Letter re: Director Resignation.  Not applicable.

(18) Letter re: Change in Accounting Principles.  Not Applicable.

(19) Report Furnished to Security Holders.  Not Applicable.

(20) Other Documents or Statements to Security Holders.
    Not applicable.

(21) Subsidiaries of the Registrant.  Not Applicable.

(22) Published Report Regarding Matters Submitted to Vote of Security
    Holders.  Not Applicable.

(23) Consents of Experts and Counsel.  Not applicable.

(24) Power of Attorney. Not applicable.

(25) Statement of Eligibility of Trustee.  Not Applicable.

(26) Invitations for Competitive Bids.  Not Applicable.

(27) Financial Data Schedule.  Not Applicable.

(99) Additional Exhibits.

DPT002329

CONVEYANCE AND ASSIGNMENT

WHITING PETROLEUM CORPORATION, a Delaware corporation, and
WHITING PROGRAMS, INC., a Delaware corporation (collectively, the
"Assignor") whose address is 1700 Broadway, Suite 2300, Denver,
Colorado 80290, for TEN DOLLARS ($10.00) and other good and
valuable consideration, the receipt and sufficiency of which are
hereby acknowledged, hereby grant, convey, transfer and assign to
DELTA PETROLEUM CORPORATION, a Colorado corporation ("Assignee"),
whose address is 3310 Qwest Tower, 555 Seventeenth Street,
Denver, Colorado 80202, a net operating interest (as herein
defined) in, to and under the following:

(a)  The oil, gas and mineral leases described on
Exhibit "A" attached hereto (collectively, the "Leases"),
including, without limitation working interests, overriding
royalty interests, royalty interests and any other interests of a
similar nature affecting the lands covered by the Leases
(collectively, the "Lands".)

(b)  The wells described on Exhibit "A" or which are
located on the Lands (collectively, the "Wells").

(c)  All unitization, communitization, pooling,
agreements, working interest units created by operating
agreements, partnership agreements and orders covering the Leases
and Lands, or any portion thereof, and the units and pooled or
communitized areas created thereby, including the Federal units
created by the Unit Agreements described on Exhibit "A"
(collectively, the "Units") and the four partnerships created by
the Partnership Agreements described on Exhibit "A" i.e., PAPCO,
PANGL, GGP and PATC (collectively, the "Partnerships").

(d)  The tangible personal property, tools, machinery,
materials, pipelines, plants, gathering systems, equipment,
fixtures and improvements, which are incident or attributable to
the Leases, Lands, Wells or Units with the production, treatment,
sale or disposal of hydrocarbons or water produced therefrom or
attributable thereto, on the Effective Time (collectively, the
"Equipment").

(e)  The licenses, permits, contracts, agreements and other
instruments owned by Seller (other than bonds posted by Seller)
which concern and relate to any of the Leases, Lands, Wells,
Units and/or Equipment, INSOFAR AND ONLY INSOFAR as same concern
or relate to the Leases, Lands, Wells, Units and/or Equipment, or
the operation thereof; including, without limitation, oil, gas
and condensate purchase and sale contracts; permits,; rights-of-
way; easements; licenses; servitudes; estates; surface leases;
farmin and farmout agreements; division orders and transfer
orders; bottomhole agreements; dry hole agreements; area-of-
mutual interest agreements; salt water disposal agreements;
acreage contribution agreements; operating agreements; balancing
agreements and unit agreements; pooling agreements; pooling
orders; communitization agreements; processing, gathering,
compression and transportation agreements; facilities or
equipment leases relating thereto or used or held for use in
connection with the ownership or operation thereof or with the
production, treatment, sale or disposal of hydrocarbons; and all
other contracts and agreements related to the Leases, Lands,
Wells, Units and/or Equipment.

(f)  Originals or copies of all computer tapes and discs, files,

DPT002330

records, information or data relating to the Interests in the
possession of Seller, including, without limitation, title
records (including abstracts of title, title opinions,
certificate of title and title curative documents), accounting
records and files, contracts, correspondence, production records,
electric logs, core data, pressure data, decline curves,
graphical production curves, drilling reports, well completion
reports, drill stem test charts and reports, engineering reports,
regulatory reports, and all related materials, INSOFAR AND ONLY
INSOFAR as the foregoing items constitute materials that may be
lawfully conveyed to Buyer (i.e., the materials are not subject
to a proprietary agreement precluding their transfer to Buyer),
and, to the extent transferable, all other contract rights,
intangible rights (excluding Seller's trademarks and service
marks), inchoate rights, choses in action, rights under
warranties made by prior owners, manufacturers, vendors or other
third parties, and rights accruing under applicable statutes of
limitation or prescription, attributable to the Interests.

