# Exhibit B to Cross Motion

In Re: Delta Petroleum Corp. (Debtor)   **R. SETH BULLOCK**   6/7/2013

**1**

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
                  FOR THE DISTRICT OF DELAWARE
 2
      Case No. 11-14006(KJC)    (Jointly Administered)
 3    Adv. Pro No. 12-50898(KJC)
      Adv. Pro No. 12-50877(KJC)
 4
      IN RE:
 5
      DELTA PETROLEUM CORPORATION, et al.,
 6
      Debtors,
 7
      DELTA PETROLEUM GENERAL RECOVERY TRUST and PAR PETROLEUM
 8    CORPORATION,
      Plaintiffs,
 9    v.
10    BWAB LIMITED LIABILITY COMPANY,
11    Defendant.
12    and
      DELTA PETROLEUM GENERAL RECOVERY TRUST and PAR PETROLEUM
13    CORPORATION,
14
      Plaintiffs,
15
      v.
16
      ALERON LARSON, JR.,
17
      Defendant.
18
19
20    DEPOSITION OF:  R. SETH BULLOCK - June 7, 2013
21    _____
22
23
24
25
```

**2**

```
 1            PURSUANT TO NOTICE, the deposition of
      R. SETH BULLOCK was taken on behalf of the Defendants
 2    at 1999 Broadway, Suite 3150, Denver, Colorado 80202,
      on June 7, 2013, at 9:02 a.m., before Rita DeRouen,
 3    Registered Professional Reporter and Notary Public
      within Colorado.
 4
 5
 6
 7              A P P E A R A N C E S
 8    For the Plaintiffs:
 9              DAVID R. PEHLKE, ESQ.
                Skadden, Arps, Slate, Meagher & Flom, LLP
10              155 North Wacker Drive
                Chicago, Illinois  60606
11
12    For the Defendants:
13              STUART N. BENNETT, ESQ.
                Jones & Keller, P.C.
14              1999 Broadway
                Suite 3150
15              Denver, Colorado  80202
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1                    I N D E X
 2    EXAMINATION OF R. SETH BULLOCK:           PAGE
      June 7, 2013
 3
      By Mr. Bennett                              5
 4
 5                                             INITIAL
      DEPOSITION EXHIBITS:                    REFERENCE
 6
 7    Exhibit 43  Notice of Rejection of Executory   25
                  Contracts and Unexpired Leases
 8    Exhibit 44  Assignment of Oil and Gas Lease    55
                  between Union Pacific Resources
 9                Company and Whiting, 7-1-81
10    Exhibit 45  Decision and Assignments Approved, 64
                  12-19-94
11
      Exhibit 46  Declaration of Seth Bullock in    115
12                Support of Plaintiffs' Motion for
                  Summary Judgment Pursuant to
13                Fed.R.Civ.P.56 and
                  Fed.R.Bankr.P.7056
14
      Exhibit 47  Plains Marketing Statements       121
15
16    PREVIOUSLY MARKED EXHIBITS:
17    Exhibit 3   Letter from Frawley to Roulier and 52
                  Roitman, Acquisition of Union
18                Pacific Resources Corp., etc.,
                  7-28-94
19
      Exhibit 4   Assignment of Overriding Royalty   31
20                between Whiting and BWAB, 12-16-94
21    Exhibit 5   Agreement between BWAB and Delta,  74
                  4-1-99
22
      Exhibit 9   Conveyance and Assignment between  28
23                Whiting and Delta
24    Exhibit 10  Assignment of Overriding Royalty   29
                  Interest between Delta and BWAB,
25                12-1-99
```

**4**

```
 1    Exhibit 11  Assignment of Overriding Royalty   30
                  Interest between Delta and
 2                Roger A. Parker, 12-1-99
      Exhibit 12  Assignment of Overriding Royalty   30
 3                Interest between Delta and
                  Aleron H. Larson, Jr., 12-1-99
 4    Exhibit 13  Assignment of Overriding Royalty   31
                  Interest between Delta and
 5                Kaiser-Francis, 7-25-01
 6    Exhibit 19  Unit Agreement for Outer           66
                  Continental Shelf Exploration,
 7                Development, and Production
                  Operations on the Point Arguello
 8                Unit, 10-1-96
 9    Exhibit 21  Purchase and Sale Agreement        76
                  between Whiting and Delta,
10                6-8-99
      Exhibit 22  Amendment to Purchase and Sale     81
11                Agreement between Whiting and
                  Delta, 6-8-99
12    Exhibit 23  DPT000039
13    Exhibit 25  Invoice from Whiting to Delta,    101
                  11-27-12
14
15    Exhibit 28  Letter from Hazlett to Roulier,    71
                  re:  Point Arguello Unitization,
16                6-24-97
17
      Exhibit 31  Delta Owner Detail Sales for      106
18                BWAB Limited Liability Company,
                  12-31-01 to 12-31-12
19
      Exhibit 33  Global Notes Regarding Debtors'    16
20                Schedules of Assets and Liabilities
                  and Statements of Financial Affairs
21
      Exhibit 34  Delta Owner Detail Sales for      106
22                Aleron H. Larson, Jr., 12-31-01
                  to 12-31-12
23
24
25
```

---

5

1          WHEREUPON, the following proceedings were
2   taken pursuant to the Federal Rules of Civil
3   Procedure.
4              *     *     *     *     *
5          R. SETH BULLOCK,
6   having been duly sworn to state the whole truth,
7   testified as follows:
8                  EXAMINATION
9   BY MR. BENNETT:
10         Q.  Good morning, Mr. Bullock.  How are you
11  today?
12         A.  Good.  Thank you.
13         Q.  Thank you for joining us in Denver for
14  your deposition.  By whom are you presently employed?
15         A.  Conway MacKenzie.
16         Q.  And what is the nature of that company?
17         A.  It is a turn-around restructuring and
18  consultancy firm.
19         Q.  Are you employed in any capacity by Par
20  Petroleum?
21         A.  I'm not employed, but I hold an officer
22  position at Par.
23         Q.  What is your position at Par?
24         A.  CFO.
25         Q.  Which is chief financial officer?

---

6

1          A.  Yes.
2          Q.  How long have you held the position of CFO
3   of Par Petroleum?
4          A.  August 31, 2012.
5          Q.  To the present?
6          A.  Yes.
7          Q.  To whom do you report?
8          A.  John Young, as well as the board.
9          Q.  What is Mr. Young's capacity?
10         A.  He is CEO.
11         Q.  Of Par Petroleum?
12         A.  Yes.
13         Q.  Is there a president of Par Petroleum?
14         A.  Not that I'm aware of, no.
15         Q.  So the senior executive for Par Petroleum
16  has a title of CEO, chief executive officer?
