**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| DELTA PETROLEUM CORPORATION, | : | Case No. 11-14006 (KJC) |
| *et al.*, | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| DELTA PETROLEUM GENERAL | : | |
| RECOVERY TRUST | : | |
| and | : | |
| PAR PETROLEUM CORPORATION, | : | |
| | : | Adv. Pro. No. 12-50898 (KJC) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| BWAB LIMITED LIABILITY | : | |
| COMPANY, | : | |
| | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO BWAB'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

Anthony W. Clark (I.D. No. 2051)
Kristhy M. Peguero (I.D. No. 4903)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

Ron Meisler
David R. Pehlke
155 North Wacker Drive
Chicago, Illinois 60606-1720
(312) 407-0700

Dated: Wilmington, Delaware
      July 5, 2013

*Counsel for Plaintiffs Delta Petroleum
General Recovery Trust and Par
Petroleum Corporation*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

    The 1994 Assignment .................................................................................................... 2

    The 1999 NOI ................................................................................................................. 4

ARGUMENT ............................................................................................................................ 6

I.     THE 1994 ASSIGNMENT UNAMBIGUOUSLY ASSIGNED ONLY A
      DERIVATIVE RIGHT TO PAYMENT THAT IS DISCHARGEABLE IN
      BANKRUPTCY. ................................................................................................ 6

      A.    The 1994 Assignment Confers Only A Derivative Right To Payment On
            BWAB. .......................................................................................................... 6

      B.    In 1999, Delta Acquired From Whiting Essentially The Same Net
            Revenue Cash Flow From Which BWAB's 1999 Interest Is Derived. ................... 7

      C.    BWAB's Right to Payment From The Net Cash Flow Was A Claim
            Dischargeable In The Bankruptcy. .......................................................................... 9

II.    THE UNAMBIGUOUS LANGUAGE OF THE 1994 ASSIGNMENT MAKES
      BWAB'S 3.5% INTEREST SUBJECT TO "*ALL* LESSORS ROYALTIES,
      OVERRIDING ROYALTIES, AND OTHER BURDENS AND PAYMENTS." ............ 11

III.   LIKE ITS 1994 INTEREST, BWAB'S 1999 INTEREST IS ONLY A RIGHT TO
      PAYMENT FROM A SPECIFICALLY DEFINED CASH FLOW. ............................... 14

IV.   IF BWAB'S 1999 INTEREST ACTUALLY WERE A REAL PROPERTY
      INTEREST, THEN BWAB COULD HAVE PERFECTED THAT INTEREST. ............ 16

CONCLUSION ........................................................................................................................ 18

## TABLE OF AUTHORITIES

**Page**

### CASES

*In re APF Co.*,
    270 B.R. 567 (Bankr. D. Del. 2001) ...................................................................... 10

*Environmental Defense Project of Sierra County v. County of Sierra*,
    158 Cal. App. 4th 877 (Cal. Ct. App. 2008) ..................................................... 16, 17

*FCC v. NextWave Personal Communications Inc.*,
    537 U.S. 293 (2003) ........................................................................................... 10

*Honolulu Oil Corp. v. Kennedy*,
    251 F.2d 424 (9th Cir. 1957) ................................................................................ 7

*Indian River Homes, Inc. v. Sussex Trust Co.*,
    108 B.R. 46 (D. Del. 1989) ................................................................................ 16

*In re Murtishi*,
    55 B.R. 564 (Bankr. N.D. Ill. 1985) .................................................................. 16

*Stewart Foods v. Broecker* (In re Stewart Foods),
    64 F.3d 141 (4th Cir. 1995) ............................................................................... 10

*In re Waste Systems International, Inc.*,
    280 B.R.824 (Bankr. D. Del. 2002) ................................................................... 10

### STATUTES

11 U.S.C. § 101(5)(A)................................................................................................ 10

### OTHER AUTHORITIES

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963....................... 10

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5887 ........................... 10

Plaintiffs respectfully submit this brief in opposition to BWAB's cross-motion for summary judgment.  (D.I. 74, 75 ("Cross-Motion" or "CMSJ").)[1]

## <u>PRELIMINARY STATEMENT</u>

Defendant BWAB's cross-motion restates the arguments it presented in response to Plaintiffs' motion for summary judgment.  (*See* D.I. 44.)  As a result, there is virtually nothing new here for the Court to consider.  This dispute still boils down to a simple question of contract interpretation.  Plaintiffs argue that the relevant contracts (the 1994 Assignment, the 1999 NOI, and the 1999 Assignment (Roitman Decl. (D.I. 44-1) Ex. 3, 7, 8))[2] unambiguously establish that BWAB's interests were not interests in real property, but were instead rights to payment from specifically defined cash flows.  As rights to payment, these interests constituted claims under the Bankruptcy Code.  Those claims were extinguished after the Plan was approved.