        (g)  All payments, and all rights to receive payments, with
respect to the ownership of the production of hydrocarbons from
or the conduct of operations on the Interests accruing after the
Effective Time.

    All of the properties, rights, and interests described in
paragraphs (a) through (g) above are referred to herein as the
"Interests."

    This Conveyance and Assignment shall be effective as of
April 1, 1999, at 7:00 a.m., local time (referred to herein as
the "Effective Time").

    The net operating interest ("NOI") herein conveyed and
assigned is defined as the monthly payable positive or negative
cash flow resulting to the Interests from the following eight
step calculation:

                (i)    oil and gas sales revenue;
                (ii)   less royalties and overriding royalties;
                (iii)  less Unit lease operating expenses;
                (iv)   less severance, production or ad valorem taxes, if any;
                (v)    less capital expenditures;
                (vi)   less Unit fees to the Unit operator; and
                (vii)  plus the positive or less the negative cash flow from
                       the Partnerships.
            (viii) plus or minus any other miscellaneous
                       costs or revenues that may be related to
                       these interests or operations

    After taking into account Assignor's retention of net
abandonment costs (i.e. cost of abandonment less equipment
salvage value) under Section 9.1 of that certain Purchase and
Sale Agreement dated as of June 8, 1999, as amended by an
Amendment to Purchase and Sale Agreement dated as of June 8,
1999, between Assignor and Assignee (as amended, the
"Agreement"), and the maximum payment of $2,000,000 by Assignor
to purchase the Preferred Stock to fund the Deficit as such terms
are defined in Section 9.2 of such Agreement, the above eight
step calculation may result in positive cash flow or negative
cash flow.  In the event of positive cash flow, Assignor will pay
the excess to Assignee; in the event of a negative cash flow,
Assignee will pay the deficit to Assignor.

    This Conveyance and Assignment is delivered pursuant to and
subject to the Agreement.  The Agreement contains certain

DPT002331

covenants and obligations which survive the delivery of, and shall not be deemed merged into, this Conveyance and Assignment as and to the extent provided in the Agreement.

Dated this 1st day of December, 1999, but effective as of the Effective Time.

Attest:                          WHITING PETROLEUM CORPORATION

s/Patricia J. Miller             By:s/John R. Hazlett
Patricia J. Miller                  John R. Hazlett, Vice President
Corporate Secretary

Attest:                          WHITING PROGRAMS, INC.

s/Patricia J. Miller             By:s/John R. Hazlett
Patricia J. Miller                  John R. Hazlett, Vice President
Corporate Secretary

Attest:                          DELTA PETROLEUM CORPORATION

s/Aleron H. Larson, Jr.          By:s/Roger A. Parker
Aleron H. Larson, Jr.               Roger A. Parker, President


STATE OF COLORADO          )
      CITY AND             )   ss.
COUNTY OF DENVER           )

The foregoing instrument was acknowledged before me this 1st day of  December, 1999, by John R. Hazlett, Vice President of Whiting Petroleum Corporation and Whiting Programs, Inc.,  both Delaware corporations.

My Commission Expires: February 28, 2003

                              s/Jean E. Solot
                              Notary Public



STATE OF COLORADO          )
      CITY AND             ) ss.
COUNTY OF DENVER           )


The foregoing instrument was acknowledged before me this 1st day of December, 1999, by Roger A. Parker as the President of Delta Petroleum Corporation, a Colorado corporation.


My Commission Expires: February 28, 2003

                              s/Jean E. Solot
                              Notary Public


                    EXHIBIT "A"
                POINT ARGUELLO FIELD
                 Offshore California


Attached to and made a part of that certain CONVEYANCE AND ASSIGNMENT between Whiting Petroleum Corporation, Assigor,

DPT002332

and Delta Petroleum Corporation, Buyer, effective April 1,
1999.

I.