17         A.  Yes.
18         Q.  How many people are on the board of
19  directors of Par Petroleum?
20         A.  Five.
21         Q.  Is Mr. Young on the board?
22         A.  No.
23         Q.  Are any of the employees of Par Petroleum
24  on the board of directors?
25         A.  No.

---

7

1          Q.  Are you on the board of directors?
2          A.  No.
3          Q.  Are any persons associated with Conway
4   MacKenzie on the board of directors?
5          A.  No.
6          Q.  Prior to August 31, 2012, did you have any
7   position with Par Petroleum?
8          A.  Well, the predecessor company was Delta
9   Petroleum, and I had a treasury title, treasurer
10  title, at Delta Petroleum.
11         Q.  And were you an employee at Delta
12  Petroleum?
13         A.  No.
14         Q.  Were you an employee of Conway MacKenzie
15  at the time?
16         A.  Yes.
17         Q.  As treasurer of Delta Petroleum, to whom
18  did you report?
19         A.  John Young.
20         Q.  What was -- I'm sorry?
21         A.  No, excuse me.  John Young was who I
22  reported to.
23         Q.  And what was Mr. Young's position with
24  Delta Petroleum?
25         A.  He was both CFO and CRO at that time.

---

8

1          Q.  And what do you mean by the acronym CRO?
2          A.  Chief restructuring officer.
3          Q.  When did you become treasurer of Delta
4   Petroleum?
5          A.  July of 2012.
6          Q.  Did you have any capacity with Delta
7   Petroleum before July of 2012?
8          A.  I was working at Delta Petroleum as a
9   consultant.
10         Q.  You were employed by Conway MacKenzie?
11         A.  Yes.
12         Q.  Did Conway MacKenzie then have some sort
13  of a contract with Delta Petroleum for consulting
14  services?
15         A.  Yes.
16         Q.  Was anyone else from Conway MacKenzie
17  working on this consulting engagement?
18         A.  During the bankruptcy?
19         Q.  Yes.
20         A.  Yes.
21         Q.  What other Conway MacKenzie people were
22  working on the consultant engagement with Delta?
23         A.  There were a number.  Jeff Huddleston.
24         Q.  What was his role in the consultancy
25  engagement?

---

2 (Pages 5 to 8)

29

1    A.   Yes.

2    Q.   Do you know what, other than by reading
3  this document, was intended by Whiting Petroleum in
4  assigning a net operating interest to Delta Petroleum?

5    A.   I don't know what would be intended other
6  than what is written on the document here.

7    Q.   Do you recall having even read this
8  document in its entirety?

9    A.   If this is the same document that is part
10 of my declaration, then I have read this document.

11   Q.   And you don't recall, sitting here today,
12 whether this document is or is not part of your
13 declaration?

14   A.   Can I see my declaration?

15   Q.   Yes, you may.  But as we sit here, you
16 don't recall whether it is or it isn't?

17   A.   Again, I've read a lot of documents, and
18 this was certainly part of what I looked at when doing
19 my analysis -- well, a document that looks similar to
20 this was certainly something that was part of -- or
21 that was used in my analysis.

22   Q.   We'll come back to your declaration in a
23 minute.  Let's look at Exhibit 10, please.  Exhibit 10
24 is a document titled, Assignment of Overriding Royalty
25 Interest.  It's dated December 1, 1999 between Delta

30

1  Petroleum as assignor and BWAB Limited Liability
2  Company as assignee.  Do you see that?

3    A.   Yes.

4    Q.   Do you recall reviewing this document as
5  part of your work as a consultant to Delta Petroleum?

6    A.   No.

7    Q.   And you have no personal knowledge of what
8  this document was intended to convey other than by
9  reading it?

10   A.   Correct.

11   Q.   Look at Exhibit 11, it's the next one in
12 the stack.  Exhibit 11 is another assignment of
13 overriding royalty interest dated December 1, 1999
14 from Delta Petroleum to Roger A. Parker.  Do you
15 recall having reviewed this document as part of your
16 work as a consultant at Delta Petroleum?

17   A.   No.

18   Q.   And you have no information of what this
19 document was intended to convey other than simply by
20 reading it; is that right?

21   A.   Correct.

22   Q.   The next document is Exhibit 12.  This is
23 an assignment of an overriding royalty interest dated
24 December 1, 1999 between Delta Petroleum and Aleron H.
25 Larson, Jr.  Do you recognize this document?

31

1    A.   This appears to be similar to documents I
2  have reviewed.

3    Q.   Do you know if you have reviewed this
4  document in particular?

5    A.   Again, I would need to look at my
6  declaration to verify, but it appears similar.

7    Q.   Do you have any knowledge of what was
8  intended to be conveyed by this document other than
9  what is set forth in the document?

10   A.   No.

11   Q.   Let's look at the last of these, Exhibit
12 13, another assignment of overriding royalty
13 interest.  This one is dated July 25, 2001 between
14 Delta Petroleum Corporation and Kaiser-Francis Oil
15 Company.  Do you recall having seen this document as
16 part of your work as a consultant to Delta?

17   A.   No.

18   Q.   And you have no knowledge about what was
19 intended to be conveyed by this document other than by
20 reading it?

21   A.   Correct.

22   Q.   In your stack there should be Exhibit 4.
23 Exhibit 4 is an assignment of overriding royalty dated
24 the 16th day of December 1994 between Whiting
25 Petroleum Corporation and BWAB Limited Liability

32

1  Company.  Do you recall having reviewed this document
2  as part of your work as a consultant to Delta?

3    A.   No.

4    Q.   Do you have any information about this
5  document other than what is set forth in its text?

6    A.   No.

7    Q.   If you'll turn to the second page of
8  Exhibit 4, the assignment of this interest by Whiting
9  is a 3 1/2 percent interest in Whiting's net revenue
10 as determined in accordance with this paragraph 1.  Do
11 you see that?

12   A.   Yes.

13   Q.   You have done some calculations included
14 in your declaration that suggest that there should be
15 some deductions in accordance with this paragraph to
16 this overriding royalty; is that right?

17   A.   Yes.

18   Q.   Did you make the determination that there
19 should be some deductions from this 3.5 percent
20 overriding royalty without regard to the document?

21   A.   I based my calculations on the document.

22   Q.   I thought you had not reviewed this
23 document.

24   A.   Your question was had I reviewed this as a
25 consultant to Delta Petroleum, and the answer is no; I

---

**37**

1  discussing in this regard?
2      A.  I don't recall the specifics.
3      Q.  What about Mr. Young and you on the same
4  subject?