All of BWAB's arguments to the contrary—whether in response to Plaintiffs' motion or in its cross-motion—rest upon the same assertion:  regardless of what the contracts say, BWAB received an interest in real property.  As set forth below, BWAB repeatedly advances that assertion without identifying any basis for it in the contracts.  Instead, BWAB relies upon unsupported statements about "custom and practice" and conjecture from a deponent about the nature of an interest with which he *admitted* he was entirely unfamiliar.  (*See infra* Section II (discussing BWAB's reliance on Mr. Nanke's testimony regarding the NOI while ignoring Mr. Nanke's admission that the NOI was an entirely novel deal structure for him).)  In fact, BWAB's

---

[1]    Unless otherwise noted, terms defined, and record citation forms used in Plaintiffs' opening memorandum of law in support of its summary judgment motion (D.I. 35) are used herein.

[2]    Wherever possible, and in order to avoid unnecessarily repetitive filings, Plaintiffs will cite to exhibits to the parties' prior filings.

cross-motion devotes almost no attention to the actual language used in any of the relevant contracts. That absence is telling.

BWAB knows that the contracts say what they say and that it has no contract-based arguments for its position. As a result, rather than discuss what the contracts say, BWAB attempts to cloud the waters with unsupported assertions about what the contracts mean according to the "industry," or according to some witness unfamiliar with the type of financial instrument at issue, or according to the self-serving interpretations of the individuals who will lose money if the contracts are interpreted *as written*.

There is no need for the Court to consider BWAB's extraneous conjecture. The Court need only look to the unambiguous language of the contracts to determine that there is simply no way to extract an actual ORRI from those documents. That one fact eliminates all of BWAB's arguments and requires summary judgment in favor of Plaintiffs.

## STATEMENT OF FACTS

As BWAB's cross-motion is largely a rehash of its response to Plaintiffs' motion for summary judgment, the underlying facts are generally identical to those set forth in support of Plaintiffs' motion. In order to avoid unnecessary repetition, Plaintiffs hereby incorporate their prior statements of facts from their briefing in support of their motion for summary judgment. Plaintiffs will only add here the relevant deposition testimony from certain witnesses, as it relates to the specific contracts at issue.

### The 1994 Assignment

BWAB originally owned the option to purchase the full interest in the Point Arguello Properties (the "Properties"), but it lacked the financial qualifications necessary to secure the required consents from other partners in the Properties. (Roitman Dep. 19:1-20 (excerpts attached hereto as Exhibit A)) Due to that financial inability, it transferred the option to Whiting

in exchange for either "an undivided 6.5% of the net rights acquired by Whiting" or "a proportionally reduced 3.5% percent of overriding royalty interest out of the net revenue interests acquired by Whiting."  (Roitman Decl Ex. 2 (July 28, 1994 Letter).)  Whiting eventually acquired the interests in the Properties and conveyed to BWAB the following:

> Whiting does hereby grant, convey, assign, set over and deliver to BWAB an overriding royalty consisting of an undivided Three and One-Half Percent (3.5%) interest in Whiting's Net Revenue Interest from the Subject Properties, to be determined as set forth below.  As used herein, the term "Net Revenue" to the BWAB Interest shall mean the difference between (A) the gross revenues received by Whiting from the sale of its fractional or percentage share of Hydrocarbons from the Subject Properties, after the deduction of all lessors royalties, overriding royalties, and other burdens and payments out of gross production that burden Whiting's fractional or percentage share, and (B) the sum of Whiting's fractional or percentage share of third party [expenses and taxes].

(Roitman Decl. Ex. 3.)

The 1994 Assignment defines the 3.5% interest granted to BWAB as an interest in "Whiting's Net Revenue Interest."  (*Id.*)  The Net Revenues are in turn defined as the result of the calculation set forth in the 1994 Assignment.  (*Id.*)  BWAB's 3.5% interest is determined by multiplying the specific net revenue stream defined in the 1994 Assignment by 3.5%.  (Roitman Dep. 27:7-13; 39:3-18.)  As set forth in the 1994 Assignment, and confirmed in the deposition of BWAB, the 1994 Assignment requires the deduction of "*all* lessors royalties, overriding royalties, and other burdens and payments" *before* applying BWAB's 3.5% interest to the Net Revenues.  (*Id.* 39:3-18 (emphasis added)).  The 1994 Assignment does not include any language limiting the expenses and burdens that must be deducted to then existing expenses and burdens.  (*Id.* 86:25-87:1 ("There's nothing in paragraph 1 about time limits.").)