    All of Seller's right, title and interest in and to the
following described partnerships:

1.   Partnership Agreement-Point Arguello Pipeline Company
     dated August 2, 1984; Partnership Interest 5.8036%.

2.   Partnership Agreement-Point Arguello Natural Gas
     Company dated September 1, 1984; Partnership Interest
     6.0652%

3.   Partnership Agreement for Ownership of Facilities-
     Gaviota Gas Plant Company dated October 1, 1984; Partnership
     Interest 5.7013%

II.

| PROPERTY NAME | WORKING INTEREST | NET REVENUE INTEREST |
|---|---|---|
| Point Arguello Unit | .06065210 | .04842500 |

All of Seller's right title and interest in and to the
leasehold estate created by the following described oil and
gas leases:

    A.   Oil and Gas Lease dated July 1, 1981 from Bureau of
       Land Management to Chevron U.S.A. Inc. and Phillips
       Petroleum Company bearing Serial No. OCS-P 0451

INSOFAR AND ONLY INSOFAR AS SAID LEASE AND INTEREST COVERS
THE FOLLOWING DESCRIBED LAND:

        The W/2 of Block 465, All that portion seaward of
        the three geographical mile line, OCS Official
        Protraction Diagram N1 10-6 Santa Maria (CA 3-
        1055).

    B.   Oil and Gas Lease dated September 1, 1979 from Bureau
       of Land Management to Chevron U.S.A. Inc., Phillips
       Petroleum Company, Champlin Petroleum Company and ICI
       Delaware Inc. bearing Serial No. OCS-P 0316.

INSOFAR AND ONLY INSOFAR AS SAID LEASE AND INTEREST COVERS
THE FOLLOWING DESCRIBED LAND:

        All of Block 55N-84W, OCS Leasing Map, Channel
        Island Area, CAL-Map No. 64 (CA 300316).

WELLS:

        A-1, A-2, A-3, A-4, A-5, A-6, A-7, A-8, A-9, A-10, A-
        11, A-12, A-13, A-14, A-15, A-16, A-16WB01, A-17, A-18,
        A-18WB01, A-19, B-1, (B-1WB-1, B-2, B-2WB01, B-3, B-6,
        B-8, B-9, B-9WB01, B-10, B-11, B-12, B-13, B-14, B-15,
        B-16, B-17, B-18, C-1, C-2, C-3, C-4, C-5, C-7, C-8, C-
        9, C-10 and C-11.

Subject to the following:

a.   Offset Development and Well and Linewell Agreement

DPT002333

dated September 12, 1988 between Chevron, Phillips and Union
Pacific Corp.;

b.  Unit Agreement for Outer Continental Shelf Exploration,
    Development and Production Operations on the Point Arguello
    Unit dated effective October 1, 1996 between Chevron U.S.A.,
    operator and Phillips Petroleum, Whiting Petroleum, Texaco
    Exploration and Production, Sun Operating Limit Partnership,
    Pennzoil Exploration and Production, Koch Industries, and
    Oxbow Energy parts of Blocks 5rN-84W and 55N-85W, Channel
    Island Area and Parts of Blocks 464 and 465, Santa Maria
    Basin Area, Offshore, California.

c.  Unit Operating Agreement Point Arguello Unit, Pacific
    Offshore, California, dated effective October 1, 1996
    between Chevron U.S.A. Inc., Phillips Petroleum Company,
    Whiting Petroleum Corporation, Texaco Exploration and
    Production Inc., Sun Operating Limited Partnership, by Oryx
    Energy Company, its Managing General Partner, Pennnzoil
    Exploration & Production Company and Oxbow Energy, Inc.

DPT002334

AMENDMENT TO PURCHASE AND SALE AGREEMENT

This Amendment to Purchase and Sale Agreement (this "Amendment") dated as of the 8th day of June, 1999, is between WHITING PETROLEUM CORPORATION, a Delaware corporation, and WHITING PROGRAMS, INC., a Delaware corporation (collectively, "Seller"), whose address is Mile High Center, 1700 Broadway, Suite 2300, Denver, Colorado 80290-2301 and DELTA PETROLEUM CORPORATION, a Colorado corporation ("Buyer"), whose address is 555 17th Street, Suite 3310, Denver, Colorado 80202. Seller and Buyer are referred to herein individually as a "Party" and collectively as the "Parties."

RECITALS:

1 . The Parties have executed that certain Purchase and Sale Agreement dated the date hereof (the "Agreement") whereby Seller agrees to sell and convey and Buyer agrees to purchase and pay for the Interests (as defined in the Agreement), subject to the terms and conditions contained therein.

2. The Parties wish to amend the Agreement in the manner set forth in the Amendment.

AGREEMENT:

NOW THEREFORE, it is hereby agreed as follows:

1 . Terms defined in the Agreement shall have the same meanings when used herein.

2. If any of the following events occurs, the provisions of Sections 3 through 8 of this Amendment shall apply and the Agreement shall be deemed amended accordingly:

(i)     The Units' owners or the Partnerships' partners shall have failed to approve the transactions contemplated by the Agreement on or before July 1, 1999 as provided in Section 6.1 of the Agreement; or

(ii)    The Units' owners and the Partnerships' partners approve such transactions by such date, but condition such approvals on Seller conveying 100% of its right, title and interest in the Interests and Buyer fails to make the Second Installment Payment; or

(iii)   Buyer fails to make the First Installment Payment.