5      A.  I don't recall the specifics.
6      Q.  And Mr. Harmony?
7      A.  I don't recall the specifics.
8      Q.  Did any of them disagree with you that the
9  1999 overriding royalty interest should be included in
10  the calculation of 3.5 percent overriding royalty set
11  forth in paragraph 1 of Exhibit 4?
12      A.  No.
13      Q.  Was Mr. Harmony aware that Delta Petroleum
14  had never included the 1999 overriding royalty
15  interests in its calculation of the amounts due BWAB
16  under this 3.5 percent overriding royalty?
17      MR. PEHLKE:  Objection; calls for
18  speculation.
19      A.  You need to ask Mr. Harmony for that.  I
20  don't know what Mr. Harmony did or did not know.
21      Q.  (BY MR. BENNETT)  Did he tell you that
22  Delta never did it that way?
23      A.  I don't recall the specifics.
24      Q.  Were you able to confirm or did you
25  attempt to confirm whether Delta, since 1999, had not

---

**38**

1  included the 1999 overrides in this calculation?
2      A.  It was my understanding that Delta did not
3  include the royalties in this calculation.
4      Q.  Did you ask anybody why, anybody at Delta?
5      A.  When this came up, Delta was no longer in
6  existence, so I couldn't have asked anybody at Delta.
7      MR. PEHLKE:  I was actually trying to
8  think of how to formulate an objection on that.
9      Q.  (BY MR. BENNETT)  Did you seek out any
10  former employees of Delta to inquire why it was that
11  Delta either had or had not included the 1999
12  overrides in this calculation?
13      A.  I did not speak to anyone other than
14  Mr. Harmony on this issue.
15      Q.  Did you seek out Mr. Nanke?
16      A.  No.
17      Q.  Did Mr. Harmony report to Mr. Nanke at
18  Delta?
19      A.  Yes; not directly.
20      Q.  Do you know that Mr. Nanke was, at the
21  time prior to -- well, during Delta's bankruptcy was
22  the CFO of Delta Petroleum?
23      A.  Yes.
24      Q.  And is it your understanding that the VP
25  of finance would report to the CFO of the company?

---

**39**

1      A.  Not directly.
2      Q.  Who did Mr. Harmony report to as VP of
3  finance?
4      A.  Ryan Gosney.
5      Q.  Spell the last name, please, or pronounce
6  it.
7      A.  G-o-s-n-e-y.
8      Q.  What was Mr. Gosney's title?
9      A.  Controller.
10      Q.  Do you know who Mr. Gosney reported to?
11      A.  Kevin Nanke.
12      Q.  Have you been made aware of Mr. Nanke's
13  testimony about whether the 1999 overriding royalties
14  were or were not included in the calculation of this
15  3.5 percent overriding royalty?
16      A.  No.
17      Q.  Is it your view that it was a mistake by
18  Delta Petroleum not to have included the 1999
19  overrides as a calculation in the amount it is due
20  under this 3.5 percent overriding royalty?
21      A.  Yes, I consider it a mistake.
22      Q.  Are you aware of any practice or custom in
23  the oil and gas industry that a grant of an overriding
24  royalty can be reduced by subsequent transfers by the
25  grantor of the overriding royalty?

---

**40**

1      MR. PEHLKE:  Object to form and
2  foundation.
3      A.  I don't understand the question.
4      Q.  (BY MR. BENNETT)  You recognize that the
5  assignment of an overriding royalty is a conveyance of
6  an interest in real property?
7      A.  Yes.
8      Q.  Are you aware of any doctrine in the oil
9  and gas industry that is generally recognized that a
10  pre-existing assignment of interest in an oil and gas
11  lease can be reduced by subsequent assignments?
12      MR. PEHLKE:  I have to object to the form
13  and vagueness of doctrine; but you can go ahead.
14      A.  I have no knowledge.
15      Q.  (BY MR. BENNETT)  So you're not relying on
16  any custom or practice in the oil and gas industry in
17  support of your interpretation of the language used in
18  paragraph 1?
19      A.  Correct.  I'm relying on the documents.
20      Q.  Solely on your reading of the documents?
21      A.  Correct.
22      Q.  Do you claim to have any knowledge of the
23  custom and practice in the oil and gas business
24  regarding the calculation of overriding royalty
25  interest?

---

41

1      MR. PEHLKE:  Object to form.
2      A.  No.
3      Q.  (BY MR. BENNETT)  Do you have any prior
4  experience in the oil and gas business?
5      A.  Yes.
6      Q.  Tell me about that.  What is your prior
7  involvement in the oil and gas business?
8      A.  Starting my career at Arthur Anderson, I
9  was in the global energy, corporate finance, and
10  corporate restructuring groups and was involved in the
11  restructuring and workouts of numerous E&P companies,
12  including Coho Petroleum, Forcenergy.
13      Q.  Forest?
14      A.  Force.  Forcenergy.
15      Q.  Force?
16      A.  F-o-r-c-e-n-e-r-g-y.
17      Q.  I got the energy part.
18      MR. PEHLKE:  I think it's one word.
19      A.  It's one word.
20      Q.  (BY MR. BENNETT)  All right.
21      A.  Actually, I think Anschutz bought the
22  company out of bankruptcy, just for the local Denver
23  connection.  TransTexas Oil and Gas, there's a number
24  of others.  In addition, I worked at Koch Industries
25  in their capital markets group; I ran a significant

42

1  credit portfolio there with a significant energy
2  concentration.  I also worked at a distressed debt
3  hedge fund, whose focus was energy, power, and
4  transportation.  In addition, starting with my time at
5  Conway, I'm involved in GMX Resources now.
6      Q.  I'm sorry, what was that?
7      A.  GMX Resources.  That's why I had to cancel
8  my last two depositions, was due to that case.
9      Q.  You really were in Oklahoma.
10      A.  I was in Oklahoma on Tuesday.
11      MR. PEHLKE:  It's on the record now.
12      Q.  (BY MR. BENNETT)  I wanted to make sure
13  there just wasn't some --
14      A.  No, not making that up.  As well as a
15  handful of other engagements.
16      Q.  While we're on the subject of your
17  background, what period of time have you worked with
18  Conway MacKenzie?
19      A.  I started in November of 2011.
20      Q.  So about the same time as you began this
21  Delta consultancy?
22      A.  Exactly the same time.
23      Q.  And were you brought on to work on the
24  Delta Petroleum restructuring?
25      A.  Well, it was my first engagement.

43

1      Q.  Let's just go through your background.
2  What period of time were you at Arthur Anderson?
3      A.  From 1996 to 2002.
4      Q.  I assume you had no involvement in the
5  Enron debacle of Arthur Anderson?
6      MR. PEHLKE:  I was going to say,
7  everybody's Arthur Anderson involvement ends right
8  around 2002.