3

**The 1999 NOI**

In 1999, BWAB advised Delta of a possible opportunity to acquire Whiting's interests in the Properties.  (*Id.* 43:20-44:1.)  In exchange for BWAB's assistance, Delta and BWAB executed a proposed fee schedule that would confer different interests on BWAB, depending on the interest that Delta ultimately acquired.  (*Id.* 44:2-8; Roitman Decl. Ex. 6 (April 1, 1999, Agreement).)  According to that fee schedule, if Delta were to acquire Whiting's full interest, then BWAB would receive a "proportionally reduced 3.0% overriding royalty interest out of the net revenue interest acquired by Delta, in recordable from and containing warranties of title by, through, and under Delta, but not otherwise." (Roitman Decl. Ex. 6 ¶ 3(2).)  If, however, Delta only acquired a "net operating interest, BWAB's overriding royalty interest will be calculated as 3.0% of the actual gross revenue generated from and accrued to Delta's interest."  (*Id.*)  The "net operating interest" option does not require an interest in recordable form or warranties of title. (*Id.*)  The "net operating interest" option was included in case Delta could not secure the consents necessary to acquire Whiting's full interest.  (Roitman Dep.  48:10-14 ("I believe that the reason net operating interest was contemplated is because of the approvals needed by the other working interest owners within the unit to approve Delta to buy all of Whiting's right, title, and interest.").)

Delta was ultimately unable to acquire Whiting's full right, title, and interest due to the refusal of other unit holders in the Properties to consent to that acquisition.  (Larson Dep. 36:8-38:10 (describing circumstances that lead to Delta acquiring "all the incidences of ownership," as opposed to "legal title") (excerpts attached hereto as Exhibit B))  As a result, Delta acquired from Whiting the Net Operating Interest ("NOI"), as defined in the 1999 NOI Agreement, instead of Whiting's full right, title, and interests in the Properties.  (*Id.*; *see also* Roitman Decl. Ex. 7 (1999 NOI); July 30, 1999, Delta Board Minutes, ¶ 1 (describing the alternative acquisition

4

options from Whiting as either "a working interest or an equivalent net operating profits interest,

or NOPI") (attached hereto as Exhibit D).)  Because Delta only acquired an NOI, as opposed to

Whiting's full right, title and interest in the Properties, BWAB received a 3% interest in the NOI.

(Roitman Decl. Ex. 6, 8.)

 The 1999 NOI Agreement defined the NOI as follows:

> The net operating interest ("NOI") herein conveyed and assigned is
> defined as the monthly payable positive or negative cash flow resulting to
> the Interests from the following eight step calculation:
>
> (i)  oil and gas sales revenue;
> (ii)  less royalties and overriding royalties;
> (iii) less Unit lease operating expenses;
> (iv) less severance, production or ad valorem taxes, if any;
> (v)  less capital expenditures;
> (vi) less Unit fees to the Unit operator; and
> (vii) plus the positive or less the negative cash flow from the
>    Partnerships;
> (viii) plus or minus any other miscellaneous costs or revenues
>    that may be related to these interests or operation. . .
>
> In the event of positive cash flow, Assignor will pay the excess to the
> Assignees; in the event of a negative cash flow, Assignees will pay the
> deficit to Assignor.

(Roitman Decl. Ex. 7.)  In its annual report, Delta described the NOI as a "financial

arrangement" that is intended to be "equivalent" to a "working interest."  (Larson Decl. Ex. 2

(Delta Annual Report).)  Delta's CEO considered the NOI to be a lesser interest than the interest

Delta originally wanted to acquire from Whiting.  (Larson Dep. 19:5-7.)  The financial

arrangement of a net operating interest was a novel structure unfamiliar to Delta.  (Nanke Dep.

103:6-14 (excerpts attached hereto at Exhibit C); Larson Dep. 19:16-20.)

 When Delta acquired the 1999 NOI its personnel simply imported and repeated the exact

same payment methodology for BWAB's 1994 Assignment that Whiting had used, despite the

fact that Whiting's payment methodology predated the 1999 Assignments.  (Nanke Dep. 100-

5

102.)  Delta did not review the 1994 Assignment or the impact the 1999 Assignments might have

on the payment methodology prior to importing Whiting's methodology.  (*Id.*)

<u>ARGUMENT</u>

I.      **THE 1994 ASSIGNMENT UNAMBIGUOUSLY ASSIGNED ONLY A
        DERIVATIVE RIGHT TO PAYMENT THAT IS DISCHARGEABLE IN
        BANKRUPTCY.**

        A.      **The 1994 Assignment Confers Only A Derivative Right To Payment On
                BWAB.**

        BWAB relies on unsupported assertions regarding "intent" and the attendant

requirements of the 1994 Assignment (*e.g.*, the requirement that the assignment be in recordable

form) to support its contention that its claim under the 1994 Assignment is not subject to the

bankruptcy.  (CMSJ 20.)  BWAB ignores, however, the *actual terms* defining the "conveyance."