3. For purposes of this Amendment, a net operating interest ("NOI") is defined as the positive or negative cash flow resulting to the Interests from the following seven step calculation:

(i)     oil and gas sales revenue,
(ii)    less royalties and overriding royalties,

Exhibit No.: 22
Deponent: Nanke
Date/RPR: 6-5-13 RN
Hunter + Geist, Inc.

CONFIDENTIAL
DPT002096

(iii)    less Unit lease operating expenses,
(iv)    less severance, production or ad valorem taxes, if any,
(v)     less capital expenditures,
(vi)    less Unit fees to the Unit operator, and
(vii)   plus the positive or less the negative cash flow from
        the Partnerships.

        After taking into account Seller's retention of net
abandonment costs under Section 9.1 of the Agreement and the
maximum payments of $2,000,000 by Seller to purchase the
Preferred Stock to fund the Deficit pursuant to Section 9.2, this
seven step calculation may result in positive cash flow or
negative cash flow. Should Buyer acquire a NOI pursuant to this
Amendment, (i) in the event of positive cash flow, Seller will
pay the excess to Buyer and (ii) in the event of a negative cash
flow, Buyer will pay the deficit to Seller.

4.      Section 2.4 of the Agreement is amended by deleting the
provisions set forth as items (i) and (ii) thereof and
substituting the following therefor:

        "(i) "If Buyer fails to make the First Installment Payment,
this Agreement shall terminate without further obligation by
either Party to the other Party; provided, however that Seller
shall retain the Common Stock delivered pursuant to Section 2.2
and shall have the registration rights provided in Section 9.3,
and shall have the option to either (a) return the Earnest Money
Deposit to Buyer or (b) retain the Earnest Money Deposition and
convey to Buyer at Closing a 16.66% NOI in the Interests,
effective the Effective Time.

        (i)  If Buyer makes the First Installment Payment, but fails
to make the Second Installment Payment, Seller shall retain the
Earnest Money Deposit, the First Installment Payment and the
Common Stock and shall have the option to convey to Buyer at
Closing either (a) fifty percent (50%) of its right, title and
interest in the Interests pursuant to Section 8.3, or (b) a 50%
NOI. effective the Effective Time."

5.      Section 7.2 is amended by adding the following as a second
paragraph to such provision:

"If the Units' owners and/or the Partnerships' partners do not
approve the transactions contemplated by the Agreement, the
following procedures shall apply.

(i)     If Buyer fails to make the First Installment Payment, Seller
shall exercise the option to return the Earnest Money Deposit or
convey a 16.66% NOI referred to in Section 2.4 of the Agreement,
as amended by the Amendment.

(ii)    If Buyer makes the First Installment Payment, but fails to
make the Second Installment Payment, Seller shall convey to Buyer
the 50% NOI referred to in Section 2.4 of the Agreement, as
amended by the Amendment.

(iii)   If Buyer makes both the First Installment Payment and

CONFIDENTIAL
DPT002097

the Second Installment Payment, Seller shall convey to Buyer a 100% NOI."

6.      Section 7.6 of the Agreement is deleted and the following is substituted therefor:

>       "7.6 Guarantee.  If Closing occurs and Buyer receives either a 50% NOI or 16.66% NOI, Buyer shall provide Seller with its guarantee of Buyer's share, depending on the NOI received and subject to the provisions of Sections 9.1 and 9.2, of all Unit and Partnership liabilities in the form of guarantee attached hereto as Exhibit "E".

7.      Section 9.2 of the Agreement is amended to add the following as a second sentence to the second paragraph in such Section: "If Buyer receives either a 50% NOI or 16.66% NOI at Closing, the amount of Seller's commitments under this Section 9.2 shall be reduced to either 50% or 16.66%, depending on the NOI received."

8.      If any provision in the Agreement conflicts with any provision contained in this Amendment, the provision in this Amendment shall govern and control.

This Amendment is executed by the Parties as of the date first above stated.


SELLER:

WHITING PETROLEUM CORPORATION

By s/John R. Hazlett
John R. Hazlett
Vice President


WHITING PROGRAMS, INC.

By s/John R. Hazlett
John R. Hazlett
Vice President



BUYER:

DELTA PETROLEUM CORPORATION

s/Roger A. Parker
Roger A. Parker
President

CONFIDENTIAL
DPT002098