9      Q.  (BY MR. BENNETT)  You were not involved in
10  the Enron debacle and the problems that gave rise to
11  Arthur Anderson's demise, I gather?
12      A.  No, of course not.
13      Q.  What office of Arthur Anderson did you
14  work out of?
15      A.  Houston.
16      Q.  For the entire time?
17      A.  I was in Dallas for the first two years
18  and then the last four in Houston.
19      Q.  Where did you go after Arthur Anderson?
20      A.  Koch, K-o-c-h, Industries in their capital
21  markets group.
22      Q.  Located in what city?
23      A.  Houston.
24      Q.  And what period of time did you work for
25  Koch Industries?

44

1      A.  '02 to '07.
2      Q.  Did you say you were in charge of a credit
3  portfolio?
4      A.  Yes.
5      Q.  Describe what that means.
6      A.  We made investments and credit instruments
7  of companies and derivative of credit instruments in
8  numerous companies.
9      Q.  Primarily in the oil and gas industry or
10  energy industry?
11      A.  No, across a number of industries, but
12  there was a significant energy concentration in the
13  portfolio.
14      Q.  Were you the manager of that credit
15  portfolio?
16      A.  Eventually, yes.
17      Q.  What were your positions from the time you
18  started to the time you concluded?
19      A.  I started off as an analyst and over the
20  course of time became the portfolio manager for lack
21  of a better term.
22      Q.  And how long a time were you the portfolio
23  manager?
24      A.  I don't recall.  A couple of years.
25      Q.  So approximately 2005 to 2007?

**77**

1   A.   I have no way of identifying that.
2   Q.   (BY MR. BENNETT)  You've referred to the
3   purchase and sale agreement in your declaration?
4   A.   Yes.
5   Q.   And you attached a version of the purchase
6   and sale agreement that was filed with the Securities
7   & Exchange Commission, correct?
8   A.   Correct.
9   Q.   Did you actually look at the individual
10  signed purchase and sale agreement in connection with
11  your declaration?
12  A.   I relied upon what was in the SEC -- filed
13  with the SEC.
14  Q.   Why did you rely on that version rather
15  than the signed version in the corporation's file?
16  A.   I don't recall.
17  Q.   Do you know if you've even seen the signed
18  document before doing your declaration?
19  A.   I don't recall seeing the signed version.
20  Q.   How did you get a copy of the SEC version?
21  A.   I don't recall.
22  Q.   Do you know where in the company's records
23  this purchase and sale agreement was maintained?
24  A.   No.
25  Q.   Do you know what effort was made by the

**78**

1   company to locate documents relevant to this case?
2   A.   There has been a substantial amount of
3   effort made to locate documents.
4   Q.   Has that been under your direction?
5   A.   I've helped coordinate and -- but, no, I'm
6   not the trustee.  So I've attempted to facilitate the
7   sourcing of documents, but I haven't been the point
8   person gathering all the documents.
9   Q.   Who at the company, or the plaintiffs, has
10  been the point person?
11  A.   Again, it's been a variety of people.
12  Maggie Conner.
13  Q.   What is her position with either the Delta
14  Recovery Trust or Par Petroleum?
15  A.   Neither.  She's a director at Conway
16  MacKenzie.
17  Q.   So she is still rendering consulting
18  services in connection with this case?
19  A.   Yes.  And then Seth Barron and Kent
20  Harmony.
21  Q.   Do either of those individuals have a
22  position with either the Recovery Trust or Par
23  Petroleum?
24  A.   No.
25  Q.   All working --

**79**

1   A.   When you say "position," I'm sorry.
2   Q.   Employment position.
3   A.   Kent Harmony consults for Par Petroleum
4   the same as we did.
5   Q.   And Seth and Maggie are both employees of
6   Conway MacKenzie?
7   A.   Yes.
8   Q.   And are engaged in a continuing consulting
9   engagement for the recovery trust and Par Petroleum?
10  A.   Yes.
11  Q.   And those three individuals have been
12  involved in searching for documents relevant to the
13  litigation?
14  A.   Yes.
15  Q.   Anyone else?
16  A.   Those are the folks I can think of now.
17  Q.   Has there been a search of electronic
18  records?
19  A.   I don't know the specifics.  I assume
20  there had been.
21  Q.   And what servers and what search terms,
22  you're not aware?
23  A.   Correct.
24  Q.   Mr. Nanke told us in the course of his
25  deposition that he maintained some electronic Excel

**80**

1   spreadsheets as part of his employment with Delta
2   Petroleum which I don't believe have been produced to
3   us.  Do you know if there's been an effort to find
4   Excel spreadsheets from the accounting documents at
5   Delta Petroleum?
6   MR. PEHLKE:  Object to form.
7   A.   We provided all of the information that he
8   had immediately available.  There is other information
9   that is, for example, from -- I believe there's 2,500
10  banker's boxes in an off-site storage location, and we
11  also have employees' hard drives; those items are, by
12  their volume and where they're located, extremely
13  difficult to -- and expensive to produce.
14  Q.   (BY MR. BENNETT)  Do you know if any
15  search has been made of the 2,500 banker's boxes or
16  the employee hard drives?
17  A.   I don't believe so.
18  Q.   Did Delta have a central file server as
19  well, a computer file server?
20  A.   They had a server.
21  Q.   Do you know if the file server has been
22  electronically searched for documents in this case?
23  A.   I don't know.
24  Q.   Did Delta have a separate e-mail server or
25  servers?

**81**

1    A.    I don't know.
2    Q.    And do you know if the e-mail server or
3    servers have been searched?
4    A.    I don't know.
5    Q.    Who would know those kinds of things?
6    A.    Someone on the Conway team would likely
7    know.
8    Q.    Maggie, Seth, or Kent?
9    A.    Probably.
10    Q.    Did someone furnish you the SEC version of
11    Exhibit 21 in connection with your work or in your
12    declaration?
13    A.    Again, I don't recall the specifics of how
14    I obtained that document.
15    Q.    How did you know it existed?
16    A.    Again, research from either attorneys --
17    I'm going to assume the attorneys; but, again, I don't
18    recall specifically.
19    Q.    And Exhibit 22, would you look at that as
20    well.  That should be the next document.  This is an
21    amendment to the purchase and sale agreement.
22    A.    Yes.
23    Q.    And you reviewed this amendment as part of
24    your work on the declaration, correct?
25    A.    If this is the same amendment that is part

**82**

1    of the SEC filing, then yes.
2    Q.    Do you know what sections of the original
3    purchase and sale agreement the amendment to purchase
4    and sale agreement amends?
5    A.    I don't recall specifically.
6    Q.    For example, let's look back at
7    Exhibit 21.  Maybe you should keep both of them out.
8    Section 1.1 of the purchase and sale agreement says,
9    Subject to Section 2.4 and the other terms and
10    conditions of this agreement, seller agrees to sell
11    and convey and buyer agrees to purchase and pay for
12    all of seller's right, title, and interest in and to
13    the interests.  And the interests are defined in
14    paragraph 1.2.  Right?