The reason why is obvious.  Those terms unambiguously describe a right to payment derived

from a net revenue stream, or cash flow:

> Whiting does hereby grant, convey, assign, set over and deliver to BWAB
> an overriding royalty consisting of an undivided Three and One-Half
> Percent (3.5%) **interest in Whiting's Net Revenue Interest** from the
> Subject Properties, to be determined as set forth below.  As used herein,
> the term "Net Revenue" to the BWAB Interest shall mean the difference
> between (A) the gross revenues received by Whiting from the sale of its
> fractional or percentage share of Hydrocarbons from the Subject
> Properties, after the deduction of all lessors royalties, overriding royalties,
> and other burdens and payments out of gross production that burden
> Whiting's fractional or percentage share, and (B) the sum of Whiting's
> fractional or percentage share of third party [expenses and taxes].

(Roitman Decl. Ex. 3 (emphasis added).)

        Whiting did not assign to BWAB a 3.5% interest in the Properties, nor did it assign to

BWAB an interest in the hydrocarbons extracted from the Properties.  Instead, Whiting assigned

to BWAB a derivative interest in a defined net cash flow.  That derivative interest is not itself an

interest in land or hydrocarbons; it is rather an interest *derived* from the net revenue calculation.

6

(*See* Roitman Dep. 27:7-13; 39:3-18 (affirming that BWAB's 3.5% interest is 3.5% of the result of the "Net Revenue" calculation described in the 1994 Assignment).)  Only after Whiting first deducts lessor royalties, overriding royalties, and  "other burdens and payments," from its gross revenues, and then deducts from that result additional expenses and burdens on that revenue stream (including taxes), does BWAB's 3.5% interest even enter the picture.  (*Id.*)  BWAB can attempt to call that interest whatever it wants in its brief—an ORRI, a "conveyance," a real property interest, a personal property interest—but labels will not change what it *is*:  a right to payment derived from a specifically defined net cash flow.

Indeed, it is telling that BWAB only offers citations to general cases regarding ORRI interests, relying once again on the label—ORRI—that it wants to affix to its interest.  None of those cases, however, supports the conclusion that an interest that is defined in the manner unambiguously set forth in the 1994 Assignment constitutes an ORRI.  That is because a right to payment out of a net cash flow, as opposed to a right in the oil and gas itself, is not an ORRI. *See Honolulu Oil Corp. v. Kennedy*, 251 F.2d 424, 429 (9th Cir. 1957) ("The decisions of California courts establish that a stipulation that there be an overriding royalty, *consisting of a share of the produce in kind*, does create an interest in real property.") (emphasis added) (quoted by BWAB at CMSJ 20).

**B.    In 1999, Delta Acquired From Whiting Essentially The Same Net Revenue Cash Flow From Which BWAB's 1999 Interest Is Derived.**

BWAB wrongly asserts that it does not matter whether BWAB received an interest in real property, or merely a personal property interest, because the interest it received "was never conveyed from Whiting to Delta."  (CMSJ 21.)  For support, BWAB offers only its own (and Defendant Larson's) statement in its Declaration that "[t]he parties' intended and the definition of the Net Operating Interest makes clear that Whiting retained bare legal title to the Point

7

Arguello Properties but conveyed all of its beneficial interest to Delta except for previously granted royalties and overriding royalties owed to third parties such as the 1994 BWAB ORRI." (Roitman Decl. ¶ 23.)  The Net Operating Interest definition, however, does not support BWAB's supposition.  Instead, it makes clear that Delta received a "cash flow" essentially identical to the cash flow that forms the basis for BWAB's 1994 derivative right to payment. (*Compare* 1994 Assignment ¶ 1 and 1999 NOI definition.)  It *does not* establish a carve-out of any pre-existing interests in the properties, let alone BWAB's mere right to payment, because Delta itself did not receive an interest in the properties.

The NOI definition is unambiguous.  The Net Operating Interest "is defined as" a "cash flow."  (*See supra* Statement of Facts.)  Royalties and overriding royalties, as well as other expenses and taxes, are deducted out *before* Delta's interest comes into existence—they are not deducted from that interest.  (*Id.*)  The result of the NOI calculation is thus the same net revenue cash flow that is set forth as the ultimate source of BWAB's 1994 interest in the 1994 Assignment.  BWAB has a 3.5% interest in the form of a right to payment from that cash flow. When Delta purchased that cash flow, BWAB's right to payment came with the cash flow. Delta, not Whiting, paid BWAB out of that cash flow after 1999—not based on some whim that BWAB acceded to, but because the cash flow to which the right to payment was anchored had been sold to Delta.  Had BWAB's right to payment been an actual interest in the land or hydrocarbons—an ORRI—then it would have been deducted and paid to BWAB *prior* to Delta's receipt of the cash flow.  But, BWAB's interest was only a right to payment from the defined cash flow.  As a result, it had to be paid out of the amounts Delta received.

C.    **BWAB's Right to Payment From The Net Cash Flow Was A Claim Dischargeable In The Bankruptcy.**

BWAB argues that its 3.5% right to payment is beyond the reach of the bankruptcy action and is, therefore, being improperly withheld.  (CMSJ 21-23.)  BWAB's argument fails because it rests entirely on the faulty premise that its 3.5% interest exists completely separate and apart from the net revenue stream that Delta acquired from Whiting.  (*Id.* 21-22.)  In other words, BWAB proceeds on the basis of the fiction that its 3.5% was some sort of pre-existing, completely separable piece of property that Whiting delivered to Delta for forwarding on to BWAB.  The facts directly contradict BWAB's theory.