15    A.    Yes.
16    Q.    Does Exhibit 22 amend Section 1.1 or 1.2?
17    MR. PEHLKE:  Objection.
18    A.    It does not appear to.
19    Q.    (BY MR. BENNETT)  The amendment,
20    Exhibit 22, seems to amend Sections 2.4, 7.2, and 7.6.
21    MR. PEHLKE:  Objection; mischaracterizes
22    the amendment.
23    Q.    (BY MR. BENNETT)  And 9.2, correct?
24    MR. PEHLKE:  It says in the recitals it's
25    amending the whole agreement.

**83**

1    Q.    (BY MR. BENNETT)  So, I mean, the only
2    provisions that are changed are the ones I just read,
3    correct?
4    A.    Clearly, Sections 7.2, 2.4, 7.6, and 9.2
5    are amended; but there appear to be other additions to
6    the agreement as well.
7    Q.    On the purchase and sale agreement, there
8    is an Exhibit A which begins at Bates page 2320, if
9    that helps you find it.  Do you have that page?
10    A.    Yes.
11    Q.    Exhibit A lists properties that are the
12    subject of the purchase and sale agreement referred to
13    as interests in paragraph 1.2, right?
14    A.    That would appear to be the case.
15    Q.    And as far as we're interested in, on the
16    second page of Exhibit A at the bottom, there is a
17    listing of the Point Arguello unit, correct?
18    A.    Yes.
19    Q.    And it refers to a working interest of
20    0.06065210?
21    A.    Yes.
22    Q.    It's that number we looked at from the
23    unit operating agreement?
24    A.    It appears to be the same.
25    Q.    There's also a reference to a net revenue

**84**

1    interest of 0.048425.  Do you know what that refers
2    to?
3    A.    Could you be more specific?
4    Q.    What is that number, 0.048425?
5    A.    It is -- well, it's going to be a
6    reduction -- it's going to be a reduction due to
7    expenses that the working interest owner bears.
8    Q.    What expenses are those that are included
9    to reduce the interest from 0.0606 to 0.048425?
10    MR. PEHLKE:  Objection.
11    A.    I don't recall.
12    Q.    (BY MR. BENNETT)  Don't know?
13    A.    I don't recall.
14    Q.    Don't know how to calculate it?
15    MR. PEHLKE:  Objection.
16    A.    I just don't recall at this point in time.
17    Q.    (BY MR. BENNETT)  Do you know what number
18    should go into that to reflect the interest between
19    the working interest and the net revenue interest?
20    A.    You'll just have to point me to the right
21    spot in the document.
22    Q.    I'm asking if you know how to calculate
23    that?
24    MR. PEHLKE:  Object to foundation and
25    argumentative.

21 (Pages 81 to 84)

85

1    A. Yeah, I -- again, if you're asking for at
2  this point in time can I remember specifically how to
3  get from 0.06065210 to 0.04842500, I can't recall how
4  to do that off the top of my head.
5    Q. (BY MR. BENNETT) Can you describe for me
6  what expenses go into that calculation?
7    MR. PEHLKE: Object to foundation.
8    A. Not specifically without looking at the
9  document more closely.
10    Q. (BY MR. BENNETT) The interest that is
11  described with respect to the Point Arguello unit is
12  set forth in the sentence after the two numbers we've
13  just been looking at, all of seller's right, title,
14  and interest in and to the leasehold estate created by
15  the following described oil and gas leases. A is the
16  July 1, 1981 oil and gas lease relating to OCS-P 0451,
17  right?
18    A. Yes.
19    Q. And there's a limitation to a license or
20  lease P 0451 to the extent it covers the West half of
21  Block 465, right?
22    A. Yes.
23    Q. Do you know why that provision is there?
24    A. No.
25    Q. The second lease that's listed is lease

86

1  P 0316, right?
2    A. Correct.
3    Q. And then again, as it relates to Block 55
4  North, 84 West, right?
5    A. Correct.
6    Q. And again, keeping the original
7  introduction to this paragraph, All of seller's right,
8  title and interest in and to the leasehold estates
9  created by these leases; then there is a listing of
10  wells in addition, correct?
11    A. Correct.
12    Q. And you understand that these wells that
13  are listed are the wells that are on lease 0451 and
14  lease 0134?
15    A. That would be my understanding, yes.
16    Q. Then there's a listing of things to which
17  the seller's right, title, and interest is subject,
18  and there are items A through F, correct?
19    A. Correct.
20    Q. Two of the items listed are the unit
21  operating agreement and the unit agreement, correct?
22    A. Operating agreement and the unit
23  agreement, yes.
24    Q. Do you have any view that the interests
25  that were contemplated by the purchase and sale

87

1  agreement relate to anything other than the seller's
2  leasehold interest in the leases described?
3    MR. PEHLKE: Object to form.
4    A. Repeat the question, please.
5    Q. (BY MR. BENNETT) Is it your view that the
6  purchase and sale agreement relates to anything other
7  than the seller's interest in the oil and gas leases
8  that are described in Exhibit A?
9    A. No.
10    Q. Do you know if the 3 1/2 percent
11  overriding royalty interest Whiting granted to BWAB
12  reduced the seller's interest that was contemplated to
13  be sold to Delta Petroleum pursuant to this agreement?
14    MR. PEHLKE: Object to foundation.
15    A. I don't have any view of that
16  historically.
17    Q. (BY MR. BENNETT) Do you know if one of
18  the expenses that reduced the 6.06 percent working
19  interest to the 4.825 revenue interest was the BWAB
20  overriding royalty interest?
21    A. It could have been.
22    Q. Do you know one way or the other?
23    A. No.
24    Q. Do you know why Whiting Petroleum, Whiting
25  Programs, and Delta entered into the amendment to the

88

1  purchase and sale agreement?
2    MR. PEHLKE: Objection.
3    A. I understand it was because Whiting could
4  not get its consent from its working interest owners
5  to sell to Delta.
6    Q. (BY MR. BENNETT) How do you come by that
7  knowledge?
8    A. I don't recall.
9    Q. Did you ever talk to anybody at Whiting?
10    A. No.
11    Q. Anybody at Delta tell you that that was
12  the case?
13    A. Possibly.
14    Q. Do you have any idea who?
15    A. Certainly discussed it with Kent Harmony;
16  may have been other professionals at Delta as well.
17    Q. What did Mr. Harmony tell you about
18  Whiting's ability to get consent from its partners?
19    A. Again, I don't recall the specifics, but
20  he's been involved in the process and it's logical I
21  would have spoken to him.