The 1994 Assignment is unambiguous—BWAB acquired a right to payment in the form of a 3.5% interest in a specifically defined net revenue stream, or cash flow.  The right that BWAB acquired is a right to payment from that net revenue stream—regardless of who holds the revenue stream.  (*See* 1994 Assignment, Para. 9 ("Successors.  This agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.").)  BWAB did not possess a 3.5% interest in the land, the hydrocarbons, or even the gross proceeds of hydrocarbon sales.  Indeed, if the specifically defined net revenue stream generated no surplus for a given month, then, under the 1994 Assignment, BWAB would receive nothing.  Its property right was completely derivative of the defined cash flow.  That is why BWAB's argument that its right to payment is beyond the reach of the Bankruptcy Code simply because it was originally acquired from Whiting, not Delta, fails.  (CMSJ 21-23.)   Its right to payment is *derivative* of the *revenue stream*, it is not an ownership right of any pre-existing thing (*e.g.*, land or hydrocarbons).  And, as a right to payment, BWAB's interest constituted a claim that was subject to discharge under the Plan.

9

Section 101(5)(A) of the Bankruptcy Code defines a "claim" to include a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]"[3]  As discussed above, the 1994 Assignment unambiguously grants BWAB only a right to payment from a defined cash flow.  That defined cash flow is Delta's property—acquired from Whiting in 1999.  Every month, Delta paid BWAB its 3.5% interest in Delta's net revenue stream from the 1999 NOI (mistakenly omitting deductions of all royalties, overriding royalties, expenses and burdens (*see infra* Section II)).  Thus, BWAB's right to payment is nothing more than a standard non-executory prepetition contract that requires the debtor to pay money.  Under relevant bankruptcy law, that right to payment is a prepetition claim.[4]

The fact that BWAB received payments through the bankruptcy does not alter that fact.  BWAB's claim is triggered by the *right to payment*, not the absence of payment.  Similarly, the fact that BWAB has not received any payments since the debtor discovered the improper payments that were made to BWAB does not constitute conversion or unjust enrichment.  (*See*

---

[3]   11 U.S.C. § 101(5)(A).  *See also* H.R. Rep. No. 95-595, at 309 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6266; S. Rep. No. 95-989, at 21-22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5887, 5807-08 (stating that the term "claim" encompasses the "broadest possible definition" and "contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case [and] permits the broadest possible relief in the bankruptcy court").  *See also FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 302 (2003) (noting that the term "claim" "has 'the broadest available definition'" (citation omitted)).

[4]   *Stewart Foods v. Broecker* (In re Stewart Foods), 64 F.3d 141, 145 (4th Cir. 1995) ("[R]egardless of the nature of the contract, if at the time of the bankruptcy filing the debtor has an obligation under the contract to pay money to the non-debtor party, that obligation is handled as a pre-petition claim in the bankruptcy proceedings."); *In re Waste Sys. Int'l, Inc.*, 280 B.R.824, 827 (Bankr. D. Del. 2002) (noting that royalty payments due to non-debtor under a non-executory prepetition contract gave rise to general unsecured claims); *In re APF Co.*, 270 B.R. 567, 572 (Bankr. D. Del. 2001) (noting that debtors' payment obligations due under deferred compensation portion of prepetition merger agreement was prepetition claim).  There can be no dispute that BWAB's agreement with Delta is non-executory.  There is no additional performance required from BWAB under the agreement.

Pl.'s Motion for Summary Judgment.)  BWAB's  right to payment was a claim upon the debtor

estate.  That claim has been extinguished.  (*Id.*)

## II.    THE UNAMBIGUOUS LANGUAGE OF THE 1994 ASSIGNMENT MAKES BWAB'S 3.5% INTEREST SUBJECT TO "*ALL* LESSORS ROYALTIES, OVERRIDING ROYALTIES, AND OTHER BURDENS AND PAYMENTS."

BWAB incorrectly asserts that Plaintiffs seek recovery of wrongly paid amounts to

BWAB "solely on Mr. Bullock's reading of the 1994 ORRI assignment."  (CMSJ 24.)  Indeed,

BWAB's desire seems to be to set up Mr. Bullock as a straw man:  Mr. Bullock did not negotiate

these agreements, therefore Plaintiffs' arguments must fail.  (CMSJ 32-33.)  BWAB even throws

out pointless and unsupported asides about Mr. Bullock's "lack of knowledge of any custom or

practice in the oil and gas industry as to the proper calculation of an ORRI."  (*Id.* 24.)  This,

despite the fact that Delta's former CEO and CFO conceded that the NOI was not a "customary"

agreement.  (Larson Dep. 19:16-20; Nanke Dep. 103:6-14.)  BWAB's strategy is transparent.