22    Q. So you haven't had any actual recollection
23  of talking to him about this subject?
24    A. Again, I think it's likely that I have,
25  but no specific knowledge. And I may have spoken to

22 (Pages 85 to 88)

**97**

1  A. Yes, they appear to be.
2  Q. And we have a listing of the wells. And,
3  again, we have the same wells that we had on the
4  purchase and sale agreement, correct?
5  A. They appear to be the same.
6  Q. And then the interests are subject to the
7  -- to at least three of the agreements that the
8  purchase and sale agreement are subject to?
9  A. Correct.
10  Q. Do you remember what the A through --
11  A. That's what I'm looking at. It looks like
12  the page got cut off.
13  Q. I don't know if there's another page or
14  not. B and C are the unit agreement and the unit
15  operating agreement that we talked about earlier.
16  A. Well, the "subject to the following" is
17  different, it looks like, according to the purchase
18  and sale agreement; but it looks like everything else
19  is the same.
20  Q. In what way are they different?
21  A. Turn to DPT 2322.
22  Q. Okay. I'm with you. In the purchase and
23  sale agreement, the first item to which the agreement
24  is subject is an offset development well and line well
25  agreement dated September 12, 1988, correct?

**98**

1  A. Yes.
2  Q. And that's the first subject item in the
3  net operating interest assignment, correct?
4  A. Correct.
5  Q. Item B is a unit operating agreement dated
6  February 1, 1985 between Chevron, Phillips, and
7  Champlin as to the Rocky Point unit, which is not
8  included on the net operating unit, is it?
9  A. No, it's not.
10  Q. The unit operating agreement for Rocky
11  Point is not referred to on the net operating interest
12  assignment, correct?
13  A. Okay, yes.
14  Q. So if you skip through the two unit
15  agreements for Rocky Point, you get down to Item F,
16  which is the Unit Agreement for Outer Continental
17  Shelf Exploration dated October 1, 1996 relating to
18  Point Arguello, correct?
19  A. Correct.
20  Q. And that is Item B on the net operating
21  interest assignment?
22  A. Correct.
23  Q. And then Item C is the unit operating
24  agreement, and that is -- where is that?
25  MR. PEHLKE: It's not listed.

**99**

1  Q. (BY MR. BENNETT) It doesn't look like
2  it's listed on the purchase and sale agreement. No,
3  it's not. I don't know why it's not. Now, let's go
4  back to where we were. What about the conveyance of
5  the net operating interest leads you to the conclusion
6  that, unlike a working interest, this is not an
7  interest in real property?
8  A. Well, I guess maybe I need to refine my
9  statement and say it may or may not be.
10  Q. Whether it is or isn't is really a matter
11  of legal analysis, isn't it?
12  A. Yes.
13  Q. Do you have any basis for a conclusion
14  from your experience one way or the other in that
15  regard?
16  A. No.
17  Q. Do you have any knowledge or information
18  that the assignment of a net operating interest was
19  done for any purpose other than to convey to Delta the
20  interests in the oil and gas leases that would not
21  require consent from the other working interest
22  partners?
23  A. No.
24  MR. PEHLKE: Object to form.
25  Q. (BY MR. BENNETT) So far as you know, that

**100**

1  was the reason for structuring it as a net operating
2  interest?
3  A. That's my understanding.
4  MR. PEHLKE: Objection.
5  Q. (BY MR. BENNETT) And that understanding
6  is based on your conversations with the folks at
7  Delta?
8  A. Yes.
9  Q. Now, you'll recognize that under the net
10  operating assignment, if the eight-step calculation of
11  the net operating interest resulted in a negative
12  number, that Delta was responsible to pay Whiting that
13  negative amount?
14  A. Yes.
15  Q. And do you know from your review of the
16  books and records of Delta whether, in any given
17  month, the eight-point calculation resulted in a
18  negative number?
19  A. Yes.
20  Q. And do you know whether, from your review
21  of Delta's books and records, Whiting sent Delta a
22  bill for the negative cash flow in any given month?
23  A. I don't recall.
24  Q. Do you know as recently in the last two
25  months Delta has received an invoice from Whiting for

129

1  A.  Correct.
2  Q.  From that, you subtract that from the
3  barrels attributable to the Whiting/Delta interest to
4  come up with barrels that would be attributable to the
5  1994 interest by your calculation?
6  A.  Correct.
7  Q.  And you have multiplied that times the
8  3 1/2 percent royalty interest for the 1994 royalty --
9  or override to come up with the barrels that you think
10  are attributable to that interest?
11  A.  Correct.
12  Q.  Then the next section of your schedule is
13  to calculate the barrels attributable to the BWAB 1999
14  interest, correct?
15  A.  Correct.
16  Q.  And you've taken that as a 3 percent
17  overriding royalty out of the gross barrels
18  attributable to the Whiting/Delta interest?
19  A.  Correct.
20  Q.  Multiplied the gross barrels times 3
21  percent to come up with the barrels attributable to
22  the 1999 agreement?
23  A.  Yes.
24  Q.  Adding the two together then from the two
25  preceding calculations gives you the total barrels

130

1  that you believe are subject to both the 1994 override
2  and the 1999 override?
3  A.  Correct.
4  Q.  Then subtracting from the calculation of
5  the actual barrels used, you come up with the excess?
6  A.  Correct.
7  Q.  Where do you come up with the realized
8  price per barrel?
9  A.  The LOE statements.
10  Q.  And as we've seen from the Plains
11  Marketing reports, the actual prices received at
12  various times during any one month will vary by a few
13  cents one way or the other?
14  A.  Say that again.
15  Q.  If you look at the Plains Marketing
16  reports, Exhibit 47, if you look at the price column
17  on the Plains Marketing, you would see that the sales
18  that take place during the month vary by either a few
19  cents or a few tenths of cents during each month.
20  A.  Okay.  Yeah, I haven't studied it, but
21  considering -- it looks like you've got different
22  prices for different gravities, so it would make sense
23  that there was some minor difference in the prices.
24  Q.  So my question is:  You've only got one
25  price listed for the month of July 2002 and one price

131

1  for August.  It appears from the Plains Marketing
2  reports that the prices vary a bit over the month --
3  over each month, right?
4  A.  Correct.
5  Q.  So how is it that you have arrived at a
6  single price for the month?
7  A.  It's going to be from the LOE statement
8  schedule, and as I understand it, that's just the
9  weighted average.
10  Q.  Who prepares the LOE schedule?  Is that an
11  internal Delta document?
12  A.  That's from the accounting system.
13  Q.  Then the last step on your Schedule F is
14  to multiply what you determine to be the excess
15  payrolls plus the price for the month to arrive at a
16  dollar figure of excess payment?