 BWAB wants to draw the Court's attention away from the plain language of the

agreements and toward the pointless and obviously true observation that Mr. Bullock, as an

individual who came in with the reorganization, did not negotiate these agreements.  It also

wants to create, without any support, the notion of a "custom" regarding ORRI payments that

would somehow (and rather conveniently) direct the reading of the *unambiguous* 1994

Assignment in BWAB's favor, and contradict the actual contract language.  But, the 1994

Assignment is unambiguous on its face.  It created a derivative right to payment from a net

revenue stream that is subordinate to other interests—including the 1999 Assignments.  There

are no customs or secret understandings within the oil and gas industry that can change that fact.

This is a contract case.  The contract is clear and it must govern the outcome.

As BWAB confirmed in the deposition of its corporate representative, Steve Roitman, its

3.5% interest was applied only to the result of the net revenue calculation set forth in the 1994

Assignment.  (Roitman Dep. 39:3-18.)  As BWAB also confirmed, that calculation first deducts

from the gross revenues that Whiting receives on its interests "***all*** lessors royalties, overriding

royalties, and other burdens and payments."  (Roitman Decl. Ex. 3 (emphasis added); Roitman

Dep. 39:3-18.)  As BWAB also confirmed in its deposition, nothing in the language of the 1994

Assignment limits the scope of that deduction to overriding royalties, burdens, or payments

existing at the time of the 1994 Assignment.  (Roitman Dep. 86:25-87:1.)  The term "all" is used

without modification in the agreement.  And, it would make little sense for that term to apply

only to existing burdens and payments, since, at the time the 1994 Assignment was executed, it

appears there were no other burdens and payments on Whiting's interests.  (*See id.* 91:16-21

(Referring to May 7, 1997 letter from Whiting to BWAB ["I think this would state that BWAB

was maybe the only overriding royalty interest at this point in time that burdens Whiting's

interest."]).)  Thus, the term "all" could only refer to future possible burdens and expenses.  The

1994 Assignment unambiguously assigns to BWAB a right to payment that will be subordinate

to subsequent burdens.

   The record also establishes that Delta did not recalculate the proper payment formula for

the 1994 Assignment after it acquired the NOI in 1999.  Instead, it simply imported the same

payment formula Whiting had used, *without* checking to see if the 1999 Assignments would

affect that payment formula in any way.  (Nanke Dep. 100-102.)  Whiting's method for

calculating BWAB's payments did not *and could not* have taken into account the 1999

Assignments because they did not exist during Whiting's tenure.  Moreover, there is no evidence

that Whiting ever granted any additional rights to payment or any ORRIs subsequent to granting

the 1994 Assignment to BWAB.  Accordingly, it is impossible to determine whether Whiting

would have applied the terms of the 1994 Assignment as written and deducted any subsequently

granted burdens prior to calculating BWAB's 3.5% interest.  Delta mistakenly continued to pay

BWAB based on Whiting's payment method without considering the effect of the 1999

Assignments.  By the plain terms of the 1994 Assignment, the subsequent burdens should have

been deducted prior to calculating BWAB's 3.5% interest.

BWAB exaggerates when it argues that reading the 1994 Assignment as it is written

would render it an "illusory conveyance."  BWAB received a right to payment from a

specifically defined cash flow.  That right to payment was granted to BWAB as a finder's fee for

bringing the opportunity to the attention of Whiting.  There is nothing "absurd" about the fact

that, rather than grant a perpetual 3.5% payment from its own revenues as a mere finder's fee,

Whiting instead granted an interest that could diminish over time due to other interests or

burdens that Whiting or its successors may later grant to further their ability to exploit the

underlying interest.  Moreover, this approach places all holders of derivative interests in the

defined cash flow on equal footing.  Just as BWAB's 3.5% interest was taken out prior to paying

any of the 1999 Assignments, BWAB's 1994 Assignment would reflect the deductions of the

1999 Assignments.  In 1999, because Delta was only able to acquire the NOI—essentially the

same net cash flow defined in the 1994 Assignment—the 1999 Assignments were the exact same

species of interest as the 1994 Assignment:  rights to payment from a defined net revenue stream.

There is no basis in the documents to prioritize any one of those equivalent interests above any

other.

BWAB's argument here ultimately rests on the baseless conviction that the 1994

Assignment was an ORRI, and that therefore, it does not matter what the documents actually say.

For BWAB, an ORRI is a species of conveyance immune from these sorts of attacks.  The

problem with this argument is that there are no ORRIs at issue here.  There can be no dispute that

13

the 1994 Assignment did not convey to BWAB an interest in land or hydrocarbons.  It conveyed

a right to payment.  That right to payment was subject to "***all*** lessors royalties, overriding

royalties, and other burdens and payments."  That should be the end of the inquiry.