17  A.  Correct.
18  Q.  And you have used the same approach
19  throughout each month and each year of Exhibit F; is
20  that right?
21  A.  Yes.
22  Q.  And you have used the same landowner's
23  royalty or MMS royalty for each month of each year?
24  A.  Yes.
25  Q.  And I think, when we were talking earlier,

132

1  you're not aware if at any time during the period
2  we're dealing with here the MMS royalty was less
3  than 1/6?
4  A.  I am not aware.
5  Q.  Now, each page of Exhibit F totals your
6  calculations of the excess payment for the year,
7  correct?
8  A.  Correct.
9  Q.  So that lower right-hand figure under the
10  column total would be your calculation of the annual
11  overpayment for each year?
12  A.  Correct.
13  Q.  Then there is a first page to your
14  Exhibit F, which takes the annual overpayment each
15  year and adds them up and comes up to the total of the
16  10 or 11 years that you've calculated of 1,199,959?
17  A.  Correct.
18  Q.  As we discussed when we were looking at
19  the 1997 agreement with Whiting, you have not adjusted
20  the BWAB 1994 royalty interest giving effect to the
21  1997 agreement between Whiting and BWAB?
22  A.  Correct.
23  Q.  Do you know what effect that 1997
24  agreement between BWAB and Whiting would have on your
25  calculations?

**133**

1  A. No.
2  Q. Do you know if the overriding royalty
3  interest under that calculation is greater or less
4  than 3 1/2 percent?
5  A. You'd have to show me the doc and I would
6  have to look at it. I remember discussing it, I don't
7  recall the specific numbers.
8  Q. Were you aware of the 1997 agreement
9  between BWAB and Whiting when you prepared Exhibit F?
10  A. No.
11  Q. So you didn't know of that agreement and
12  consciously exclude adjusting the 3 1/2 percent for
13  that agreement?
14  A. Correct.
15  Q. Do you know of any reason why, in doing
16  your calculation of excess barrels, you would not give
17  effect to an agreement between Whiting and BWAB as to
18  the calculation of its override?
19  MR. PEHLKE: Object to form.
20  A. This is such a lawyer question.
21  Q. (BY MR. BENNETT) I can't help it, I'm a
22  lawyer, I have to ask lawyer questions.
23  A. Let me just simply say, I used all the
24  agreements to my knowledge to calculate the numbers I
25  have here.

**134**

1  Q. But you weren't aware of an agreement
2  between BWAB and Whiting relating to the sharing of
3  the dilution factor, which we talked about?
4  A. Correct.
5  Q. Now, the actual barrels used in the
6  payment calculation, four lines from the bottom of
7  your schedule, which on page 1 is 2,265; 2,027;
8  et cetera -- got that line?
9  A. Yes.
10  Q. Do you know what the elements are that go
11  into that number in terms of the 1994 calculation and
12  the 1999 calculation? Did that question make sense?
13  A. The question makes sense. My source
14  document for the number is the accounting statement.
15  Q. What accounting statement?
16  A. Exhibit -- whatever this is.
17  Q. 31, the schedule?
18  A. Yes, 31.
19  Q. And that number is basically derived from
20  using this decimal interest percentage of 414980?
21  A. It's -- again, I used the quantity number
22  on this column to calculate the amounts.
23  Q. I understand. But the quantity that is
24  derived from the schedule, Exhibit 31, that number
25  results from the application of the interest figure

**135**

1  set forth on the schedule times the actual production
2  reflected on Delta's books and records?
3  A. I haven't done that math.
4  Q. You would assume it to be true, right?
5  A. I would assume it to be true, but I
6  haven't done the math. And I say that because there
7  may be other adjustments or accounting entries between
8  schedules that I'm just not aware of.
9  Q. I gather, because you just used the
10  quantities attributed to the BWAB interest, you didn't
11  do an analysis of how the 414980 decimal is arrived
12  at?
13  A. Correct.
14  Q. And you don't know the components of that
15  decimal, right?
16  A. Other than speculating, no.
17  Q. And so you don't have any basis, as we sit
18  here today, to say whether that 414980 decimal is
19  correct or incorrect, right?
20  A. Okay.
21  Q. And whatever it is and whatever its
22  components are, the basis of your claim that there was
23  an overpayment is the failure to deduct the 99
24  overrides to BWAB, Kaiser-Francis, Aleron Larson, and
25  Parker?

**136**

1  A. And MMS.
2  Q. That gets to one of my questions, I guess.
3  Do you know whether the MMS royalty is, in fact,
4  included in the decimal interest of 414980?
5  A. You know what, that's a good point. I
6  actually don't know.
7  Q. So you don't know. If it is included in
8  the 414980 and it was used to derive the quantities
9  paid to BWAB, the MMS barrels calculation to be done
10  does not add to the overpayment?
11  A. It would not add to the overpayment,
12  correct. That's good algebra for a lawyer.
13  Q. I think I understand your schedule; I
14  can't say I agree with it, but I understand it. One
15  other question on the schedule. In calculating the
16  amount of barrels attributable to BWAB's 1999
17  overriding royalty, you have not deducted the MMS
18  royalty from those barrels, correct?
19  A. That's true.
20  Q. So to the extent that the 414980 includes
21  3 percent attributable to the 1999 agreement, and if
22  that portion of the decimal is not reduced by the MMS
23  barrel, that is a correct calculation?
24  A. I would want to pencil through the math,
25  but what you're saying sounds directionally correct.

141

1    Q. Do you know how much or what the total
2  barrels would be that would have been attributable to
3  BWAB's interest had it been calculated on the
4  historical basis for those months?
5    A. No, not off the top of my head.
6    Q. Have you calculated that number?
7    A. No.
8    Q. Do you know -- we claim an interest in
9  those four months that you haven't paid us. Do you
10  have any idea how much that is?
11    A. Again, not off the top of my head.
12    Q. The number could be derived following the
13  same approach that you used previously?
14    A. Correct.
15    Q. The complaint suggests that in calculating
16  the BWAB overriding royalty, the actual barrels used
17  on your Schedule F was simply a combination of the
18  1994 and the 1999 override calculated in accordance
19  with the 1999 override. Do you know if that's a true
20  fact?
21    A. You're going to have to -- it's in my
22  declaration, I'm going to assume it's true.
23    Q. It comes from the complaint, not your
24  declaration, but I think your declaration says
25  something similar. Let me point you to the language.

142

1  If you look at the paragraph number 17 of your
2  declaration, Exhibit 46, page 6, you state at
3  paragraph 17 as follows: The formulation of the
4  monthly payment obligations due and payable to
5  Defendant under each of the 1994 agreement and the
6  1999 agreement differed; however, following Whiting's
7  sale to Delta of the leases, which were subject to the
8  1994 BWAB interest and Delta's conveyance of the 1999
9  interest -- and you think my questions are bad --
10  including the conveyance to Defendant of the 1999 BWAB
11  interest, Delta mistakenly lumped together the
12  percentages related to each of the 1994 and 1999
13  interests for purposes of calculating the aggregate
14  amounts payable to Defendant.