**III.    LIKE ITS 1994 INTEREST, BWAB'S 1999 INTEREST IS ONLY A RIGHT TO PAYMENT FROM A SPECIFICALLY DEFINED CASH FLOW.**

BWAB misstates the record when it asserts that "all evidence in this case points to the

fact that the NOI was in fact a real property interest."  (CMSJ 26.)  The *only* support BWAB

offers for this assertion is the testimony of Mr. Nanke that the NOI interest appeared to him to be

a "working interest."  (*Id.*)  BWAB relies on this statement exclusively despite the fact that Mr.

Nanke later admitted that he had never dealt with an "NOI" before and that "[i]t was not a typical

structure that [he] was used to applying."  (Nanke Dep. 103:6-14.)  The unique nature of this

interest was reiterated by the former CEO of Delta in his deposition.  (Larson Dep. 19:16-20

("[I]t's not a definitive term, legal term of art. . . .  You can't tell by looking at these words what

that means.").)  BWAB also ignores the significant evidence that directly contradicts its assertion

that Delta acquired a real property interest from Whiting:

- Delta originally contemplated two possible forms of acquisition from Whiting:  "a working interest **or** an equivalent net operating profits interest, or NOPI."  ((July 30, 1999, Delta Board Minutes) (attached hereto as Exhibit D)) (emphasis added).)

- The second option, the NOI, was considered a *lesser* interest (Larson Dep. 19:5-7).

- According to the fee agreement between Delta and BWAB, if Delta only acquired the NOI, then BWAB's 3% finder's fee interest would not need to be assigned in recordable form or with warranties of title.  (Roitman Decl. Ex. 6 (April 1, 1999, Agreement).)

- Delta and Whiting drafted an amendment to their agreement that would be triggered if Delta was not able to acquire the full bundle of rights it originally intended to acquire.  (Bullock Decl. Ex. C (August 25, 1999, Delta 8-K).)  Once triggered, that amendment would change the nature of the interest conveyed from

14

the full bundle of rights Delta initially sought to acquire, to the NOI as defined in the agreement. (*Id.*)

- The amendment was triggered because the other unit holders would not consent to Delta's full acquisition of Whiting's interests. (Larson Dep. 36:8-38:10.)

- Delta and all of its subsequent assigns were specifically instructed *not* to record their interests. (Larson 60:4-6 ("Whiting asked us not to [record] . . . I don't believe Whiting had even recorded its interest."); Roitman Dep. 80:8-17 ("It was requested by Delta that we don't record our assignment, and it had to do with notice to the other working interest owners in the unit and any of the partnerships they were involved with at point Arguello.").)

- Delta described the NOI in its own Annual Report as a "financial arrangement." (Larson Decl. Ex. 2.)

BWAB wants the Court to believe that the NOI, a novel financial arrangement contrived specifically to get around Delta's *inability* to acquire Whiting's full working interest, nonetheless conveyed to Delta the *same* bundle of real property rights as originally intended. (*See* Roitman Dep. 62:12-22 (the NOI conveyed the same "right, title, and interest" as the originally intended acquisition of Whiting's full interest).) But BWAB does not, and cannot, address how the NOI could have cured the concerns of other unit holders *and* conveyed a co-extensive bundle of rights in the Properties. (*Id.* 63:9-14 ("Q: If the outcome was the same [between the originally intended transaction and the NOI], how does that cure the concerns of the other partners and the lack of consents? A: That's a question I don't have an answer to.").) That is because the truth is far simpler. When it became clear to Delta that it could not acquire the full bundle of Whiting's rights—all its "right title, and interest" in the Properties—Delta instead acquired a merely economic interest in the form of a novel "financial arrangement," the NOI.

The 1999 Delta-Whiting Agreement unambiguously defines the NOI as the net "cash flow" that results from a specific calculation. A cash flow is not an interest in real property. It necessarily follows that the 1999 Assignments, all of which are derivative interests in that cash

flow, are not interests in real property.  They are contractual rights to payment of a portion of the

cash flow.[5]

IV.    **IF BWAB'S 1999 INTEREST ACTUALLY WERE A REAL PROPERTY INTEREST, THEN BWAB COULD HAVE PERFECTED THAT INTEREST.**

BWAB argues that its 1999 interest is a real property interest *and* that it would have been

impossible for it to perfect that interest due to Delta's failure to record the NOI (which BWAB

also contends is a real property interest).  (CMSJ 30-32.)  On that basis, BWAB asserts that the

1999 Interest is not avoidable under section 544(a)(3).  (*Id.*)  The parties briefed this issue

extensively in connection with Plaintiffs' motion for summary judgment.  The only new

argument that BWAB raises in the cross-motion is the assertion that it could not have sought a

declaration as to its property rights because it would not have had standing to do so.  (*Id.* 31.)

BWAB argues that because it had received payments pursuant to the 1999 Interest, there was no

existing controversy to form the basis for a declaratory action.  (*Id.* 30-31.)