15    As a result, Delta incorrectly applied the
16  payment formula under the 1999 agreement to both the
17  '94 and '99 BWAB interests when they should have
18  applied two different formulas. Do you know if that's
19  true?
20    A. I believe that statement to be true.
21    Q. As I understand it, you do not know how
22  the barrels actually used from your Schedule F were
23  calculated?
24    A. Correct.
25    Q. So you don't know whether the barrels

143

1  attributable to the '99 agreement and the barrels
2  attributable to the '94 agreement were calculated on
3  the same basis --
4    MR. PEHLKE: Objection.
5    Q. (BY MR. BENNETT) -- to arrive at the
6  actual barrels paid?
7    A. Correct.
8    Q. So there may have been two separate
9  formulas used to arrive at the actual barrels paid;
10  isn't that true?
11    A. It's, I think, highly unlikely.
12    Q. Let's do a little math. The way you've
13  calculated the barrels that were payable under the
14  1999 agreement was to take 3 percent times the barrels
15  attributable to the Whiting/Delta interest, right?
16    A. Yes.
17    Q. If the same formula were applied to the
18  1994 interest, it would be 3 1/2 percent times the
19  barrels attributable to the Whiting/Delta interest,
20  right?
21    A. Yes.
22    Q. And if the two were simply lumped
23  together, it would be 6 1/2 percent times the barrels
24  attributable to the Whiting/Delta interest?
25    A. Yes.

144

1    Q. So why don't you take the calculator and
2  multiply 6 1/2 percent times the 33,109 barrels in
3  July of 2012?
4    A. Okay.
5    Q. What number do you come up with?
6    A. 2,152.
7    Q. And the actual barrels paid were 2,265?
8    A. Yes.
9    Q. So that calculation is not the result of
10  simply lumping the '99 interest and the '94 interest
11  together and paying it; it's actually a bit higher,
12  right?
13    A. Sure, yes.
14    Q. So as you sit here today, do you know how
15  and what formulas were used as to each of the '94 and
16  '99 overrides in reaching -- in paying the 2,265
17  barrels in July of 2002?
18    A. No. My source data is an output from the
19  accounting system.
20    Q. In paragraph 19 of your declaration, you
21  state, The revenue deductions -- and you define that
22  in paragraph 14 as the lessor royalty overriding
23  royalties and other burdens and payments, including
24  the 1999 override, right?
25    A. Say that one more time.

36 (Pages 141 to 144)

145

1   Q.   Let's go to paragraph 14 first, because
2  this is where you define the term "revenue
3  deduction."
4   A.   Okay.
5   Q.   Look at that paragraph.
6   A.   Okay.
7   Q.   You define revenue deductions as lessor
8  royalties, overriding royalties, other burdens and
9  payments out of gross production that burden the
10  leases.  And in your definition, would that include
11  the 1999 overrides granted by Delta?
12   A.   Yes.
13   Q.   Now going to paragraph 18, is it your
14  belief that there is an overpayment because the
15  payments to BWAB did not account for those revenue
16  deductions?
17   A.   Correct.
18   Q.   And in paragraph 19, you state, The
19  revenue deductions should have included the deductions
20  on account of the 1999 interests.
21   A.   Correct.
22   Q.   And that "should have" is based on your
23  reading of the document and nothing else?
24   A.   Yes, correct.
25   Q.   Now, you mentioned in paragraph 20 of your

146

1  declaration that these excess payments were discovered
2  in the course of an audit.
3   MR. PEHLKE:  Objection.
4   Q.   (BY MR. BENNETT)  I'll rephrase it.  You
5  indicate that you discovered this overpayment and then
6  underwent an audit of the records to determine the
7  extent.
8   A.   Yes.
9   Q.   What audit was done of Delta's records?
10   A.   That's Exhibit F.
11   Q.   So the term "audit," is that meant to
12  impart an audit by an independent certified public
13  accounting firm, or is that an audit based upon your
14  review of the records?
15   A.   My review of the records.
16   Q.   So there isn't any further documentation
17  of this audit other than your Schedule F that you
18  produced to us?
19   MR. PEHLKE:  Objection.
20   A.   Schedule F is the result of the audit.
21   Q.   (BY MR. BENNETT)  What I'm asking is, are
22  there any other documents that comprise the audit
23  other than your work on Schedule F?
24   A.   Well, the audit and the documents that
25  we've mentioned and I've relied upon during the course

147

1  of this deposition.
2   Q.   I understand, the documents you relied
3  upon to prepare Exhibit F; but there isn't anything
4  else in the universe that I should be looking for or
5  asking about?
6   A.   Correct.
7   Q.   In paragraph 23, you suggest that the same
8  mistaken formula that you've identified through your
9  audit, Exhibit F, occurred during the years 1999 to
10  2001.
11   A.   Correct.
12   Q.   Who paid BWAB during the year 1999?
13   A.   Who paid BWAB?
14   Q.   It wasn't Delta, was it?
15   MR. PEHLKE:  Objection.
16   A.   I don't understand the question.
17   Q.   (BY MR. BENNETT)  Delta didn't acquire the
18  properties until December 1999.
19   A.   Okay.
20   Q.   Right?
21   A.   Okay.
22   Q.   The overriding royalties, which you call
23  the -- what do you call them -- the revenue deductions
24  did not exist until December 1, 1999.
25   MR. PEHLKE:  Objection.

148

1   Q.   (BY MR. BENNETT)  Correct?
2   MR. PEHLKE:  I think that agreement is
3  back-dated, isn't it?
4   A.   Yeah, I think the effective date is --
5  it's got that different effective date.
6   Q.   (BY MR. BENNETT)  The announcement of the
7  transaction is in, I think it's your Exhibit D to your
8  declaration.
9   A.   I'm looking at Exhibit B, first page --
10  second, April 1, 1999.
11   Q.   Let's assume that that's correct, that
12  this acquisition was as of April 1, 1999.  Did Delta
13  pay BWAB with respect to the 1994 override from
14  April 1 through December 31, 1999?
15   A.   There would have been a true-up after
16  sale, so my assumption is yes; obviously, I wasn't
17  there, but it's a reasonable assumption to think that
18  if the effective date is back-dated once the sale
19  closes, you can figure out what is owed and monies
20  change hands.
21   Q.   Have you ever seen a post closing true-up
22  of the purchase price?
23   A.   Yes.
24   Q.   Really?  Have you produced that?
25   A.   Are you referring to Delta and BWAB, or

37 (Pages 145 to 148)