BWAB's argument fails because a declaratory action could have been brought on the

basis of the immediate controversy regarding BWAB's ability to record its supposed real

property interest.  *See Environmental Defense Project of Sierra Cty. v. Cty. of Sierra*, 158 Cal.

App. 4th 877, 884 (Cal. Ct. App. 2008) ("The purpose of declaratory relief is 'to set

controversies at rest before they lead to repudiation of obligations, invasion of rights or

commission or wrongs.'") (citation omitted).  According to BWAB, in 1999, it believed that it

---

[5]    BWAB's last ditch effort to transform the 1999 NOI from a financial arrangement into a real property interest is to argue that the NOI can only be a rejected executory contract or a real property interest. (CMSJ 27-28.)  The NOI, however, is neither of these things.  The NOI is a fully executed contract that requires only the payment of money.  *See Indian River Homes, Inc. v. Sussex Trust Co.*, 108 B.R. 46, 50 (D. Del. 1989) (citing *In re Murtishi*, 55 B.R. 564, 569 (Bankr. N.D. Ill. 1985) ("It is well established that where all the elements of performance have been accomplished leaving only an obligation to pay money, the contract is not executory within the meaning of the statute.")). Accordingly, there was no need for the debtor to accept, reject, or elect to allow that contract to ride through the bankruptcy.

was receiving an interest in real property, even though this interest in real property was being

conveyed by an entity that had been instructed not to record its own supposed real property

interest, and that then instructed BWAB not to record *its* supposed real property interest.  (*See*

Larson 60:4-6 ("Whiting asked us not to [record] . . . I don't believe Whiting had even recorded

its interest."); Roitman Dep. 80:8-17 ("It was requested by Delta that we don't record our

assignment, and it had to do with notice to the other working interest owners in the unit and any

of the partnerships they were involved with at point Arguello.").)  Moreover, all of the

instructions not to record came after Delta had been forced to *change* the subject of its

acquisition of Whiting's interest from all of Whiting's right, title, and interest in the properties,

to a novel device called a Net Operating Interest.  (*See supra* Section III.)

As a supposed real property holder, at any point after the execution of the 1999

Assignments, BWAB could have challenged Delta's objection to recording the 1999 Interest as

well as Delta's attempt to enforce that objection by refusing to record its own interest, and

sought a declaration of its rights in the Properties.  *See Environmental Defense Project of Sierra

Cty.*, 158 Cal. App. 4th at 885 (A "controversy is 'ripe' when it has reached, but has not passed,

the point that the facts have sufficiently congealed to permit an intelligent and useful decision to

be made.").  Indeed, it is difficult to fathom why any entity that believes it holds an interest in

real property would simply accept an instruction not to record, rather than, at some point, seeking

to perfect and protect its interest.  BWAB cannot use its *choice* not to perfect its rights to nullify

section 544(a)(3).

The fact that BWAB could have taken steps to attempt to perfect its supposed real

property interest ultimately does not matter.  Any such effort would have failed—not because of

any non-existent standing problem, but because the 1999 Assignment did not convey a real

property interest.  Once again, BWAB's argument ultimately returns to and relies upon the same underlying assumption—that it was assigned genuine ORRIs.  But, as Plaintiffs have demonstrated here and in their own motion for summary judgment, the contracts at issue unambiguously contradict BWAB's foundational assumption.  BWAB  never held anything more than a right to payment from a defined cash flow.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court deny BWAB's cross-motion and grant Plaintiffs' motion for summary judgment.[6]

---

[6]    BWAB includes in its cross-motion a complaint regarding the discovery it has received to date in this action.  (CMSJ 33-34.)  BWAB, however, never raised any of its discovery issues with the Court, and instead allowed the discovery window to close on June 7, 2013.   BWAB also conceded to the Court at the June 25, 2013, status hearing that no further discovery was needed for the resolution of the parties' cross-motions for summary judgment.  BWAB's untimely complaint regarding discovery has no bearing on the cross-motions for summary judgment currently pending before the Court.

Dated:      July 5, 2013
            Wilmington, Delaware


                            */s/ Anthony W. Clark*_____
                            Anthony W. Clark (I.D. No. 2051)
                            Kristhy M. Peguero (I.D. No. 4903)
                            Skadden, Arps, Slate, Meagher & Flom LLP
                            One Rodney Square
                            P.O. Box 636
                            Wilmington, Delaware 19899-0636
                            Telephone: (302) 651-3000
                            Fax: (302) 651-3001

                            - and -

                            Ron E. Meisler
                            David R. Pehlke
                            Skadden, Arps, Slate, Meagher & Flom LLP
                            155 N. Wacker Dr.
                            Chicago, Illinois 60606
                            Telephone: (312) 407-0700
                            Fax: (312) 407-0411

                            *Counsel for Plaintiffs Delta Petroleum General Recovery Trust*
                            *and Par Petroleum Corporation*